IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

SOUTHWEST STAINLESS, LP, et al.    )
    )
    Plaintiffs,    )
    )
vs.    )
    )    Case No:  07-CV-334-CVE-FHM
JOHN R. SAPPINGTON, et al.,    )
    )
    Defendants.    )
    )

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

OF COUNSEL:

Timothy P. Reilly
reilly@taftlaw.com
Justin D. Flamm
flamm@taftlaw.com
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH  45202-3957
(513) 381-2838
(513) 381-0205 – FAX

J. Ronald Petrikin, OBA# 7092
Jason S. Taylor, OBA# 17755
Conner & Winters, LLP
4000 One Williams Center
Tulsa, OK  74172-0148
(918) 586-5683
(918) 586-8683 – FAX
rpetrikin@cwlaw.com
jtaylor@cwlaw.com

{W1195429.5}

## TABLE OF CONTENTS

Page

I.     STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................. 1

II.    ARGUMENT AND AUTHORITIES.................................................................................. 6

       A.     Southwest Cannot Prevail On The Restrictive Covenants At Issue (Count I)........ 6

              1.     The Seven-State Noncompete Restrictions Are Not Enforceable Under
                     Oklahoma Law............................................................................................. 6

              2.     Because The Seven-State Restrictions Are Not Enforceable Under
                     Oklahoma Law,  Florida Law Cannot Be Applied. .................................... 7

              3.     Sappington And Emmer Have Not Violated The Noncompete Provisions,
                     And Southwest Has Suffered No Damages. .............................................. 11

              4.     Emmer's 2000 Retirement, Though Brief, Started The Clock On Any
                     Post-Employment Obligations. ................................................................. 12

       B.     The 1997 Acquisition Agreement Contains No Ongoing Obligations (Count II) 13

       C.     Southwest Has Not Established Any Actionable Interference With Its Business
              Relations (Count III) ............................................................................................ 15

       D.     Neither Sappington Nor Emmer Breached Any Duty Of Loyalty (Count IV) ..... 16

       E.     Neither Siegenthaler Nor Rolled Alloys Have Interfered With Southwest's
              Contractual Relations (Count V) .......................................................................... 18

       F.     Southwest Cannot Establish Any Trade Secrets, Much Less Any Misappropriation
              (Count VI)............................................................................................................. 19

III.   CONCLUSION................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**                                                                                          Page

*Beck v. Lazard Freres &  Co.*, 175 F.3d 913 (11th Cir. 1999) ......................................................11

*Boyd Rosene and Associates, Inc. v. Kansas Municipal Gas Agency*,
  174 F.3d 1115 (10th Cir. 1999) ...............................................................................10

*Daniels v. Union Baptist Ass'n*, 55 P.3d 1012 (Okla. 2001) ..........................................................18

*Digital Design Group, Inc. v. Information Builders, Inc.*,
  24 P.3d 834 (Okla. 2001)...........................................................................................11

*Dill v. City of Edmond*, 155 F.3d 1193 (10th Cir. 1998) ...............................................................15

*Eakle v. Grinnell Corp.*, 272 F. Supp. 2d 1304 (E.D. Okla. 2003)............................................9, 10

*Freeman v. Sikorsky Aircraft Corp.*, No. 04-CV-0506-CVE-SAJ, 2006 WL 2385311
  (N.D. Okla. Aug. 17, 2006) ...............................................................................18, 19

*In re Professional Home Health Care, Inc.*, 159 Fed. Appx. 32 (10th Cir. 2004) .......................17

*Gumberg v. Janis Servs., Inc.*, 847 So. 2d 1048 (Fla. Dist. Ct. 2003).........................................11

*Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486 (Colo. 1989)....................................................18

*MidAmerica Constr. Mgt., Inc. v. Mastec North Am., Inc.*,
  436 F.3d 1257 (10th Cir. 2006) ........................................................................7, 8, 9

*Mirville v. Mirville*, 10 Fed. Appx. 640 (10th Cir. 2001) ..............................................................9

*Navistar Int'l Transp. Corp. v. Vernon Klein Truck & Equip.*, 919 P.2d 443
  (Okla. App. 1994) ...................................................................................................15

*Oliver v. Omnicare, Inc.*, 103 P.3d 626 (Okla. Civ. App. 2004) ........................................6, 7, 8, 9

*SEB S.A. v. Sunbeam Corp.*, 148 Fed. Appx. 774 (11th Cir. 2005)...............................................11

*Stumpf v. Montgomery*, 226 P. 65 (Okla. 1924).........................................................................10

*Veiser v. Armstrong*, 688 P.2d 796 (Okla. 1984).......................................................................10

*Wankier v. Crown Equip. Corp.*, 353 F.3d 862 (10th Cir. 2003) ...................................................7

*Weber v. Continental Casualty Co.*, 379 F.2d 729 (10th Cir. 1967) ..............................................10


**Other Authorities**

Restatement (Second) Agency § 393, cmt. e ...............................................................................18


**Statutes**

Fed. R. Civ. P. 11 .........................................................................................................................17

Fed. R. Civ. P. 30(b)(6)..............................................................................................................21

Fed. R. Civ. P. 56........................................................................................................................1, 17

Fla. Stat. § 542.335(d)(3) ............................................................................................................10

Fla. Stat. § 542.335(e)..................................................................................................................10

Fla. Stat. § 90.301 - 90.304.........................................................................................................10

LCvR 56.1......................................................................................................................................1

Okla. Stat. tit. 15, § 217 .............................................................................................................6, 9

Okla. Stat. tit. 15, § 218 .............................................................................................................7, 9

Okla. Stat. tit. 15, § 219A ............................................................................................................6

Okla. Stat. tit. 78, § 86(4)........................................................................................................19, 21

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

SOUTHWEST STAINLESS, LP, et al.        )
                                        )
                    Plaintiffs,         )
                                        )
vs.                                     )
                                        )        Case No:  07-CV-334-CVE-FHM
JOHN R. SAPPINGTON, et al.,             )
                                        )
                    Defendants.         )
                                        )

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Come now Defendants John Sappington, William Emmer, Ron Siegenthaler, and Rolled

Alloys, Inc. (collectively "Defendants"), pursuant to Federal Rule of Civil Procedure 56 and

LCvR 56.1 for the Northern District of Oklahoma, and move the Court for an order granting

summary judgment in favor of Defendants and against Plaintiffs Southwest Stainless, LP and HD

Supply, Inc.[1] on the six causes of action in the Second Amended Complaint.  In support of this

Motion, Defendants show the Court that the undisputed facts establish that there is no genuine

issue as to any material fact and that Defendants are entitled to judgment as a matter of law on all

claims in the Second Amended Complaint.

