# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

SOUTHWEST STAINLESS, LP, et al.,    )
    )
       Plaintiffs,    )
    )
v.    )  Case No. 07-CV-334-CVE-FHM
    )
JOHN R. SAPPINGTON, et al.,    )
    )
       Defendants.    )

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT THEREOF

William E. Grob
Florida Bar No. 0463124
Wgrob@fordharrison.com
Dawn Siler-Nixon
Florida Bar No. 993360
Dsiler-Nixon@fordharrison.com
Ralph Zatzkis
Texas Bar No. 00792246
Rzatzkis@fordharrison.com

FORD & HARRISON LLP
101 E. Kennedy Boulevard, Suite 900
Tampa, FL 33602-5133
Telephone:    813.261.7800
Facsimile:    813.261.7899

James R. Polan, OBA No. 12441
Donald M. Bingham, OBA No. 794
**Riggs, Abney, Neal, Turpen, Orbison, & Lewis, P.C.**
502 West Sixth Street
Tulsa, Oklahoma 74119-1010
Phone:  918-587-3161
Fax:  918-584-1603

# TABLE OF CONTENTS

Page

I.    MOTION ................................................................................................................. 1

II.   UNDISPUTED MATERIAL FACTS ...................................................................... 2

      A.    Agreements Executed By Siegenthaler, Sappington And Emmer ................... 2

      B.    Southwest Stainless' and HD Supply's Standing To Enforce the
            Agreements ..................................................................................................... 7

      C.    Defendants' Consideration for Selling The Metals Group and Entering
            Into the Agreements ........................................................................................ 8

      D.    Defendants' Employment With Southwest Stainless .......................................... 8

      E.    Opening and Staffing Rolled Alloys' Tulsa Office .............................................. 9

      F.    Sappington, Emmer and Others in Concert With Them Are Violating the
            Agreements ..................................................................................................... 14

      G.    Plaintiffs Are Incurring Damages and Irreparable Injury as a Result of
            Defendants' Conduct ....................................................................................... 16

III.  MEMORANDUM OF LAW ..................................................................................... 18

      A.    Summary Judgment Standard .............................................................................. 18

      B.    Plaintiffs Are Entitled to Summary Judgment on Their Claims of Tortious
            Interference With Contractual Relations Against Defendants Siegenthaler
            and Rolled Alloys ............................................................................................... 18

            1.    Plaintiffs maintained contractual relationships with Sappington and
                  Emmer .................................................................................................... 19

            2.    Siegenthaler and Rolled Alloys intentionally and unlawfully
                  interfered with Plaintiffs' contractual relationships with
                  Defendants Sappington and Emmer ....................................................... 20

            3.    Plaintiffs sustained damages as a result of Defendants' tortious
                  interference ............................................................................................. 22

      C.    CONCLUSION ..................................................................................................... 22

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................... 18

*Anderson v. Suiters*, 499 F.3d 1228 (10th Cir. 2007)....................................................... 19

*Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228 (10th Cir. 2006).................................. 22

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................ 18

*Enderwood v. Sinclair Broadcast Group, Inc.*, 233 F. Appx. 793 (10th Cir. 2007)......... 19

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)........................................................................................................................ 18

## STATE CASES

*Mac Adjustment, Inc. v. Prop. Loss Research Bureau*, 595 P.2d 427 (Okla. 1979) ......... 19

*Morrow Development Corp. v. America Bank & Trust Co.*, 875 P.2d 411 (Okla. 1994) ............................................................................................................................ 19

*Voiles v. Santa Fe Minerals, Inc.*, 911 P.2d 1205 (Okla. 1996) ...................................... 19

## FEDERAL STATUTES

Fed. R. Civ. P. 56............................................................................................................. 18

COME NOW Plaintiffs, SOUTHWEST STAINLESS, L.P. ("Southwest Stainless") and HD SUPPLY, INC. ("HD Supply") (collectively, "Plaintiffs"), by and through their undersigned attorneys, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and hereby submit their Motion for Partial Summary Judgment and Memorandum of Law in Support Thereof in the above-captioned action, and state as follows:

## I.   **MOTION**

1.      Plaintiffs filed their Second Amended Complaint in this action on November 17, 2007, alleging, *inter alia*, tortious interference with Plaintiffs' contractual relations against Defendant Ronald Siegenthaler ("Siegenthaler") and Defendant Rolled Alloys ("Rolled Alloys"). For the reasons set forth below in the Statement of Undisputed Material Facts and Memorandum of Law, Plaintiffs are entitled to judgment as a matter of law with respect to Count V of their Second Amended Complaint.

2.      Plaintiffs are entitled to summary judgment on their claim for tortious interference in Count V of its Second Amended Complaint because it can establish that Plaintiffs maintained contractual relationships with Defendants Sappington and Emmer; that Defendants Sigenthaler and Rolled Alloys intentionally and without justification, privilege, or excuse, interfered with Plaintiffs' contractual relationships with Defendants Sappington and Emmer; and that Plaintiffs have been damaged by Defendants' interference with these contractual relationships.

WHEREFORE, Plaintiffs move that this Court enter summary judgment in their favor with respect to Count V of the Second Amended Complaint and grant such other and further relief as this Court deems just and proper.

## II.   UNDISPUTED MATERIAL FACTS

1.   Plaintiff Southwest Stainless is a wholesale supplier of stainless steel and high nickel alloys, servicing the petrochemical, heat exchanger, pharmaceutical, sanitary and fabrication markets.