**I.        STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.        Rolled Alloys, which has its home office in Temperance, Michigan, has been

serving the Tulsa market for several decades.  (Tom Nichol Dep. at 78, 91-92[2]; Ron Siegenthaler

Decl., Dkt. #25, at ¶ 4)  The company had a full-time salesperson covering Tulsa at various

_____

[1] Southwest sought to add HD Supply, Inc. as a plaintiff for an explicitly limited purpose: "in an abundance of
caution and to resolve any question as to whether Plaintiff Southwest Stainless LP has standing to enforce the
Agreements at issue."  (Dkt. #61 at 1)  In granting Southwest's motion for leave to amend the complaint, the Court
noted that Southwest "joins HD Supply merely to ensure that at least one entity has standing."  (Dkt. #68 at 7)
Given HD Supply's nominal role in this case, Defendants refer to the two Plaintiffs (along with their supposed
predecessor entities) as "Southwest."
[2] Deposition excerpts are attached.

points, and other salespersons have also targeted Tulsa customers despite being based elsewhere. (Nichol Dep. at 91-92; Siegenthaler Decl., Dkt. #25, at ¶ 4)

2.      Rolled Alloys' involvement with the Tulsa market also included a working relationship with Southwest that dated back into the 1990s.  (Nichol Dep. at 93)  The two businesses had a nonexclusive customer-supplier relationship through which customers could buy Rolled Alloys products using Southwest as a middleman.  (Nichol Dep. at 93; Southwest Dep. at 229)

3.      The metals industry is a commodity business.  (Jon Murphy Dep. at 96)  For any given order, customers solicit quotes from various competing suppliers and choose who will get the business based on the quotes.  (Pete Kaup Dep. at 15-16)  Southwest does not have any customers who make purchases exclusively from Southwest.  (Southwest Dep. at 143; Murphy Dep. at 96; Kaup Dep. at 17; Dan Sisney Dep. at 121)  Southwest gets orders from customers who have awarded other work to Southwest's competitors.  (Kaup Dep. at 17-18)  Customers such as Flowell, for example, will choose between Rolled Alloys and Southwest based on price. (Sisney Dep. at 86-87)

4.      Ron Siegenthaler started working in the metals industry in 1965.  (Siegenthaler Decl., Dkt. #25, at ¶ 3)  He was one of the founders of Metals, Inc., which was acquired by Hughes Supply, Inc. in 1997.  (Id. ¶ 2)  Siegenthaler played a prominent role at Metals, Inc., and he developed extensive contacts throughout the industry with customers and suppliers. (Siegenthaler Dep. at 73; Siegenthaler Decl., Dkt. #25, at ¶ 3)

5.      In 2006, Siegenthaler approached Tom Nichol, President of Rolled Alloys, about the possibility of helping Rolled Alloys expand its existing market presence in the Tulsa area. (Siegenthaler Dep. at 32-34; Nichol Dep. at 53-54)  Siegenthaler had been out of the industry for

several years at that point.  (Siegenthaler Dep. at 28; Siegenthaler Decl., Dkt. #25, at ¶ 3; Mike

Stanwood Dep. at 137)  After a series of discussions, Siegenthaler began working as a consultant

on behalf of Rolled Alloys, opening and running a Tulsa office for Rolled Alloys.  (Siegenthaler

Dep. at 49-50; Siegenthaler Decl., Dkt. #25, at ¶ 1)

      6.      Siegenthaler also has responsibility for developing business for Rolled Alloys.

(Siegenthaler Dep. at 41)  In doing so, Siegenthaler has used his extensive industry contacts,

most of whom remained in place during Siegenthaler's hiatus from the industry.  (Siegenthaler

Dep. at 115; Siegenthaler Decl., Dkt. #25, at ¶ 5)  Additionally, Rolled Alloys has a dedicated

business development division that seeks to obtain new business for the company.  (Siegenthaler

Dep. at 115)

      7.      From Southwest's perspective, Rolled Alloys' decision to open a Tulsa office

meant that Southwest was being bypassed as a middleman for Rolled Alloys' product.

(Southwest Dep. at 229)

      8.      Siegenthaler has known John Sappington since 1974, and the two were among the

co-owners of Metals, Inc.  (Siegenthaler Dep. at 9; Siegenthaler Decl., Dkt. #25, at ¶ 6)  In 2006,

Siegenthaler told Sappington about Siegenthaler's discussions with Rolled Alloys and asked if

Sappington had any interest in working with him.  (Siegenthaler Dep. at 44; Sappington Dep. at

44)  Over the course of several discussions, Sappington expressed some possible interest.

(Siegenthaler Dep. at 44; Sappington Dep. at 53, 56-57)

      9.      At the time, Sappington had complete authority for Southwest's Tulsa operations.

According to Mike Stanwood, Southwest's President and Sappington's supervisor:  "It was his to

run."  (Stanwood Dep. at 33)

10.     Around the same time, Siegenthaler was also talking with Emmer about the possibility of Emmer joining Rolled Alloys.  (Emmer Dep. at 12-15)  Emmer did not know that Siegenthaler was having similar discussions with Sappington.  (*Id.* at 16)  Likewise, Sappington did not know that Siegenthaler and Emmer were discussing this possibility, and Sappington did not discuss Rolled Alloys with Emmer.  (Sappington Dep. at 50-51; Emmer Dep. at 16)  Sappington did not even know that Emmer was joining Rolled Alloys until Emmer actually left Southwest.  (Sappington Dep. at 59)

11.     In late February 2007, Siegenthaler extended an offer for Emmer to join Rolled Alloys.  (Emmer Dep. at 18-19)  Emmer accepted the offer and began work at Rolled Alloys on or about March 8, 2007.  (*Id.* at 26)  At that time, Emmer's responsibilities for Southwest were limited to handling freight claims and other paperwork.  (*Id.* at 94; Murphy Dep. at 40; Kaup Dep. at 119; Sisney Dep. at 37)  He had long since phased out of any sales responsibilities, and he had not kept his industry contacts intact.  (Emmer Dep. at 38-39; Murphy Dep. at 40)