### A.   Agreements Executed By Siegenthaler, Sappington And Emmer

2.   Commensurate with the 1997 sale of The Metals Group to Hughes Supply, and as conditions precedent to the closing of the Acquisition Agreement, Metals, Inc. ("Metals"); entered into a Consulting Agreement with Siegenthaler; and Employment Agreements with Sappington and Emmer.[1]

3.   At the same time, Hughes Supply (which later became HD Supply) entered into Noncompetition Agreements with Siegenthaler, Sappington and Emmer[2] (collectively with the Employment Agreements, "Agreements"). (Exhibits 5.9 and 5.10 to the Acquisition Agreement, attached to Plaintiffs' Second Amended Complaint as Exhibit A.)

4.   Metals entered into the Agreements with Siegenthaler, Sappington and Emmer -- who were former owners and executives with The Metals Group -- specifically to ensure their years of experience in the industry, goodwill and substantial relationships associated with customers of The Metals Group, and confidential and proprietary information belonging to The Metals Group, all were secured by Metals in the purchase of The Metals Group's interests. (Sapp. 117.)

---

[1]   *See* Employment Agreements for Sappington and Emmer, attached hereto as Composite Exhibit 1.

[2]   *See* Noncompetition Agreements for Siegenthaler, Sappington and Emmer, attached hereto as Composite Exhibit 2.

5.      Pursuant to the Acquisition Agreement and expressly incorporated in their Employment Agreements annexed thereto, was a restrictive covenant in which Sappington and Emmer agreed, *inter alia*:

> 8.(a)   During the time when the Executive is employed by the Employer and for the Noncompetition Period (as hereinafter defined) ..., the Executive specifically agrees that the Executive shall not ..., either directly or indirectly, as a stockholder of any corporation or partner of any partnership or as an owner, investor, principal or agent, or in any other manner, engage in any business within the States of Missouri, Texas, Oklahoma, Tennessee, Louisiana, Alabama and Florida (the "Geographic Area"), which competes in any manner with any business conducted by Employer or Hughes .... For purposes of this Agreement, the term "Noncompetition Period" shall mean the later of three (3) years after the Closing Date, or one (1) year after the Executive no longer receives any compensation from Employer, or any affiliate of Employer.
>
> (b)     ... The Executive agrees not to directly or indirectly solicit any of the Employer's or Hughes' employees to work for Executive or for any business which is competitive with any business conducted by the Employer or Hughes to the date on which Executive's employment with the Employer is terminated with the Employer within the Geographic Area and during the Noncompetition Period.

(Ex. 1.)   In addition to the restrictive covenant, Sappington and Emmer acknowledged and agreed that each would acquire trade secret, confidential and proprietary information belonging to his employer, and that each would not disclose such information to anyone outside the Company. (Ex. 1.)

6.      Moreover, pursuant to the Acquisition Agreement and expressly incorporated in their Noncompetition Agreements annexed thereto, was a restrictive covenant in which Siegenthaler, Sappington and Emmer agreed, *inter alia*:

> 3.(a)   During the time when the Stockholder is employed by any constituent corporation of the Metals Group and for the Noncompetition Period (as hereinafter defined) ..., the Stockholder specifically agrees that the Stockholder shall not ..., either directly or indirectly, as a stockholder of any corporation or partner of any partnership or as an owner, investor, principal or agent, or in any other manner, engage in any business within

3

the States of Missouri, Texas, Oklahoma, Tennessee, Louisiana, Alabama and Florida (the "Geographic Area"), which competes in any manner with any business conducted by any constituent corporation of the Metals Group or Hughes …. For purposes of this Agreement, the term "Noncompetition Period" shall mean the later of three (3) years after the Closing Date or one (1) year after the Stockholder no longer receives any compensation from Employer, or any affiliate of Employer.

(b)  … The Stockholder agrees not to directly or indirectly solicit any of the Metals Group's or Hughes' employees to work for Stockholder or for any business which is competitive with any business conducted by the Metals Group or Hughes prior to the date on which Stockholder's employment with any constituent corporation of the Metals Group is terminated within the Geographic Area and during the Noncompetition Period.

(Ex. 2.)  In addition to the restrictive covenant in the Noncompetition Agreements, Siegenthaler, Sappington and Emmer acknowledged and agreed that each would acquire trade secret, confidential and proprietary information belonging to Metals, and that each would not disclose such information to anyone outside the Company. (Ex. 2.)

7.      The parties to the Agreements also expressly agreed and acknowledged that the restrictive covenants in the Agreements were "ancillary to the main business purpose of the Acquisition Agreement" and that the restrictive covenants were executed to protect the legitimate business interests of the employer directly related to the purchase of The Metals Group. (Ex. 1 and 2.)

8.      The restrictive covenants contained in the Agreements and the confidentiality agreement expressly were intended to survive the termination of the Agreement, and extend one (1) year beyond Siegenthaler's, Sappington's and Emmer's receipt of his final compensation from Southwest or any affiliate of Southwest, respectively. (Ex. 1 and 2.)

9.      Siegenthaler, Sappington and Emmer expressly acknowledged and agreed that the restrictive covenants in the Agreements were appropriate and reasonable, and that the restrictive

covenants were necessary to protect Southwest's respective customer bases and branch locations, and the investment by Southwest in The Metals Group common stock. (Ex. 1 and 2.)