12.     This was not the first time that Emmer had left Southwest.  In 2000, Emmer retired from Southwest, which threw a retirement party to commemorate the occasion.  (Emmer Dep. at 34)  But retirement did not agree with Emmer -- or, perhaps more to the point, Emmer's wife -- and just days later he arranged with Sappington to resume working at Southwest.  (*Id.* at 35-36)  Emmer does not know how Southwest handled his short-lived retirement on its books.  (*Id.* at 36)

13.     During another discussion with Siegenthaler in late March 2007, Sappington decided to accept employment with Rolled Alloys and communicated that decision to Siegenthaler on the spot.  (Sappington Dep. at 157, 282)  Sappington started with Rolled Alloys

on April 9, 2007.  (*Id.* at 30)  Sappington took no documents or Southwest materials (including even his personal contact list) with him when he left Southwest.  (*Id.* at 238)

14.     Sappington and Emmer each were parties to 1997 agreements that purported to limit them from competing with Southwest for one year post-employment in seven states: Missouri, Texas, Oklahoma, Tennessee, Louisiana, Alabama, and Florida.  (*Id.* at 81, 96; Emmer Dep. at 12)

15.     Siegenthaler and Nichol agreed that Rolled Alloys would seek to honor the terms of the noncompete agreements with regard to Sappington and Emmer's work.  (Siegenthaler Dep. at 75; Nichol Dep. at 27-28, 30)  Accordingly, from the time when Siegenthaler was first in discussions with Sappington and Emmer about joining Rolled Alloys, Siegenthaler took steps to ensure that they would not be selling competitive products in the seven states.  (Siegenthaler Dep. at 66, 70)  Sappington's role was to be an outside salesperson for territories other than the seven states, and Emmer's role was to serve as inside salesperson for the same territories.  (*Id.* at 70, 72)

16.     Siegenthaler did not need to rely on the relationships that Sappington had with customers; Siegenthaler has business relationships of his own with most of the same customers, and Rolled Alloys does as well.  (*Id.* at 73; Sappington Dep. at 119)  Nor did Siegenthaler need information from Sappington or Emmer -- neither of them brought documents to Rolled Alloys from Southwest.  (Siegenthaler Dep. at 80)  They have not disclosed any information about Southwest's customers, vendors, pricing, margins, financial information, or business methods. (*Id.* at 80-82)

17.     Since they joined Rolled Alloys, Sappington and Emmer have primarily covered Kansas, Arkansas, Colorado, and New Mexico.  (*Id.* at 79; Emmer Dep. at 20)  Rolled Alloys

had only sparse sales coverage for these areas when Sappington and Emmer joined.

(Siegenthaler Dep. at 71)

18.     Sappington and Emmer are restricted from selling to customers within the seven-state territory named in the noncompetition provisions.  (*Id.* at 79)  When Sappington and Emmer have come into contact with customers from within the seven states, each has told the customers that they cannot discuss business matters.  (Sappington Dep. at 123-25; Emmer Dep. at 20, 105)  Siegenthaler has directed other Rolled Alloys employees in Tulsa not to even talk with Sappington or Emmer about customers within those seven states.  (Lesikar Dep. at 14)

19.     The only exception to the limitations on Sappington and Emmer in the seven states is for customers who are aerospace industry end-users.  (Sappington Dep. at 61)  Because Southwest does not sell to aerospace industry end-users, this work is not competitive with Southwest.  (Southwest Dep. at 15, 19; Stanwood Dep. at 124; Kaup Dep. at 111)

## II.     ARGUMENT AND AUTHORITIES

### A.     <u>Southwest Cannot Prevail On The Restrictive Covenants At Issue (Count I)</u>

#### 1.     The Seven-State Noncompete Restrictions Are Not Enforceable Under Oklahoma Law.

The noncompete provisions at issue are not enforceable under Oklahoma law.  Both the Employment Agreements and the Noncompetition Agreements contain the same restriction, which would purport to prevent competition with Southwest anywhere in a seven-state area.  The Employment Agreements, which recite that they were made so that Southwest's supposed predecessor could "avail itself of the services" of Sappington and Emmer, are governed by Okla. Stat. tit. 15, § 217, which voids them.[3]  Because the Noncompetition Agreements recite that they

---

[3] The agreements at issue were executed in 1997.  Because Okla. Stat. tit. 15, § 219A was not enacted until 2001, it has no application here.  *Oliver v. Omnicare, Inc.*, 103 P.3d 626, 629 (Okla. Civ. App. 2004) ("The law in force when an agreement is made effective determines the validity and effect of the agreement.").

were made by Sappington and Emmer to "induce" Southwest's supposed predecessor to "consummate" the acquisition of Metals, Inc., the Oklahoma provision applicable to those agreements is Okla. Stat. tit. 15, § 218.  This statute allows only narrow noncompete restrictions in this context, limited to "a specified county and any county or counties contiguous thereto, or a specified city or town."  The Noncompetition Agreements, however, purport to limit competition in roughly half of the southeastern United States; thus, the seven-state restrictions cannot be enforced under Section 218 because they are far more broad than allowed by the statute.   The seven-state noncompete restrictions cannot be enforced consistent with Oklahoma law.

> ### 2.      Because The Seven-State Restrictions Are Not Enforceable Under Oklahoma Law,  Florida Law Cannot Be Applied.

Because the seven-state restrictions are not enforceable under Oklahoma law, Florida law cannot be applied to the agreements.  In diversity-jurisdiction cases like this one, "federal courts must look to the forum state's choice-of-law rules to determine the effect of a contractual choice-of-law clause." *MidAmerica Constr. Mgt., Inc. v. Mastec North Am., Inc.*, 436 F.3d 1257, 1260 (10th Cir. 2006).  Once the Tenth Circuit has rendered an opinion on an issue of state law, "that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue." *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003).

A 2004 decision by the Court of Civil Appeals of Oklahoma makes clear how Oklahoma law handles choice-of-law clauses in noncompetition agreements.  In *Oliver v. Omnicare, Inc.*, 103 P.3d 626 (Okla. Civ. App. 2004), the court first reiterated the longstanding rule that a contractual designation of a particular state's law cannot be upheld if "contrary to the law or public policy of the state where enforcement of the contract is sought." *Id.* at 628.  The court then addressed whether applying Ohio law, which was designated in the noncompetition

contract, "would violate the law or public policy of Oklahoma." *Id.*  In turn, "[p]ublic policy is **synonymous** with the policy of the law, expressed by the manifest will of the state which may be found in the Constitution, statutory provisions, and judicial records." *Id.* (emphasis added).