10.     Siegenthaler, Sappington and Emmer expressly acknowledged and agreed that the execution of the Noncompetition Agreements was a prerequisite to "induce Hughes to complete the Closing and to consummate the transaction contemplated by the Acquisition Agreement." (Ex. 2.)

11.     Additionally, Siegenthaler, Sappington and Emmer each agreed that, should any one of them violate any of the terms of the restrictive covenant or confidentiality clauses in the Agreements, Southwest would be irreparably injured and immediately entitled to injunctive relief, both temporary and permanent. (Ex. 1 and 2.)

12.     Sappington had ample opportunity to review the Agreements before he signed them, had no reason to believe the Agreements were unenforceable, and had every intention of abiding by them. (Sapp. 77, 92-93.)[3]

13.     Sappington was aware that his Agreements, like those of Siegenthaler and Emmer, contained restrictions on competition, and understood the Agreements when he signed them. (Sapp. 19, 77.)

14.     Sappington was paid all of the compensation that was owed to him as a condition to signing the Agreement. (Sapp. 79-81, 103)

15.     Sappington, Emmer and Siegenthaler were represented by counsel when they signed the Agreements, and had the opportunity to change the content of the Agreements if they wanted to. (Sapp. 77-78, 92, 101; Sieg. 13-14; Emmer 70, 73-74, 93.)[4]

---

[3]     *See* cited excerpts from the deposition of John Sappington (cited herein as "Sapp. __[page no.]), attached hereto as Exhibit 3.

16.     Sappington agreed that for the prohibited time period, he would not, directly or indirectly, in any capacity, engage in a competitive business in the states of Oklahoma, Missouri, Texas, Tennessee, Louisiana, Alabama or Florida. (Sapp. 95-96.)

17.     Sappington does not dispute that his Southwest Stainless branches were doing business in all seven prohibited states comprising the territorial prohibition. (Sapp 110.)

18.     Most importantly, Sappington knew he was not to operate in the seven states for a period of one year: "[M]y interpretation of this agreement because it specifically states those seven states, was that I was not to operate within those seven states if I left [Southwest Stainless] for a year's period." (Sapp. 122.)

19.     Sappington understood the importance of protecting against employees going to competitors because of the competitive nature of the business. (Sapp. 116.)

20.     Sappington agreed and acknowledged that when Hughes bought his company, they bought the relationships he enjoyed with his long-term customers. (Sapp. 116.)

21.     The Agreements served to protect his relationships with customers on behalf of Southwest Stainless and served to protect Southwest's opportunity to continue to cultivate the customer relationships in the event he left the company: **"if a person leaves a corporation and they have a strong relationship with the customer base then it's more likely that the customer base may follow that person to the next company."** (Sapp. 117-18)(emphasis added.)

---

[4]  *See* cited excerpts from the deposition of Ronald Siegenthaler (cited herein as "Sieg. __[page no.]), attached hereto as Exhibit 4.  *See* cited excerpts from the deposition of William Emmer (cited herein as "Emmer __[page no.]), attached hereto as Exhibit 5.

**B.      Southwest Stainless' and HD Supply's Standing To Enforce the Agreements**

22.      The Employment Agreements at issue are between Metals, Inc., and Sappington and Emmer, individually. (Ex. 1.)  Hughes was specifically made a third-party beneficiary to the Employment Agreements. (Ex. 1.)

23.      The Noncompetition Agreements are between Hughes Supply and Sappington, Emmer and Siegenthaler, individually. (Ex. 2.)  Metals, Inc., and each affiliate or subsidiary of Hughes was specifically made a third-party beneficiary to the Noncompetition Agreements. (Ex. 2.)

24.      On January 24, 1997, Hughes Supply, Inc., acquired all of the issued and outstanding shares of Metals, Inc.--Gulf Coast Division, Metals, Inc., and Stainless Tubular Products, Inc., each an Oklahoma corporation (collectively "The Metals Group").[5]

25.      Effective December 31, 2004, The Metals Group merged to form the "Surviving Party," Southwest Stainless, L.P.[6]  The Agreement and Plan of Merger provided that "[t]he Surviving Party [Southwest Stainless, L.P.] shall succeed to all rights, assets, liabilities and obligations of the Merging Parties [which included the interest in Metals Group]." (Plaintiffs' Second Amended Complaint, Exhibit B.)

26.      On October 27, 2006, Hughes Supply, Inc., merged into The Home Depot Supply, Inc.  The surviving entity was The Home Depot Supply, Inc.[7]  On January 1, 2007, The Home Depot Supply, Inc., then changed its corporate name to HD Supply, Inc. (Ex. 6.)

---

[5]   *See* Acquisition Agreement, with related attachments, attached to Plaintiffs' Second Amended Complaint as Exhibit A.

[6]   *See* Agreement and Plan of Merger and State of Delaware Certificate of Merger, attached to Plaintiffs' Second Amended Complaint as Exhibit B.

[7]   *See* Documents associated with merger and corporate name-change, public records filed in Florid and Texas, attached hereto as Composite Exhibit 6.

**C.**    **Defendants' Consideration for Selling The Metals Group and Entering Into the Agreements**

27.    In exchange for entering into the Acquisition Agreement -- which consideration was expressly predicated on Siegenthaler, Sappington and Emmer executing the Agreements annexed thereto and incorporated therein – Siegenthaler, Sappington and Emmer received the lion's share of approximately $21 million in compensation and guaranteed employment for Sappington and Emmer for a period of at least three (3) years at an annual salary of no less than $100,000 per year. (Sapp. 73, 89-90, 93, 107, 115; Sieg. 9-10.)