To make this public policy determination, the *Oliver* court held that the noncompete provision must first be analyzed under Oklahoma law.  The court stated:

> Ohio law, then, may be only used to govern this agreement if it does not violate the provisions of Oklahoma law with respect to contracts in restraint of trade.  Accordingly, the trial court correctly looked to Oklahoma law to determine whether the public policy of Oklahoma would be violated by enforcement of the non-competition provision.

*Id*. at 628-29 (internal citations omitted).  In other words, if the noncompete would not be enforceable under Oklahoma law, the Ohio choice-of-law clause could not be given force.

In the *MidAmerica* case cited above, the Tenth Circuit followed *Oliver* on its choice-of-law analysis.  At issue was a commercial contract containing what the court called a "pay-if-paid" clause (i.e., the general contractor had to pay its subcontractor only if the general contractor was actually paid by the customer).  *MidAmerica*, 436 F.3d at 1259.  Addressing first the parties' assertion that the laws of New Mexico and Texas applied under the contract, the court noted that it "must determine whether the application of those states' laws . . . would violate the law or public policy of Oklahoma as expressed in the state's constitution, statutes, or judicial records." *Id.* at 1260 (citing *Oliver*).  As required by *Oliver*, the Tenth Circuit then considered whether the clause was enforceable under Oklahoma law.  The court stated:

> Enforcing this clause does not yield a result that violates the law or public policy of Oklahoma.  There are no Oklahoma cases interpreting "pay-if-paid" clauses . . . and thus there are no Oklahoma cases stating that Oklahoma does not enforce such clauses. . . .  There is no constitutional or statutory prohibition against "pay-if-paid" clauses in Oklahoma.  Therefore, we apply

  
> Texas and New Mexico law in interpreting the Subcontract
> Agreement.

*Id.* at 1260-61.  Conversely, there is an Oklahoma statutory provision prohibiting geographically expansive noncompetes.

Taken together, *Oliver* and *MidAmerica* require the Court to first analyze the noncompetition covenants under Oklahoma law.  If the covenants would not stand under Oklahoma law, then the reference to Florida law in the agreements is of no effect.  As discussed in Section II.A.1, the noncompete restrictions run afoul of Oklahoma statutory provisions -- which are synonymous with the public policy of Oklahoma under *MidAmerica* and *Oliver*.  Given the public policy violation presented by the noncompete terms that Southwest now seeks to enforce, Florida law cannot apply to the agreements.  The broad provisions of Fla. Stat. § 543.335, Florida's noncompete statute, simply cannot be reconciled with the strict geographic limits imposed upon noncompetes by Okla. Stat. Tit. 15, §§ 217 and 218.

Earlier in this litigation, Southwest erroneously relied upon *Eakle v. Grinnell Corp*., 272 F. Supp. 2d 1304 (E.D. Okla. 2003), for the proposition that a "mere difference" in state law does not implicate the public policy element of Oklahoma's choice-of-law analysis.  The *Eakle* court found that some "broader concept of public policy is required."  *Id.* at 1312.  Yet *Eakle* was decided in 2003 -- *before* both *Oliver* and *MidAmerica* established the governing standard for Oklahoma choice-of-law issues within the Tenth Circuit and confirmed that that Oklahoma's public policy is synonymous with its statutes.  Thus, no "broader concept" must be implicated before a choice-of-law provision will fall under the current state of the law.  Further, the *Eakle* opinion relied upon *Mirville v. Mirville*, 10 Fed. Appx. 640 (10th Cir. 2001), an unpublished Tenth Circuit case decided under Kansas law, not Oklahoma law -- and in any event the published, more recent decision in *MidAmerica* would control over *Mirville*.  The *Eakle* court

expressed concern that the public policy exception could swallow the rule -- and that may indeed be true -- but this is how Oklahoma's courts and the Tenth Circuit have decided it shall be. Whatever persuasive authority may have been found in the *Eakle* decision has been supplanted by subsequent decisions that now govern this case.

An independent reason not to apply Florida law is that its noncompete statute would require this Court to apply a series of presumptions. *See* Fla. Stat. § 542.335(d)(3) ("a court shall presume reasonable in time any restraint 3 years or less" where restrictions apply to sellers of a corporation's shares); Fla. Stat. § 542.335(e) ("a court shall presume reasonable in time any restraint of 5 years or less" where the restrictions protect trade secrets). These presumptions are further defined under Florida's Evidence Code. *See* Fla. Stat. § 90.301 - 90.304.

The Tenth Circuit has noted that "[i]n Oklahoma, a presumption is merely a 'procedural tool for ordering proof' . . . ." *Weber v. Continental Casualty Co*., 379 F.2d 729, 732 (10th Cir. 1967) (quoting *Stumpf v. Montgomery*, 226 P. 65 (Okla. 1924)). In turn, Oklahoma's choice-of-law rules require that matters of procedure be decided under Oklahoma law. As the court stated in *Boyd Rosene and Associates, Inc. v. Kansas Municipal Gas Agency*, 174 F.3d 1115 (10th Cir. 1999):

> Oklahoma choice-of-law principles require a court to apply Oklahoma rules to procedural matters even when those principles require the application of the substantive law of another jurisdiction. See *Veiser v. Armstrong*, 688 P.2d 796, 799 n. 6 (Okla. 1984) ("In a conflict-of-law analysis matters of procedure are governed by the law of the forum.").

*Id*. at 1118-19 (citations omitted). Although the Florida noncompete statute purports to be substantive in nature, it is inextricably intertwined with a series of presumptions that cannot be reconciled with the mandate that Oklahoma law govern all procedural matters. For this additional reason, the Florida law provision in the contracts cannot be enforced.