28.    As the driving force behind the sale of The Metals Group to Hughes Supply, Siegenthaler was aware of the Agreements and the respective terms of each. (Sapp. 21; Sieg. 19-20, 25, 69, 74-77, 88-89.)

**D.**    **Defendants' Employment With Southwest Stainless**

29.    Following the acquisition of Metals in 1997, Sappington held the position of highest authority within the Southwest Stainless branches he supervised. (Sapp. 42, 72-73.)

30.    Sappington had access to all of Southwest Stainless' confidential information in the Tulsa, Mobile, Houston and Dallas branches, and understood that he was not free to share Southwest Stainless' confidential information with competitors. (Sapp. 97. 110-11.)

31.    Not only did Sappington have access to Plaintiffs' tangible proprietary information, but he also had unlimited access to all sales and customer information Southwest Stainless kept stored in its computer systems. (Sapp. 242.)

32.    Southwest Stainless took measures to keep the information confidential and there is no dispute that Southwest Stainless' confidential information would be valuable to competitors. (Sapp. 112-13.)

33.     At least ten years of customer-related information is retained in the Southwest Stainless computer system. (Sapp. 243-44.)

34.     Sappington estimated that it cost Southwest Stainless approximately $200,000.00 to accumulate the wealth of confidential information in the computer system to which he had access. (Sapp. 244.)

35.     During this same time period, Emmer held the position of Vice President and Branch Manager in Plaintiff's Tulsa office. (Emmer 33.)

36.     Emmer understood that he was bound by restrictive covenants against competition pursuant to his Agreements with Plaintiff, and received all the compensation due him under the Agreement. (Emmer 34.)

37.     At no time did Defendant Emmer believe that the Agreements could not be enforced against him. (Emmer 40-41.)

38.     Following the Acquisition in 1997, Siegenthaler worked as a consultant for Plaintiffs for one year, but maintained and occupied an office located in Southwest Stainless' building in Tulsa, Oklahoma, until November 2007, at no charge. (Sieg. 16, 17, 27.)

**E.      Opening and Staffing Rolled Alloys' Tulsa Office**

39.     In August/September 2006, while maintaining his rent-free office space in Southwest Stainless' building, Siegenthaler had discussions with Sappington and Emmer about the possibility of working for Rolled Alloys. (Sapp. 38-39; Sieg. 44; Emmer 18.)

40.     At the same time, Siegenthaler was in contact with Tom Nichol, President of Defendant Rolled Alloys, and proposed that they start a business together within the metals industry. (Sieg. 32-33; Nichol 43, 54.)[8]

---

[8] *See* cited excerpts from the deposition of Tom Nichol (cited herein as "Nichol __[page no.]), attached hereto as Exhibit 7.

9

41.     Siegenthaler discussed his desire to hire Sappington with Nichol in advance of engaging in negotiations with Sappington. (Nichol 29-30, 72.)

42.     During the initial conversation with Nichol, Siegenthaler notified Nichol that Sappington was subject to a noncompetition Agreement, but did not discuss the terms of the Agreement with Nichol. (Nichol 99.)

43.     Nichol never saw a copy of the noncompetition Agreements for Defendants Sappington and Emmer, but just assumed Siegenthaler had the Agreements, as he was a former owner of Metals, Inc. (Nichol 99.)

44.     Knowing Sappington had worked in the metals industry for over a decade in Tulsa, Nichol approved Siegenthaler's pursuit of Sappington on behalf of Rolled Alloys, despite the prohibitions in the Agreements. (Nichol 108.)

45.     On November 1, 2006, Rolled Alloys officially hired Siegenthaler (through a shell corporation, Myriad Technologies,) to open a branch office in Tulsa, Oklahoma. (Sieg. 35-36; Nichol 41, 45.)  The Tulsa branch office of Rolled Alloys opened for business in November 2006. (Sieg. 41, 52.)

46.     Siegenthaler holds the highest authority over (and responsibility for) Rolled Alloys' Tulsa branch. (Nichol 72.)  He has the authority to hire and fire employees (with the approval of Nichol), and is responsible for the profit and loss figures for the Tulsa branch office. (Sieg. 54; Nichol 72.)

47.     Knowing that his, Sappington's and Emmer's Agreements were significant consideration in the $21,000,000.00 sale of Metals to Hughes Supply, between September and December 2006, Siegenthaler secretly communicated with Sappington and Emmer to convince

them to leave Southwest Stainless and initiate employment in Rolled Alloys' new Tulsa branch. (Sieg. 19-21, 44-46, 55, 68.)

48.    While he insisted he did not need Sappington and Emmer to be successful in opening the Tulsa branch of Rolled Alloys, Siegenthaler sought to hire (and hired) Sappington and Emmer despite his clear knowledge of the restrictions contained in their Agreements, **knowing they were valid**, and knew he was taking a chance on violating the Agreements: "I assume that's a chance you'd take." (Sieg. 19-21, 56, 69, 71-72, 77.)

49.    In February 2007, Siegenthaler invited Todd Lesikar, a current outside salesman with Plaintiff, to lunch, at which time Defendant Siegenthaler offered Lesikar employment with Defendant Rolled Alloys. (Sieg. 119-120.)