>    **3.     Sappington And Emmer Have Not Violated The Noncompete**
>    **Provisions, And Southwest Has Suffered No Damages.**

Regardless of which state's law is applied by the Court, Southwest cannot prevail on Count I of the Second Amended Complaint because it cannot satisfy two essential elements required to prove a breach of contract claim.  Oklahoma law and Florida law are similar with regard to this cause of action (despite their marked dissimilarity on the substantive treatment of restrictive covenants).  Oklahoma requires, *inter alia*, breach of the agreement as well as "damages as a direct result of the breach."  *Digital Design Group, Inc. v. Information Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001).  Likewise, Florida law requires proof of both damages and a *material* breach of the contract.  *See, e.g.*, *SEB S.A. v. Sunbeam Corp.*, 148 Fed. Appx. 774, 790 (11th Cir. 2005) (stating that breach of contract claim requires both a material breach and damages under Florida law) (citing *Gumberg v. Janis Servs., Inc.*, 847 So. 2d 1048, 1049 (Fla. Dist. Ct. 2003)); *Beck v. Lazard Freres & Co.*, 175 F.3d 913, 914 (11th Cir. 1999) (same).

First, there has been no breach of the agreements.  As noted above, Sappington's role with Rolled Alloys is that of an outside salesperson for territories other than the seven states named in the restrictive covenants, and Emmer's role is an inside salesperson for the same territories.  (Siegenthaler Dep. at 70, 72)  Rolled Alloys and Siegenthaler have voluntarily restricted Sappington and Emmer from selling to customers within the seven-state area.  (*Id.* at 79)  They are not even permitted to talk with other Rolled Alloys employees in Tulsa about customers within those seven states.  (Lesikar Dep. at 14)

Additionally, Southwest cannot show that it has been damaged by Sappington or Emmer.  Southwest has not lost any customers to Rolled Alloys.  (Kaup Dep. at 150; Sisney Dep. at 121-22)  As for specific orders from the two companies' mutual customers, Southwest's Rule 30(b)(6) deposition witness could cite only two orders that it believes it lost to Rolled Alloys

because of Sappington -- a John Zink order and a Hughes-Anderson order.  (Southwest Dep. at 216-17)  However, Southwest conceded that it had no evidence to suggest Emmer had diverted any business away from it.  (*Id.* at 220; Kaup Dep. at 139)  And Southwest begrudgingly admitted having no evidence that Sappington was involved with those orders in any way on behalf of Rolled Alloys.  (Southwest Dep. at 183-84, 186-88)  Sappington's own uncontradicted testimony establishes that he has not worked with either of those customers since joining Rolled Alloys.  (Sappington Dep. at 198, 270-71)

Southwest's current managing agent for its Tulsa operations, Dan Sisney, claimed that Southwest lost an order from each of two additional customers, but he conceded having no proof that Sappington or Emmer had anything to do with those.  (Sisney Dep. at 123-25)  Southwest's business relationship with those four customers remains intact, as it has had additional orders from all of them since Sappington and Emmer joined Rolled Alloys.  (Southwest Dep. at 225-26)

Because Southwest has no evidence to prove a breach of contract or damages, it cannot prevail on Count I.  Summary judgment should be granted in Defendants' favor as a result.

### 4.    Emmer's 2000 Retirement, Though Brief, Started The Clock On Any Post-Employment Obligations.

Emmer's retirement in 2000, albeit brief, was a break in service that started the clock on any post-employment restrictions that applied to him under the 1997 agreements.  (Emmer Dep. at 34)  The one-year noncompetition period therefore would have expired no later than 2001.  Had Southwest wished to secure new restrictions from Emmer, it was free to do that during the years that followed his short break in service.  Having failed to do so, Southwest should not now be permitted to enforce any restrictions against Emmer.  For this additional reason, summary judgment in Emmer's favor is appropriate on Count I of the Second Amended Complaint.

**B.      The 1997 Acquisition Agreement Contains No Ongoing Obligations
(Count II)**

Count II of the Second Amended Complaint claims that Sappington, Emmer, and

Siegenthaler breached the 1997 Acquisition Agreement by which Metals, Inc. was sold.  Yet

nowhere does the Second Amended Complaint cite any language from the Agreement that has

been violated.  The sole references in the Second Amended Complaint to the Acquisition

Agreement itself are to sections 5.9 and 5.10, which read in their entirety as follows:

> 5.9    Employment Agreements.  At the closing, Mr. Siegenthaler
> and the Metals Group shall have executed a Consulting
> Agreement in the form of Exhibit 5.9(a) attached hereto,
> and Messrs. Emmer [and] Sappington . . . shall have each
> executed his Employment Agreements with the appropriate
> corporation of the Metals Group annexed hereto as Exhibits
> 5.9(b) through (h).

> 5.10   Non-Competition Agreements.  At the Closing each of the
> Stockholders shall have executed their respective Non
> Competition Agreements annexed hereto as Exhibits
> 5.10(a) through (h).

(Acquisition Agreement at 22-23)  These provisions do not support a breach of contract claim

because they are merely conditions precedent; indeed, all that Article V of the Acquisition

Agreement contains is "Conditions Precedent to the Obligation of the Purchaser to Close."  (*Id.*

at 22)  The record does not support a claim that these conditions were not satisfied.  Regardless,

had Sappington, Emmer, or Siegenthaler failed to satisfy these provisions, the purchaser had two

options:  refuse to close, or waive the conditions and proceed with the purchase.

An independent review of the Acquisition Agreement confirms that it contains no other

language providing a colorable basis for a breach of contract claim.  Subject only to an

inapplicable exception, the Acquisition Agreement provided that all post-closing obligations

therein expired in 1998:

> 8.1   <u>Survival</u>.  Except as otherwise provided in Section 4.5 of
> this Agreement [pertaining to registration of Hughes
> Supply, Inc. stock], the parties hereto agree that their
> respective representations, warranties, covenants and
> agreements contained in this Agreement shall survive the
> Closing for a period of one (1) year from the Closing Date
> (the "Indemnification Period."). . . .

(Acquisition Agreement at 25)  Accordingly, the Second Amended Complaint's claims for

breach of the Acquisition Agreement fail as a matter of law.

Should Southwest attempt to fold the separate Non-Competition Agreements and

Employment Agreements into the Acquisition Agreement (as suggested by the Second Amended

Complaint at ¶¶ 21, 23), the plain language of the separate agreements does not allow this result.

As for the Employment Agreements, they note the existence of the Acquisition Agreement

before reciting their own purpose -- to ensure the continued employment of Sappington and

Emmer.  (Employment Agreements at p. 1)  The Employment Agreements also state as follows:

> Except as provided in the Non-Competition Agreement of even
> date herewith, this Agreement represents the entire understanding
> and agreement between the parties with respect to the subject
> matter hereof, and supersedes all of the negotiations,
> understandings and representations (if any) made by and between
> such parties.