50.    Siegenthaler made Lesikar sign a confidentiality agreement to prohibit him from telling anyone Rolled Alloys was opening a Tulsa branch or that he was being interviewed (Sieg. 119.)  Nichol approved Lesikar's hire, but had no idea why Siegenthaler wanted to keep it a secret that Lesikar was going to work for Rolled Alloys: "It's just something Ron [Siegenthaler] wanted." (Nichol 80, 128.)

51.    In February 2007, while Emmer was still employed with Southwest Stainless, Siegenthaler contacted Emmer to solicit Emmer to leave his employment at Southwest Stainless and initiate employment with Rolled Alloys. (Sieg. 68; Emmer 18, 24.)  Emmer never notified Plaintiff that a large competitor had contacted him or that it was going to open an office in the same town where he worked with Sappington and Siegenthaler for over thirty years in the steel business. (Emmer 29-30.)

52.    At the same time he was in communication with Emmer, Siegenthaler continued to pursue Sappington. (Sieg. 66-67.)

53.     Siegenthaler invited Sappington to a lunch meeting, during which Siegenthaler offered Sappington a position with Rolled Alloys in the Tulsa branch. (Sieg. 66-67.)   As compensation, Siegenthaler offered Sappington an annual salary of $175,000, plus a car allowance, country club membership, and expense account. (Sieg. 67.)

54.     Sappington began his employment with Defendant Rolled Alloys on April 9, 2007. (Sapp. 30.)

55.     In the thirteen months leading up to his departure from Southwest Stainless, Sappington received compensation approaching $1,900,000.00, including salary of $125,000, $500 monthly country club membership, a $215,000 bonus in March 2006, an equity payment of $1,063,200 in April 2006, over $100,000.00 in retention bonuses, and a $377,000 annual bonus he received ten days before leaving Southwest Stainless. (Sapp. 31-32, 134, 259-62.)

56.     The $100,000.00-plus retention bonuses were all paid to Sappington during the same time he was discussing the opportunity to leave Southwest Stainless and join Siegenthaler at Rolled Alloys in Tulsa. (Sapp. 259-62.)   Even then, Sappington failed to tell anyone at Southwest Stainless he was being recruited by Rolled Alloys or that Rolled Alloys was opening (and had opened) a new branch office in Tulsa. (Sapp. 54-55, 261-62.)

57.     When he was asked, after Southwest Stainless employees became suspicious of the departure of key employees, Sappington tried to "evade" the subject of Rolled Alloys coming to Tulsa, or the possibility that he was contemplating leaving Southwest Stainless. (Sapp. 281-82.)   When asked why he waited ten days after receiving his $377,000 bonus before leaving Southwest Stainless (without notice), Sappington responded that the decision was entirely based on his own self-interest:

Q:     How soon before you left did you get that bonus? What was the time period between receiving it and leaving?

A:      I received it about 10 days prior to, I think, leaving.

Q:      Any reason that you waited that 10 days?

A:      Yes.

Q:      Why

A:      I want to make sure [the check] cleared.

(Sapp. 161-62.)

58.     At the time that he made job offers to Sappington and Emmer, Siegenthaler knew that they were subject to the Employment Agreements and Noncompetition Agreements. (Sieg. 69.)

59.     Well in advance of making the offers to Sappington and Emmer on behalf of Rolled Alloys, Siegenthaler had put Rolled Alloys on notice of the existence of the Agreements and had discussed the restrictions therein with Rolled Alloys in detail. (Nichol 26, 28, 34-35, 73, 97-98, 123; Sieg. 69,74-78, 85-86.)

60.     Nichol assumed that Siegenthaler was well aware of the content of the Agreements since he had signed one himself during the 1997 acquisition. (Nichol 99.)

61.     Despite knowing that Sappington and Emmer were subject to restrictive covenants prohibiting them from working for a competitor in Tulsa, Oklahoma, and other states, Nichol approved of hiring Sappington and Emmer. (Nichol 26-29, 28-30, 32-35, 98.)

62.     Rolled Alloys, through Nichol, went so far as to strike an agreement with Siegenthaler in advance; agreeing that if Sappington and Emmer were sued for a violation of their Agreements, Rolled Alloys would provide representation to them and cover their legal costs. (Nichol 21.)   Although Nichol agreed "[t]here's always a chance" that hiring Sappington

and Emmer was in violation of their Agreements, he approved of Siegenthaler's quest to hire them anyway. (Nichol 123.)

63.     Nichol had no idea whether the Agreements were enforceable or not when he approved hiring Sappington or Emmer. (Nichol 126.)

64.     Ironically, Nichol had never approved anyone being hired by Rolled Alloys who was subject to a restrictive covenant, other than Sappington and Emmer. (Nichol 97.)

65.     Moreover, Sappington and Emmer were aware of the restrictive covenants and understood the terms and restrictions of those agreements. (Sapp. 19-26, 122, 140, 221-222, 224, 255, 275; Emmer 12, 32-33, 40-41, 64, 82-83, 85, 90-92.)

66.     In addition to Sappington and Emmer and Todd Lesikar, Siegenthaler also offered Lisa Freeman, an employee Sappington had just approved for hire on behalf of Southwest Stainless, a position with Defendant Rolled Alloys.  (Sieg. 74.)