(Employment Agreements at ¶ 12)  Because the closing under the Acquisition Agreement was

deemed effective at 12:00 a.m. on January 24, 1997 -- which is also the date of the Employment

Agreements -- this integration clause means that Southwest cannot turn to the Acquisition

Agreement as a basis for its claims.  (Acquisition Agreement at ¶ 7.1)

The Non-Competition Agreements contain a similar integration clause at paragraph 17,

so they too preclude a claim based on the Acquisition Agreement.  Further, those contracts state

that "[t]he covenants of Stockholder under this Agreement shall be independent of any other

contractual relationship between Hughes and Stockholder."  (Non-Competition Agreements at ¶ 13)

Count II of the Second Amended Complaint is based on the Acquisition Agreement alone.  However, Southwest has not actually alleged any violations of the Acquisition Agreement because the restrictive covenants at issue are in the standalone Employment Agreements and Noncompetition Agreements on which Count I is based.  And were Southwest successful in conflating the separate agreements into the Acquisition Agreement, the one-year survival provision in Section 8.1 of that contract would mean that all obligations terminated in 1998.  Additionally, Southwest's President, Mike Stanwood, confirms that Siegenthaler was out of the industry altogether for more than one year, meaning there was no reason he could not work for Rolled Alloys in any capacity he chose.  (Stanwood Dep. at 137)

For all of the above reasons, Southwest's claims based on the Acquisition Agreement cannot succeed.  Summary judgment on Count II of the Second Amended Complaint should be granted in Defendants' favor, based on the undisputed facts.

### C.    Southwest Has Not Established Any Actionable Interference With Its Business Relations (Count III)

Count III of the Second Amended Complaint claims interference with business relations.  To prevail on this cause of action, Southwest must show all of the following:

> In order to recover for a state law claim for tortious interference with business relations, Plaintiff must prove: (1) that he had a contractual right that was interfered with; (2) that such interference was malicious or wrongful and was not justified, privileged or excusable; and (3) that damages resulted from the interference.

*Dill v. City of Edmond*, 155 F.3d 1193, 1207-08 (10th Cir. 1998) (citing *Navistar Int'l Transp. Corp. v. Vernon Klein Truck & Equip.*, 919 P.2d 443, 446 (Okla. App. 1994)).  Plaintiff can show none of these.

As to the first element, Southwest does not have any customers who are exclusive to it, and customers solicit quotes from various competing suppliers before choosing -- sometimes based solely on price -- who will get their business on any particular order.  (Southwest Dep. at 143; Murphy Dep. at 96; Kaup Dep. at 15-17; Sisney Dep. at 86-87, 121)  Southwest gets orders from customers who have awarded other work to Southwest's competitors.  (Kaup Dep. at 17-18)  In other words, Southwest has no colorable claim (much less a contractual right) to continued business from these mutual customers of Southwest and Rolled Alloys.  Even with regard to the orders from John Zink and Hughes-Anderson that Southwest claims Rolled Alloys diverted, Southwest was merely quoting the work; nothing had been awarded when Sappington left.  (Legrand Dep. at 163)

Southwest also fails on the second element, that of malicious or wrongful interference.  Sappington and Emmer have not interfered in Southwest's relationships with customers in the seven states because they do not sell to those customers.  (Siegenthaler Dep. at 79)  Further, Southwest conceded at deposition that it had no evidence of malicious conduct by Sappington or Emmer, at whom this claim is directed.  (Southwest Dep. at 273)

The last element is damages.  As discussed in Section II.A.3 above, Southwest cannot prove any.  For this and all of the above reasons, summary judgment should be granted against Southwest on Count III.

### D.  Neither Sappington Nor Emmer Breached Any Duty Of Loyalty (Count IV)

Although Southwest has alleged a breach of fiduciary duty of loyalty against Sappington and Emmer in Count IV of the Second Amended Complaint, the record does not support this claim.  As for Emmer, Southwest and its managing agents have repeatedly admitted knowing of no pre-resignation actions whatsoever that were not in the best interests of Southwest.  (Southwest Dep. at 153; *see also* Stanwood Dep. at 136; Sisney Dep. at 129)  The claims against

Emmer in Count IV appear questionable under a Fed. R. Civ. P. 11 analysis, and they certainly cannot withstand a Fed. R. Civ. P. 56 analysis.

With regard to Sappington, the crux of Southwest's complaint is that he did not tell Mike Stanwood about Rolled Alloys increasing its market presence in Tulsa.  (Southwest Dep. at 145-153)  However, Stanwood himself admits that the Tulsa operation of Southwest was under Sappington's complete authority and control.  (Stanwood Dep. at 33)  During Sappington's tenure running the Tulsa operations for Southwest, Stanwood was content to have very little interaction with him; the two usually spoke only once or twice a month, they seldom exchanged e-mails, and Stanwood came to Tulsa on just four occasions *ever* during the many years Sappington was there.  (*Id.* at 32-33; Sappington Dep. at 179)  In short, Sappington was in charge of Tulsa and had no reason to notify Stanwood that Rolled Alloys might be expanding in the area.

Southwest also makes much of certain operational issues that it now seeks to pin on Sappington.  (Southwest Dep. at 145-153)  Yet Stanwood was aware of all of these issues when he decided in 2007 to award Sappington a large -- and entirely discretionary -- bonus payment with no strings attached.  (Stanwood Dep. at 75-76)  Had Sappington been performing poorly, much less breaching any fiduciary duty of loyalty to Southwest, Stanwood would have had no reason to reward him like this.

Although Oklahoma law does not appear to be well-developed on the issues underlying Count IV of the Second Amended Complaint, persuasive authority confirms that Southwest has no claim here.  *See, e.g.*, *In re Professional Home Health Care, Inc.*,  159 Fed. Appx. 32, 34 (10th Cir. 2005) ("Employees do enjoy a privilege which enables them to prepare or make arrangements to compete prior to leaving the employ of their future competitors.") (citing *Jet*

*Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 497 (Colo. 1989) and Restatement (Second) Agency § 393, cmt. e). Southwest cannot prevail on Count IV, and summary judgment is thus appropriate for Sappington and Emmer.