**F.     Sappington, Emmer and Others in Concert With Them Are Violating the Agreements**

67.     Defendant Sappington received his last compensation from Plaintiff in March 2007. (Sapp. 80-81.)

68.     Over the years, Sappington developed serious relationships with his customers and cultivated substantial goodwill with his customers on behalf of Southwest. (Sapp 216.)

69.     Despite knowing that the Agreements were specifically designed and executed to protect against him using his substantial relationships with Southwest Stainless' customers in competition with his former employer, Sappington continues to play golf with some of his Southwest customers, including the representatives for his long-term customers Hughes-Anderson and Inserv (formerly Cust-O-Fab). (Sapp 118-19, 124-25, 134.)

70.    Rolled Alloys agreed to fully fund his $500/month golf membership at a local country club. (Sapp 136-37.)

71.    Sappington and Emmer called on Chanute Manufacturing and Dynamic Materials on behalf of Rolled Alloys (Lesikar 100-02.)[9]  Both were customers of Southwest Stainless in Tulsa, under Sappington's supervision. (Lesikar 101.)

72.    Sappington identified other customers he serviced on behalf of Southwest Stainless, that he knows now conduct business with Defendant Rolled Alloys. (Sapp. 167-175, 189-192, 217-234.)

73.    Sappington had ultimate responsibility for all customer relationships on behalf of Southwest Stainless in the Tulsa branch. (Lesikar 87.)

74.    Sappington regularly made sales calls on customers Hughes-Anderson and Thermal Engineering on behalf of Southwest Stainless. (Lesikar 64-66.)

75.    Lesikar and Siegenthaler made it a priority to inform customers, including Hughes-Anderson, Flowell and others that Sappington had joined Rolled Alloys, when he called on them to secure sales on behalf of Rolled Alloys. (Lesikar 104-05, 111-15, 117-18; Sieg. 114.) Lesikar also made it a point to tell customers about the instant lawsuit. (Lesikar 114-15, 117-18.)

76.    Shari Roberts, another employee of Rolled Alloys in Tulsa who has worked with Defendants Siegenthaler and Emmer for nearly thirty (30) years, confirmed that Emmer and Sappington work together, as a team, on sales derived through their efforts at Rolled Alloys. (Roberts 19, 123-24.)[10]

---

[9]    *See* cited excerpts from the deposition of Todd Lesikar (cited herein as "Lesikar __[page no.]), attached hereto as Exhibit 8.
[10]   *See* cited excerpts from the deposition of Shari Roberts (cited herein as "Roberts __[page no.]), attached hereto as Exhibit 9.

77.     Rolled Alloys' Tulsa branch did not receive a single order from Hughes-Anderson or Thermal Engineering until **after** Sappington came on board. (Lesikar 78-79.)

78.     Rolled Alloys Tulsa has done approximately $950,000.00 in business with John Zink, Sappington's former client at Southwest Stainless, but did not receive a single sale until after Sappington joined Rolled Alloys. (Roberts 213.)

79.     Roberts also confirmed that the Rolled Alloys' Tulsa branch only had "different small customer" sales before Sappington joined the office. (Roberts 217-18.)

80.     On February 12, 2008, Plaintiffs received 1,384 sales documents from Defendants.  Although it was clear that Rolled Alloys had nearly a $1 million in sales to John Zink, not one of the documents produced referenced a single sale to John Zink.  Out of the 50 customers where sales were reflected by the documents, only 5 reflected sales before April 8, 2007 (the date Sappington joined the office).  Those 5 sales accounted for $15,000.00 of the $1 million total documented sales.

## G.     <u>Plaintiffs Are Incurring Damages and Irreparable Injury as a Result of Defendants' Conduct</u>

81.     It was not until March 2007, after Emmer joined Rolled Alloys and just weeks in advance of Sappington joining Rolled Alloys, that representatives from the new Rolled Alloys Tulsa office began soliciting business on behalf of Rolled Alloys. (Sieg. 42-43, 96-97, 102, 106-107; Lesikar 77, 139; Roberts 218.)

82.     According to Siegenthaler, at the time of his deposition, after having been open and seeking business for just six months, Rolled Alloys Tulsa office had been successful in

soliciting the following business from customers formerly services by Sappington, Emmer, Lesikar, Siegenthaler, all on behalf of Southwest Stainless:[11]

| | |
|---|---|
| John Zink | $840,000 |
| Hughes Anderson | $100,000 |
| Wagner Plate Works | $100,000 |
| Braden | $20,000 |
| Linde | $40,000 |
| Cust-o-Fab | $100,000 |
| Energy Exchangers | $100,000 |
| Hanlock | $20,000 |
| Inserv | $7,200 |
| Flowell | $40,000 |

(Sieg. 94-107.)

83.    Sappington and Emmer have solicited their former customers. (Sieg. 79.)

84.    Nichol knew of only one Aerospace customer of Rolled Alloys, Chromalloy, in Cincinnati. (Nichol 129-30.)

85.    Within days of Sappington's resignation, two large fabrication and supply projects Sappington supervised, priced and bid on behalf of Southwest Stainless, representing over $300,000.00 in revenue and profits to Southwest Stainless, were transferred to Rolled Alloys. (Legrand 208.)[12]   Documents produced by Defendant show $200,000.00 in sales to Hughes-Anderson beginning within days after Sappinton joined the company.[13]

86.    Defendant Emmer kept in touch with several of Plaintiff's clients and customers after he became employed with Defendant Rolled Alloys, including customers that had not previously done business with Defendant Rolled Alloys prior to Defendant Emmer's employment. (Emmer 39, 41-43, 103.)