> **E.** **Neither Siegenthaler Nor Rolled Alloys Have Interfered With Southwest's Contractual Relations (Count V)**

Southwest claims in Count V that Siegenthaler and Rolled Alloys tortiously interfered with the contracts between Southwest and Sappington and Emmer. This claim requires Southwest to show "malicious and wrongful" interference that was "neither justified, privileged nor excusable." *Freeman v. Sikorsky Aircraft Corp.*, No. 04-CV-0506-CVE-SAJ, 2006 WL 2385311, at *4 (N.D. Okla. Aug. 17, 2006) (quoting *Daniels v. Union Baptist Ass'n*, 55 P.3d 1012, 1015 (Okla. 2001)). Southwest can make no such showing because both Siegenthaler and Rolled Alloys made sure that neither Sappington nor Emmer would compete with Southwest for business in the seven-state area at issue in the restrictive covenants.

The undisputed facts make clear that Siegenthaler and Rolled Alloys were careful to ensure that Sappington and Emmer did not sell competitive product in the seven-state territory, without regard to the enforceability of those restrictions. From the time Siegenthaler first had discussions with Sappington and Emmer (separately) about their possible involvement with Rolled Alloys, Siegenthaler took steps to limit any role that the two would play. (Siegenthaler Dep. at 66, 70, 72, 75; Nichol Dep. at 27-28, 30) In addition, the nondisclosure provisions are not implicated because Siegenthaler has not had discussions with Sappington or Emmer about Southwest's business information. (Siegenthaler Dep. at 80-82) Southwest can show no interference by Siegenthaler or Rolled Alloys, much less the "malicious and wrongful" interference required to prevail on this claim.

An independent basis for rejecting the tortious interference claim against Siegenthaler and Rolled Alloys is Southwest's burden of showing damages proximately sustained as a result of the interference.  *See Freeman v. Sikorsky Aircraft Corp.*, No. 04-CV-0506-CVE-SAJ, 2006 WL 2385311, at *4 (N.D. Okla. Aug. 17, 2006).  Yet Southwest can show no damages period, as discussed in Section II.A.3 above, so the tortious interference claim fails for this reason as well.

For all of these reasons, summary judgment should be granted in favor of Siegenthaler and Rolled Alloys on the tortious interference claim in Count V of the Second Amended Complaint.

### F.    Southwest Cannot Establish Any Trade Secrets, Much Less Any Misappropriation (Count VI)

Count VI claims misappropriation of trade secrets by Sappington, Emmer, Siegenthaler, and Rolled Alloys, based on information that Sappington and Emmer supposedly received from Southwest during their employment.  Yet the information at issue does not constitute trade secrets, and in any case Southwest cannot show misappropriation.  *See* Okla. Stat. tit. 78, § 86(4) (defining "trade secret").

As for Southwest's efforts to protect its supposed trade secrets, the record establishes that those efforts fall well short of the reasonableness required by statute.  When asked what steps it took to protect its business information, Southwest was quick to cite its use of noncompetition agreements.  (Southwest Dep. at 97)  Yet Dan Sisney now has access to the very same information Sappington did, and Sisney has no noncompete.  (*Id.* at 84)  A Southwest employee named Lee Land also has much of the same information, but like Sisney he too has no noncompete.  (*Id.*)  Indeed, Southwest has over 100 sales associates -- all of whom have access to much of the same information supposedly vested in Sappington and Emmer -- who have never signed noncompetition or nonsolicitation agreements.  (*Id.* at 79-88, 96)

With regard to certain of its supposed trade secrets, Southwest's deposition testimony establishes that it has made no effort to protect the information from dissemination by others.  A case in point is information relating to Southwest's relationships with its customers and vendors, like prices and rebates.  Southwest admits having taken no steps whatsoever to prevent those customers and vendors from disclosing that information to other people such as Southwest's competitors, and the customers and vendors are free to do so.  (Southwest Dep. at 89-91)

The failure of Southwest's trade secrets claim is underscored by its testimony about what information Sappington and Emmer have used in the months since they left Southwest.  When asked to describe the trade secrets that Sappington had supposedly used, Southwest testified as follows:

Q.   What trade secrets does Southwest believe Mr. Sappington has used since April 9, 2007?

A.   I believe he has used the posted pricing we had with [John] Zink.

Q.   What else?

A.   I believe he has used his relationships that were developed and built while he was employed by Metals and Southwest Stainless in the marketplace.

Q.   What other trade secret information does Southwest believe Mr. Sappington has used since April 9th of this year?

A.   I believe he's used the knowledge of the customer lists.  I believe he's used the knowledge of the pricing.  I believe he's used his knowledge of our relationship with our vendors.

Q.   Anything also?

A.   I believe because of his knowledge, background information of our profit he's used that.

Q.   What else?

A.   And I believe he's probably used our employee information.

Q.   Anything else?

> A.      No.

(*Id.* at 100-01)  With regard to Emmer, Southwest stated:

> Q.      What about Mr. Emmer?  What information does Southwest believe Mr. Emmer
> has used since March 8, 2007?
>
> A.      I believe Mr. Emmer has used his relationships, once again, based on his years of
> experience at Metals.
>
> Q.      I didn't ask you about relationships.  What information about Southwest does
> Southwest believe Mr. Emmer has used since March 8, 2007?
>
> A.      Once again, my answer is:  He has years of experience[,] relationships.  Him and
> Mr. Sappington were in communication daily in the office when Mr. Emmer was
> there.  He knew exactly what was going on in that building.
>
> Q.      What information does Southwest believe Mr. Emmer has used since leaving?
>
> A.      I have answered it two or three times.  He had years of experience in relationships
> with customers and others.

(*Id.* at 131)  Because the deposition was conducted pursuant to Rule 30(b)(6), Southwest had a

duty to provide all information "known or reasonably available to the organization."  Fed. R.

Civ. P. 30(b)(6).