---

[11]   These figures are estimates of the amount of sales Defendant Rolled Alloys has secured with the listed companies, to the best of Defendant Siegenthaler's knowledge and memory.
[12]   *See* cited excerpts from the deposition of Jeff Legrand (cited herein as "Legrand __[page no.]), attached hereto as Exhibit 10.
[13]   *See* Hughes-Anderson sales documents produced by Defendants, attached hereto as Exhibit 11.

87.     Ironically, Sappington was not able to identify a single sale Southwest Stainless

lost to Rolled Alloys during his employment with Southwest Stainless. (Sapp. 42, 165-66.)

### III.     MEMORANDUM OF LAW

#### A.     Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c), *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the movant has

met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact,"

summary judgment is appropriate unless the nonmoving party presents concrete, specific

evidence on every essential element of its case. *Catrett*, 477 U.S. at 322-323; *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Although the evidence as well as all inferences drawn

therefrom must be read in a light most favorable to the party opposing the motion, the court need

only make reasonable inferences. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

475 U.S. 574 587 (1986).

A party cannot defeat summary judgment merely by casting "some metaphysical doubt as

to the material facts," and a mere scintilla of evidence is not enough. *Id.* at 586-87; *Anderson*,

477 U.S. at 251.  If the record as a whole would not lead a rational trier of fact to find for the

non-movant, summary judgment is appropriate. *See Matsushita*, 475 U.S. at 587.

#### B.     Plaintiffs Are Entitled to Summary Judgment on Their Claims of Tortious Interference With Contractual Relations Against Defendants Siegenthaler and Rolled Alloys

In order to establish a claim for tortious interference with a contract, Plaintiffs must

establish: (1) "a business or contractual right with which there was interference; (2) the

interference was malicious and wrongful, and that such interference was neither justified,

privileged, nor excusable; and (3) damage was proximately sustained as a result of the complained-of interference." *Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2007) (quoting *Morrow Dev. Corp. v. Am. Bank & Trust Co.*, 875 P.2d 411, 416 (Okla. 1994), *see Enderwood v. Sinclair Broadcast Group, Inc.*, 233 F. Appx. 793 (10th Cir. 2007); *Mac Adjustment, Inc. v. Prop. Loss Research Bureau*, 595 P.2d 427, 428 (Okla. 1979). Further, a wrongful interference claim "can arise only when one who is not a party to a contract interferes with that contract by convincing one of the contracting parties to breach its terms." *Voiles v. Santa Fe Minerals, Inc.*, 911 P.2d 1205, 1210 (Okla. 1996).

### 1. <u>Plaintiffs maintained contractual relationships with Sappington and Emmer.</u>

On January 24, 1997, Sappington, Emmer and Siegenthaler entered into the Agreements with Metals and Hughes Supply. (SOF 22, 23.)  Metals later merged into Southwest Stainless, giving the Company the right to enforce Defendants' obligations under the Agreements. (SOF 24, 25.)  Hughes Supply later merged into The Home Depot Supply, which later changed its corporate name to HD Supply, giving HD Supply standing and the right to enforce Defendants' obligations under the Agreements. (SOF 26.)  Plaintiffs possess the right to enforce the respective Agreements at issue. (SOF 22-26)  The Agreements specifically restricted Defendants Sappington and Emmer from engaging in a competing business, including the planning and/or organizing of such competing business, for one year following the last compensation paid to them by Plaintiff. (SOF 5, 6, 8, 18, 38.)  There is no question Sappington and Emmer were paid all compensation owed to them under the Agreements, pursuant to the 1997 acquisition of The Metals Group. (SOF 14, 27, 36.)  Moreover, Siegenthaler was aware of the restrictions in the Agreements (having been subject to them himself for a period of time) and specifically apprised Rolled Alloys of the terms and restrictive covenants contained in the Agreements. (SOF 48, 59.) Triggering the one (1) year competition and non-solicitation prohibition in the Agreements,

Sappington and Emmer were last compensated by Plaintiff in March  and April 2007, respectively. (SOF 8, 14, 36, 67.)

> ## 2. Siegenthaler and Rolled Alloys intentionally and unlawfully interfered with Plaintiffs' contractual relationships with Defendants Sappington and Emmer.

Punctuating Siegenthaler's intentional and unlawful interference with Sappington and Emmer's Agreements was his specific knowledge of it and increasing efforts to find ways to circumvent the Agreements.   During his conversation with Nichol, when he initially proposed that they start a business together in the metals industry and first expressed interest in hiring Sappington to join the Rolled Alloys Tulsa team in 2006, Siegenthaler expressly notified Nichol that Sappington was restricted by a non-competition agreement. (SOF 42.)   Based on these conversations, Nichol concluded that Siegenthaler had access to the Agreements and that he knew and understood the terms of those Agreements.   Further, Nichol knew Siegenthaler was a party to the same agreement at one time. (SOF 43, 60.)