Consideration of each type of information enumerated by Southwest leads to the

conclusion that they are not trade secrets under Oklahoma law and/or Southwest lacks any

evidence of misappropriation.  Relationships are not "information" as required under Okla. Stat.

tit. 78, § 86(4).  The posted pricing had no "independent economic value" after Sappington left

because John Zink promptly advised Southwest that it was no longer going to make purchases

based on that posted pricing.  (Southwest Dep. at 101)  The other pricing information at issue is

also of no economic value now, as pricing for the products that Sappington handled have

changed since he left -- including some that change on a day-to-day basis.  (*Id.* at 114-16)  With

the fluctuation in pricing comes fluctuation in profit margins (*id.* at 114), rendering useless

whatever information Sappington had about margins when he left over ten months ago.  Case in

point:  metal prices have been falling, and Southwest's margins have dropped by as much as sixteen percentage points in the past eleven months.  (Kaup Dep. at 149; Sisney Dep. at 10)  Regardless, Southwest has no evidence of Sappington using any profit information.  (Southwest Dep. at 127)

As for vendor information, Southwest's only basis to claim Sappington has used or disclosed any such information is that a company called Outokumpu said Rolled Alloys had asked it about pricing and rebates for commodity stainless steel.  (*Id.* at 123)  Notably, Outokumpu did not say that Sappington had anything to do with this inquiry, and Southwest has nothing but this inconclusive bit of hearsay to support the claim that Sappington disclosed any vendor information.  (*Id.* at 124-25)  No genuine issue of material fact is presented here.  Further, Southwest's vendors are free to discuss rebate information with third parties.  (*Id.* at 89-91)

Regarding employee information, Southwest could cite only three specific employees supposedly at issue:  Todd Lesikar, Larry Brown, and Lisa Lewis.  (*Id.* at 129-30)  Southwest's claim that Sappington was involved in Lesikar's hire by Rolled Alloys is based solely on the fact that Lesikar is working at Rolled Alloys; the best Southwest can do is "imagine" that Sappington told Siegenthaler about Lesikar's unhappiness at Southwest.  (*Id.* at 253-54)  Siegenthaler's testimony refutes Southwest's imagination on this issue.  (Siegenthaler Dep. at 123)  Southwest readily admitted it had no information that Sappington was involved at all in any contact between Rolled Alloys and Brown.  (Southwest Dep. at 158)  As for Lewis, she was not even an employee of Southwest at the time Sappington contacted her.  (Sisney Dep. at 119-20)

Last of the supposed trade secrets that Southwest enumerated is Sappington's knowledge of customer lists.  Yet Southwest's testimony confirms that it has no evidence Sappington has ever used this information:

Q.      What facts does Southwest have to support its belief that Mr.
        Sappington has used a customer list?

A.      I believe he's used his knowledge of that customer list.  These are
        the same customers he's used on a daily basis.

Q.      And what facts does Southwest have to support that belief, sir?

A.      We know he is calling on customers from that list.

Q.      What customers?

A.      He is calling on -- well, like I said, once again, I'm not specific to
        his call reports.  He indicated in his testimony that he is calling on
        customers in Arkansas, Kansas, Colorado, New Mexico.  Those
        were all customers of Southwest Stainless.

Q.      And what information does Southwest have to believe that Mr.
        Sappington is using a Southwest customer list to do that?

A.      I don't believe I said he was using a customer list.  I think I said he
        was using the knowledge of the customers on the list.

Q.      What basis does Southwest have to believe he was using any for –

A.      Because of his 23 years of experience in Metals.

Q.      Any other facts that Southwest believes support the conclusion that
        Mr. Sappington has used information from a Southwest customer
        list?

A.      No.

(Southwest Dep. at 120-21)  Conclusory suppositions that fall apart under examination cannot

salvage Southwest's claims from summary judgment.

Defendants also note that Southwest has failed to protect its supposed trade secrets in this

litigation.  Southwest provided testimony about many of its customers after *declining*

Defendants' September 13, 2007 offer to enter into a stipulated protective order.  It also elicited

testimony from Sappington and Emmer about specific customers and contact persons without

seeking any of the protections that Rule 26(c) allows.  Southwest even filed deposition passages

with testimony its own counsel elicited about John Zink, Braden, J&G, Wayne Inhofe at Linde,

and Larry Houston at American Pipe Bending -- without taking any steps to keep that customer information from public view.  (Dkt. #54, Exhs. C and D)  Were this information actually secret, Southwest should have taken appropriate steps to prevent the information from being disseminated into the public domain.

In sum, Southwest's proposed trade secrets claim cannot succeed as a matter of law.  The deposition testimony of Southwest's corporate representative does not create a genuine issue of material fact because the information at issue cannot be considered a trade secret under the applicable Oklahoma statute, and in any event Southwest has no colorable basis to claim misappropriation.  Dan Sisney, who is now Southwest's managing agent for its Tulsa operations, confirms that Southwest does not know of any information that either Sappington or Emmer have supposedly used.  (Sisney Dep. at 160)  Pete Kaup knew of nothing.  (Kaup Dep. at 145)  Jon Murphy knew of nothing.  (Murphy Dep. at 94-95)  Even Mike Stanwood knew of nothing. (Stanwood Dep. at 110)  Summary judgment is thus appropriate in Defendants' favor on Count VI of the Second Amended Complaint.

### III.    CONCLUSION

The material facts of this case are not subject to genuine dispute.  Defendants respectfully submit that the Court should grant summary judgment in their favor on all of the claims in the Second Amended Complaint.  Upon further motion, Defendants intend to seek reimbursement of their attorney fees under certain of the contracts at issue.

Respectfully submitted,

OF COUNSEL:

Timothy P. Reilly
reilly@taftlaw.com
Justin D. Flamm
flamm@taftlaw.com
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH  45202-3957
(513) 381-2838

/s/ Jason S. Taylor
J. Ronald Petrikin, OBA# 7092
Jason S. Taylor, OBA# 17755
Conner & Winters, LLP
4000 One Williams Center
Tulsa, OK  74172-0148
(918) 586-5683
(918) 586-8683 – FAX
rpetrikin@cwlaw.com
jtaylor@cwlaw.com

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing has been served via CM/ECF this 14th day of February, 2008 upon the following:

Donald Mitchell Bingham
Riggs Abney Neal Turpen Orbison & Lewis
502 W. 6th Street
Tulsa, OK  74119-1010
918-587-3161
Fax:  918-584-1603

Ralph J. Zatzkis
Ford & Harrison LLP
1601 Elm Street, Suite 4450
Dallas, TX  75201
214-256-4714
Fax:  214-256-4701

James Ronald Polan
Riggs Abney Neal Turpin Orbison & Lewis
502 W. 6th Street
Tulsa, OK  74119-1010
918-587-3161
Fax:  918-584-1603

William E. Grob
Ford & Harrison
101 E. Kennedy Blvd. Suite 900
Tampa, FL  33602-5133
831-261-7800
Fax:  813-261-7899

 /s/ Jason S. Taylor