Notwithstanding Siegenthaler and Nichol's knowledge of the Agreements, Siegenthaler and Rolled Alloys solicited Sappington and Emmer to leave their employment with Southwest Stainless and engage in a competitive business, in violation of the non-competition restrictive covenants contained in their Agreements. (SOF 61, 62.)   Regardless of how Defendants are attempting to convolute the interpretation of the restrictive covenants in the Agreements, there simply can be no question that Sappington and Emmer are employed by Rolled Alloys in Tulsa - - the same town where they have worked for thirty years – "**directly or indirectly, as a[n] … agent, … engag[ing] in any business … which competes in any manner with any business conducted by**" their former employer. (SOF 5, 6.)   The efforts of Sappington and Emmer in Tulsa directly and substantially contribute to the competitive proceeds of the Rolled Alloys Tulsa office, and therefore, are in violation of their Agreements.   As such, the contumacious actions of

Rolled Alloys and Siegenthaler directly have led to the breach of the Agreements and resulted, and continue to result, in damages to Plaintiffs.

Moreover, Siegenthaler, Lesikar, Emmer and Sappington went to extraordinary lengths to keep their plans to engage in a competing business secret, despite Sappington's clear obligation to put his employer on notice that a major competitor was opening a new office in Southwest Stainless' back yard. (SOF 47, 49-51, 56)  Even Nichol did not fully appreciate the reasons that Siegenthaler insisted on total secrecy because Nichol did not review the Agreements; rather, he left that obligation to Siegenthaler acting on behalf of Rolled Alloys. (SOF 50.)  Siegenthaler made Lesikar sign a non-disclosure statement before he would even discuss his plans to open a Tulsa office of Rolled Alloys. (SOF 50.)  Siegenthaler was extra-careful not to disclose his plans to open a Rolled Alloys office in Tulsa to anyone for fear word would get back to Southwest Stainless. (SOF 50.)  However, he told Sappington and Emmer in August or September 2006, because he knew he could count on them to keep his secret. (SOF 39.)  Most damaging to Southwest Stainless, unfortunately, is the fact that Sappington was the one with the highest fiduciary duty to the Company in Tulsa, and the individual the Company should have been able to rely upon to notify the Company of any competitor's plan to open operations in Tulsa.

Despite his clear fiduciary duty to Southwest Stainless, and despite his receipt of nearly $2,000,000 in compensation from Southwest Stainless in the year leading to his departure, Sappington made no effort to notify Plaintiffs that a competing business was opening a branch office in town because he knew Siegenthaler did not want him to say anything. (SOF 56.)  This deceptive behavior clearly shows that Siegenthaler and Rolled Alloys wrongfully and maliciously interfered with Plaintiffs' contractual relationships at every turn, in a plan designed to circumvent Defendants' obligations under their Agreements and benefit Rolled Alloys to the

detriment of Southwest Stainless. *See Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1236 (10th Cir. 2006) (finding sufficient evidence of malicious interference where Defendants concealed their activities from Plaintiffs, used fictitious names to register their business, ordered products using a fake business name, and dishonestly stated to suppliers that they had a network of business).

### 3.   Plaintiffs sustained damages as a result of Defendants' tortious interference.

Assuming, *arguendo*, that Plaintiffs' damages were limited to the amounts listed above, which Plaintiffs lost as a result of Siegenthaler and Rolled Alloys hiring Sappington and Emmer in violation of their Agreements, the lost sales amount to almost $1.5 million. (SOF 78, 82, 85.) These amounts, however, are not the only sales Rolled Alloys obtained from its wrongful interference with the Agreements between Plaintiffs and Sappington and Emmer. Sappington identified numerous other customers he serviced on behalf of Southwest Stainless, that he knows now conduct business with Rolled Alloys. (SOF 71, 72, 82, 85.) Moreover, as Southwest Stainless **never** experienced lost business to Rolled Alloys while Sappington was in charge of the Tulsa branch, before Sappington became employed with Rolled Alloys, there can be no doubt that Plaintiffs will continue to experience losses in sales as a result of the interference. (SOF 87.)

## C.   CONCLUSION

As the evidence and documentation referenced herein amply illustrates, Defendant Siegenthaler and Rolled Alloys have tortiously interfered with Plaintiffs' contractual relations with Defendants Sappington and Emmer. Therefore, Plaintiffs respectfully pray that their Motion for Partial Summary Judgment be granted and that this Court enter judgment on their behalf with respect to Count V of Plaintiffs' Second Amended Complaint, with damages to be determined at trial.

Respectfully submitted,

RIGGS, ABNEY, NEAL, TURPEN, ORBISON,
& LEWIS, P.C.

By:  /s/ William E. Grob_____
  William E. Grob
  Florida Bar No. 0463124
  Wgrob@fordharrison.com

James R. Polan
OBA No. 12441
Donald M. Bingham
OBA No. 794
Riggs, Abney Neal Turpen Orbison
 & Lewis
502 W. 6th St.
Tulsa, OK  74119-101
Telephone:  (918) 587-3161
Facsimile:  (918) 584-1603

  Dawn Siler-Nixon
  Florida Bar No. 993360
  Dsiler-Nixon@fordharrison.com
  Ralph Zatzkis
  Texas Bar No. 00792246
  Rzatzkis@fordharrison.com

FORD & HARRISON LLP
101 E. Kennedy Boulevard, Suite 900
Tampa, FL 33602-5133
Telephone: 813.261.7800
Facsimile: 813.261.7899

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

  I hereby certify that on February 15, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF, which will send a notice of electronic filing to the following:

Jason Sean Taylor
J. Ronald Petrikin
Conner & Winters
1 Williams Center Room 4000
Tulsa, OK 74172-0148

Justin D. Flamm
Timothy P. Reilly
Taft Stettinius & Hollister, LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957

/s/ William E. Grob_____

TAMPA:240678.1

23