IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SOUTHWEST STAINLESS, LP, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) Case No: 07-CV-334-CVE-FHM |
| JOHN R. SAPPINGTON, et al., | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

### I.    THE MATERIAL FACTS ARE NOT SUBJECT TO DISPUTE

A review of Southwest's opposition brief reveals that none of the 19 numbered

paragraphs offered by Defendants are subject to a genuine issue of material fact. Southwest's

assertions are largely *non sequiturs* when compared to the core facts established in Defendants'

brief. On other occasions, Southwest simply labels Defendants' sworn deposition testimony as

"self-serving" without offering any record evidence to contradict the facts that Southwest

dislikes. In other words, Southwest is impermissibly asking the Court to weigh the evidence and

discredit certain witnesses on summary judgment. *See Nat'l Am. Ins. Co. v. Am. Re-Ins. Co.*, 358

F.3d 736, 742-43 (10th Cir. 2004).

What little new evidence Southwest offers is unavailing. Pete Kaup's declaration claims

that Emmer maintained contact with "some clients," but Kaup was unable to provide even one

name of a client or one time and place of a supposed contact. Bobbi Kenney makes a similar

assertion that is even more vague than Kaup's. Kenney also says that Emmer was in

Sappington's office with the door closed for 20 minutes in March 2007, but she says nothing

about what the two discussed. Southwest then attempts to manufacture a fact issue by claiming

that Sappington denied any such meetings, but the deposition passage Southwest cites involved

just two related questions: whether Sappington and Emmer had "a number of closed-door meetings" in the weeks preceding Emmer's resignation, and whether Sappington went into *Emmer's* office for closed-door meetings. (*See* Sappington Dep. at 147)

Kenney also asserts that Emmer did not actually retire in 2000, but her sole basis for this claim is that "he went to part time status." (*See* Kenney Decl. at ¶ 5) That Emmer *returned* from his brief 2000 retirement into a part-time position does not contradict the retirement that is independently established in Defendants' motion. Nor does it matter whether Southwest made some subjectively "official" notation of Emmer's retirement; the break in service is all that matters, and the personnel forms Southwest offers (having just produced them to Defendants 13 days earlier) do not contradict Emmer's testimony that he was retired, if only for a few days.

The 16 numbered paragraphs in Southwest's "Statement of Additional Facts" are recycled from Southwest's own motion for summary judgment. (Dkt. #82) The numbered paragraphs in the two briefs correspond as follows:

| Numbered paragraphs from Southwest's "Statement of Additional Facts" in Dkt. #96 | Corresponding paragraphs from Southwest's motion, Dkt. #82 |
|---|---|
| 1 | 2 and 3 |
| 2 | 4 |
| 3 | 5 and 6 |
| 4 | 12, 17, 19, 20, and 21 |
| 5 | 27 |
| 6 | 29, 30, 31, 33, and 34 |
| 7 | 32 |
| 8 | 35, 36, and 37 |
| 9 | 38 |
| 10 | 81 |
| 11 | 82 |
| 12 | 83 |
| 13 | 85 |
| 14 | 77 |
| 15 | 78 |
| 16 | 87 |

Defendants have already responded to these claims *seriatim* (in Dkt. #95), highlighting numerous problems with almost all of the 28 paragraphs from which Southwest cobbled together its "Additional Facts," so they will not restate the various conflicts between Southwest's claims and the record. Defendants note, however, that their earlier brief was filed just after 4:00 p.m. on March 12 (Dkt. #95), while Southwest did not file the instant opposition brief until well after 8:00 p.m. that day. (Dkt. #96) Despite having nearly five hours to review Defendants' brief discussing Southwest's misrepresentations of the record, Southwest chose to republish many of the same misrepresentations to the Court.

## II.    ARGUMENT

### A.    Southwest Cannot Prevail On Its Contract Claims.

#### 1.    Although Florida Law Cannot Be Applied To The Contracts, It Would Not Salvage Southwest's Claims.

As before, Southwest erroneously relies on *Eakle v. Grinnell Corp.*, 272 F. Supp. 2d 1304 (E.D. Okla. 2003), in its effort to divert attention from the public policy violation that would result from the application of Florida law.[1] The *Eakle* court relied on an unpublished decision applying Kansas law, not Oklahoma law, with regard to the critical public policy issue. *See id.* at 1312 (citing *Mirville v. Mirville*, 10 Fed. Appx. 640 (10th Cir. 2001)). The following year, in *Oliver v. Omnicare, Inc.*, 103 P.3d 626, 628 (Okla. App. 2004), Oklahoma clarified that its public policy is synonymous with its statutes -- implicitly negating *Eakle* and *Mirville*. The *Oliver* court held that a contractual choice-of-law clause could be applied only if the foreign state's *law* -- as opposed to the contract itself -- "does not violate the provisions of Oklahoma law with respect to contracts in restraint of trade." *Id.* at 629. Florida law does just that.

---

[1] Southwest's suggestion that the Court has already decided to apply Florida law is incorrect. The Court explicitly said that its statements from the bench on September 24 were merely an "overview of where I am preliminarily, so that you can then focus on disabusing me of any incorrect notions I have . . . ." (Dkt. #72 at 4)

Contrary to the narrow provisions of Okla. Stat. tit. 15, § 218, Florida purports to impose various presumptions favoring enforcement (*see* Fla. Stat. § 542.335(d)(3)) and to preclude this Court from even considering certain evidence (*see id.* at (g)(1)). The two cannot be reconciled.

Even putting aside the public policy problem, Southwest's contract claims would fail under Florida law because it requires not just any breach but a "material breach" to prevail on a contract. *See, e.g.*, *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999). Yet Southwest's briefing does not address or even acknowledge this heightened burden of proof that it would have the Court apply. Defendants respectfully submit that their successful efforts to keep Sappington and Emmer from working with customers in the seven-state area (other than aerospace industry end-users, to whom Southwest does not sell) preclude a finding of any breach, much less a material one.

Moreover, the Florida noncompete statute requires that Southwest "plead and prove" two things: "one or more legitimate business interests justifying the restrictive covenant," and "that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests." Fla. Stat. § 542.335(1)(b) and (c). Southwest has not articulated what its supposed interests are, or why a one-year, seven-state restriction is reasonably necessary. Rather, it argues for the application of Florida law and then effectively asks the Court to assume all requirements have been satisfied. It is not enough for Southwest to say merely that Sappington and Emmer "made a deal" (Southwest's Brief at 18) without justifying the terms.

Had Southwest tried to prove some legitimate business interest, it would have failed nonetheless under applicable Florida precedent. *Florida Hematology & Oncology v. Tummala*, 927 So. 2d 135 (Fla. App. 2006), *review dismissed*, 969 So.2d 316 (Fla. 2007), is instructive in this regard. Tummala had signed an agreement not to compete with his former employer for two

years within a 15-mile radius. *Id.* at 137. After his employment terminated, Tummala immediately opened an office within the restricted area. *Id.* Yet he was careful not to work with any of his former employer's patients. *Id.* Despite Tummala's direct competition within the restricted geographic territory, the court found in his favor because the employer failed to prove a legitimate business interest under the statute. *Id.* at 139. Similar facts and a similar outcome are found in another case, *University of Florida v. Sanal*, 837 So. 2d 512 (Fla. App. 2006). Southwest likewise has no legitimate business interests since Sappington and Emmer have not been competing for customers within the seven states.

Rather than discussing cases like these, Southwest instead cites two Tenth Circuit cases that have nothing to do with the issues in this lawsuit. (Southwest's Brief at 18) *Norton v. City of Marietta*, 432 F.3d 1145 (10th Cir. 2005), was a Section 1983 case with "hotly contested" facts surrounding a jail cell disturbance. *Id.* at 1154. A fellow inmate supported the plaintiff's version of the story, and the police had implicated the excessive use of force by using pepper spray. *Id.* Southwest's other case, *Burlington Northern & Santa Fe Railway Co. v. Grant.*, 505 F.3d 1013 (10th Cir. 2007), involved claims that a particular substance was an "imminent and substantial endangerment" under environmental law. *Id.* at 1022. Those claims were supported by both the EPA and expert witnesses who found "elevated levels of known carcinogens." *Id.* Given Southwest's lack of evidence, the "hotly contested" facts of *Norton* and the compelling expert opinions of *Burlington Northern* stand in stark contrast to the case now before this Court.

## 2.    No Authority Supports Southwest's Attempt To Subsume All The Various Agreements Into The Acquisition Agreement.

Southwest attempts to conflate the Acquisition Agreement with the separate agreements containing the restrictive covenants here. The authorities it cites do not support this attempt, however. Both Florida law and Oklahoma law provide that related agreements can be *construed*

together, but none of the authorities cited by Southwest on this issue suggest that courts can or should meld multiple agreements into one single contract.

In addition to the lack of support for Southwest's efforts to fold the various agreements together, the language of the agreements themselves is fatal to this claim. The Noncompetition Agreements contain integration clauses that explicitly apply not just to prior agreements but also "all *contemporaneous* oral negotiations, commitments, *writings* and understandings relating to the subject matter hereof." (Noncompetition Agreements at ¶ 17 (emphases added)) And if indeed the Acquisition Agreement was one with the other agreements, Southwest would not have needed to assert causes of action under it and the others separately, as it has in Counts I and II of the Second Amended Complaint. The various agreements stand on their own, and Southwest's inability to cite any language in the Acquisition Agreement that has been violated is telling.

Further, the Acquisition Agreement designates Orange County, Florida as the exclusive venue for any disputes thereunder -- which, of course, Southwest did not abide. (Acquisition Agreement at ¶ 10.9) Conversely, both the Employment Agreements and the Noncompetition Agreements specify that suit may be brought under those contracts anywhere within the seven-state area. (Employment Agreements at ¶ 17; Noncompetition Agreements at ¶ 10) It was these latter provisions to which Southwest adhered, underscoring that this dispute is about the restrictions in the separate agreements, not the 1997 deal or the Acquisition Agreement.

## B. The Lone Fact Southwest Offers In Support Of Count III Does Not Prove A Tortious Interference With Business Claim.

In an effort to salvage its Count III, tortious interference with business relations, Southwest first asserts that the Tenth Circuit misstated the elements of the claim in a published opinion. The particular decision, *Dill v. City of Edmond*, 155 F.3d 1193 (10th Cir. 1998), recites

four separate times that the relevant claim at issue is "tortious interference with business relations," the same claim Southwest asserts in Count III. *Id.* at 1201, 1207, 1208.

Even accepting Southwest's argument that on-point Tenth Circuit authority can be ignored, Count III still fails. The cause of action Southwest has pled requires that it establish a property right -- whether a contract or a business relation -- that was subject to interference, unlike a separate not at issue here. *See Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1094 (10th Cir. 2006) ("On appeal, Champagne argues that it did not need to separately plead interference with prospective business advantage, because this tort is 'encompassed' within the tort of interference with business relations. This is incorrect."); *Overbeck v. Quaker Life Ins. Co.*, 757 P.2d 846, 847-48 (Okla. App. 1984) (distinguishing different interference torts).

Southwest's entire argument under Count III hinges on just one fact -- as Southwest describes it, the "longstanding, 'evergreen' relationship with John Zink . . . ." (Southwest's Brief at 22) In the first instance, this "evergreen relationship" provided no guarantees that John Zink would continue purchasing from Southwest. (Sappington Dep. at 195-96) Southwest itself described the evergreen concept as an unwritten agreement "to continue business in good faith over a period of time with nothing really . . . documented, hard posted" and equated it with standardized pricing offered to a particular customer. (Southwest Dep. at 93-95) Thus, the evergreen relationship gave Southwest no property interest in ongoing revenue or orders. Despite the posted pricing, competitors like Rolled Alloys could always obtain business from John Zink "simply by going in and trying to beat the competition[']s pricing." (Sappington Dep. at 195) To this point, Rolled Alloys had an active customer relationship with John Zink before it even had a Tulsa office. (Ron Siegenthaler Decl. at ¶ 2) Southwest may believe it "controlled" its customers, as it claims elsewhere (Southwest's Brief at 18), but the facts show otherwise.

Nor can Southwest establish any interference, much less malicious or wrongful interference, with regard to John Zink. Citing a desire to get more bids, John Zink notified Southwest it was abandoning the posted pricing; nonetheless, Southwest has obtained *multiple* orders from John Zink since Sappington resigned. (Southwest Dep. at 95-96, 103, 225) Dan Sisney, who now oversees Southwest's Tulsa operations, was not aware of anything that Sappington or Emmer did to cause the changes that John Zink requested of Southwest -- and he said the posted pricing in place when Sappington resigned "was due for requoting" anyway. (*Id.* at 156-57) Further, the undisputed evidence establishes that Sappington and Emmer have had no contact with anyone at John Zink since they left Southwest. (Southwest Dep. at 184-85; Sappington Dep. at 198; Emmer Dep. at 103-04) Count III fails for all of these reasons.

### C.   Southwest's Fiduciary Duty Claims Cannot Stand.

Southwest admitted at deposition that it had no evidence of anything Emmer did as an employee that was not in its best interests. (Southwest Dep. at 153) Southwest's opposition brief makes but one assertion as to Emmer -- that he knew Rolled Alloys was opening an office in Tulsa but did not sound the alarm at Southwest. (Southwest's Brief at 23) Yet it is undisputed that Emmer did not know this was happening until another Southwest employee told him. (Emmer Dep. at 29) Before then, Emmer knew only that Siegenthaler was "thinking about contacting Rolled Alloys" to see if there were any opportunities for Siegenthaler. (*Id.* at 14)

As for Southwest's list of grievances against Sappington in support of this claim, many of these consist of managerial second-guessing on issues that were well known to Southwest President Mike Stanwood when he decided to award Sappington six-figure bonus payments that were entirely discretionary. (Stanwood Dep. at 77-78) These actions by Sappington were minor concerns at most during Sappington's employment, and they are not actionable now.

Whether Sappington told Stanwood that Rolled Alloys was opening an office in Tulsa is beside the point. (Southwest's Brief at 23)  It is undisputed that Stanwood was a hands-off supervisor who gave Sappington complete authority for the Tulsa operations. (Stanwood Dep. at 32-33; Sappington Dep. at 179)  Moreover, Southwest's selective citation to the *Restatement (Third) of Agency* omits the following principle: "[A]n agent may take action, not otherwise wrongful, to prepare for competition following termination of the agency relationship." *Id.* at § 8.04. Sappington did not talk with customers about Rolled Alloys before resigning from Southwest, did not take business information, did not encourage Southwest employees to resign, and did not do anything "otherwise wrongful." He merely discussed and accepted a new job.

Given the dearth of guidance on fiduciary duty claims under Oklahoma law, Defendants respectfully submit that the Court should decline to make new law on the scant facts that Southwest has offered here.  Southwest's position would abrogate the well-established privilege employees have to quietly pursue a new job provided they, like Sappington and Emmer, refrain from committing fraudulent, unfair, or wrongful acts in the process.

**D.      Southwest Offers No New Argument In Support of Count V.**

Southwest offers no new argument in support of its Count V, choosing instead to cite its own motion for summary judgment. (Dkt. #82)  The reasons why that motion fails were set forth by Defendants in their March 12 opposition brief. (Dkt. #95)

**E.      Even Assuming Southwest Could Prove The Existence Of Trade Secrets, It Has No Evidence Of Misappropriation.**

Even without regard to Southwest's threshold requirement of establishing the *existence* of trade secrets under the Oklahoma statutory definition, Southwest simply has no evidence of misappropriation.  The passages from Southwest's own deposition testimony that Defendants cite in their motion made that clear.  In its opposition, Southwest underscores its weaknesses by

offering merely a naked implication that Sappington must have used business information because certain bids were awarded to Rolled Alloys. Southwest's syllogism falls apart when the supposedly "suspicious timing" (Southwest's Brief at 25) of Rolled Alloys' successes is viewed in the context of Ron Siegenthaler's efforts to capitalize on his own longstanding customer relationships, as well as Rolled Alloys' own preexisting relationships with many of the customers at issue. (*See* Southwest's Brief at 13; Siegenthaler Decl. at ¶¶ 2-11) The trade secrets claim is without merit.

### III.   CONCLUSION

Southwest filed nearly 2,000 pages of deposition transcripts with its opposition brief, yet it cites only 244 of those pages. Lacking quality evidence in the record, Southwest seeks unsuccessfully to obscure the failings of its case through sheer quantity. For the reasons set forth above and in Defendants' motion, summary judgment should be granted against Southwest and in Defendants' favor on all claims in the Second Amended Complaint.

Respectfully submitted,

OF COUNSEL:

Timothy P. Reilly
reilly@taftlaw.com
Justin D. Flamm
flamm@taftlaw.com
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH  45202-3957
(513) 381-2838
(513) 381-0205 - FAX

 /s/ Jason S. Taylor
J. Ronald Petrikin, OBA# 7092
Jason S. Taylor, OBA# 17755
Conner & Winters, LLP
4000 One Williams Center
Tulsa, OK  74172-0148
(918) 586-5683
(918) 586-8683 - FAX
rpetrikin@cwlaw.com
jtaylor@cwlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing has been

served via CM/ECF this 26th day of March, 2008 upon the following:

Donald Mitchell Bingham
Riggs Abney Neal Turpen Orbison & Lewis
502 W. 6th Street
Tulsa, OK 74119-1010

James Ronald Polan
Riggs Abney Neal Turpin Orbison & Lewis
502 W. 6th Street
Tulsa, OK 74119-1010

William E. Grob
Ford & Harrison LLP
101 E. Kennedy Blvd. Suite 900
Tampa, FL 33602-5133

Dinita L. James
Ford & Harrison LLP
2525 East Camelback Road, Suite 450
Phoenix, AZ 85016

/s/ Jason S. Taylor

WILLIAM BENJAMIN EMMER, 9-10-07          Page   1

1        IN THE UNITED STATES DISTRICT COURT FOR THE

2              NORTHERN DISTRICT OF OKLAHOMA

3

4    SOUTHWEST STAINLESS, LP, a        )      ⓒⓄⓅⓎ
     Delaware limited partnership,     )
5                                      )
             Plaintiff,                )
6                                      )
     VS.                               )  NO. 07-CV-334-CVE-PJC
7                                      )
     JOHN R. SAPPINGTON, WILLIAM B.    )
8    EMMER, RONALD L. SIEGENTHALER     )
     and ROLLED ALLOYS, INC.,          )
9    a Michigan corporation,           )
                                       )
10           Defendants.               )

11

12   - - - - - - - - - - - - - - - - - - - - - - - - -

13

14        *VOLUME I DEPOSITION OF WILLIAM BENJAMIN EMMER,*

15   produced as a witness on behalf of the Plaintiff, in

16   the above styled and numbered cause, taken on the 10th

17   day of September, 2007, in the City of Tulsa, County of

18   Tulsa, State of Oklahoma, before me, Marlene Percefull,

19   Certified Shorthand Reporter, duly certified under and

20   by virtue of the laws of the State of Oklahoma.

21

22

23

24

25

WILLIAM BENJAMIN EMMER, 9-10-07          Page   14

1    anybody about the possibility of working with Rolled          4:53PM

2    Alloys?

3    A    We were playing golf.

4    Q    When you say "we," who was that?

5    A    Ron and I.                                                4:53PM

6    Q    Okay.

7    A    And at that time he told me that he was thinking

8    about talking to them about seeing what might be

9    available.

10   Q    Okay.  And when was that?                                4:53PM

11   A    That would have been mid to late summer.

12   Q    August?

13   A    August, September.

14   Q    Okay.  2006?

15   A    Right.                                                   4:53PM

16   Q    And did the topic come up on the golf course?

17   A    Yes.

18   Q    And how did Mr. Siegenthaler raise it?

19   A    He just said that I'm thinking about contacting

20   Rolled Alloys and see if there's anything there for me       4:54PM

21   and that's --

22   Q    How did you respond?

23   A    I was surprised.

24   Q    Was there any talk about, hey, Bill, if I go,

25   would you be interested?                                     4:54PM

| | | |
|---|---|---|
| 1 | working for Rolled Alloys before you went over there? | 5:10PM |
| 2 | A    No. | |
| 3 | Q    When is the first time that you knew Rolled Alloys | |
| 4 | had opened a branch in Tulsa? | |
| 5 | A    Oh, gosh.  I don't recall when it would have been. | 5:10PM |
| 6 | Q    Was it before your conversation with | |
| 7 | Mr. Siegenthaler in December? | |
| 8 | A    Yes. | |
| 9 | Q    Because you had that conversation on the golf | |
| 10 | course mid to late summer, you said August or | 5:10PM |
| 11 | September, and then your next conversation with | |
| 12 | Mr. Siegenthaler was December 2006.  How did you know | |
| 13 | that Rolled Alloys had opened a branch without talking | |
| 14 | to Mr. Siegenthaler? | |
| 15 | A    Well, Pete Kaup had told me about that, asked me | 5:11PM |
| 16 | if I knew about it.  And I said I didn't.  And I asked | |
| 17 | him where he heard about it.  And he said he heard | |
| 18 | about it from Mitch Silman. | |
| 19 | Q    When was that? | |
| 20 | A    I don't remember when it was.  I would guess | 5:11PM |
| 21 | sometime in October. | |
| 22 | Q    And so Pete Kaup said that he had heard that | |
| 23 | Rolled had opened a branch? | |
| 24 | A    Correct. | |
| 25 | Q    Did you ask anybody about it? | 5:11PM |

WILLIAM BENJAMIN EMMER, 9-11-07          Page  48

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2              NORTHERN DISTRICT OF OKLAHOMA

 3

 4   SOUTHWEST STAINLESS, LP, a          COPY
     Delaware limited partnership,  )

 5                                   )
              Plaintiff,             )
 6                                   )
     VS.                             )  No. 07-CV-334-CVE-PJC
 7                                   )
     JOHN R. SAPPINGTON, WILLIAM B.  )
 8   EMMER, RONALD L. SIEGENTHALER   )
     and ROLLED ALLOYS, INC.,        )
 9   a Michigan corporation,         )
                                     )
10            Defendants.            )

11

12   - - - - - - - - - - - - - - - - - - - - - - - - -

13

14        VOLUME II DEPOSITION OF WILLIAM BENJAMIN EMMER,

15   produced as a witness on behalf of the Plaintiff, in

16   the above styled and numbered cause, taken on the 10th

17   day of September, 2007, in the City of Tulsa, County of

18   Tulsa, State of Oklahoma, before me, Marlene Percefull,

19   Certified Shorthand Reporter, duly certified under and

20   by virtue of the laws of the State of Oklahoma.

21

22

23

24

25
```

WILLIAM BENJAMIN EMMER, 9-11-07          Page 103

```
 1   Q     And do you know if Chanute was doing business with 10:17AM
 2   Rolled Alloys prior to you coming over there?
 3   A     Chanute was.
 4   Q     How do you know that?
 5   A     I remember their name.                              10:18AM
 6   Q     Do you remember seeing any business -- any records
 7   of purchases by Chanute when you went over to Rolled
 8   Alloys?
 9   A     Any records of purchase by Chanute?
10   Q     Yes, sir.                                           10:18AM
11   A     No.  At -- from Rolled Alloys?
12   Q     Yes, sir.
13   A     No, I don't recall having seen any.
14   Q     What about Bemberg, were they doing business with
15   Rolled Alloys before you got there?                      10:18AM
16             MR. FLAMM:  Objection.
17             Answer that if you know, Bill.
18   A     I'm not sure if they were or not.
19   Q     Do you recall seeing any documentation that
20   Bemberg was doing any business with Rolled Alloys after 10:18AM
21   you had gotten there?
22   A     No, I don't recall seeing any documentation to
23   that effect.
24   Q     What about John Zink, have you personally had any
25   contact with anyone at John Zink on behalf of Rolled    10:19AM
```

WILLIAM BENJAMIN EMMER, 9-11-07          Page 104

| | | |
|---|---|---|
| 1 | Alloys? | 10:19AM |
| 2 | A    No. | |
| 3 | Q    Do you know of anyone who has had any contact with | |
| 4 | John Zink on behalf of Rolled Alloys since you have | |
| 5 | been there? | 10:19AM |
| 6 | A    Ron Siegenthaler. | |
| 7 | Q    Anyone other than Mr. Siegenthaler? | |
| 8 | A    Not to my knowledge. | |
| 9 | Q    What about Hughes-Anderson, have you personally | |
| 10 | had any communication with anyone at Hughes-Anderson | 10:19AM |
| 11 | since you started at Rolled Alloys? | |
| 12 | A    No. | |
| 13 | Q    Do you know of anyone who has personally had any | |
| 14 | communication with anyone at Hughes-Anderson on behalf | |
| 15 | of Rolled Alloys since you have been there? | 10:19AM |
| 16 | A    Ron. | |
| 17 | Q    Anyone else? | |
| 18 | A    No.  Let me back up.  Todd, inside sales. | |
| 19 | Q    Todd Lesikar? | |
| 20 | A    Yes. | 10:20AM |
| 21 | Q    So do you know if he has been in communication | |
| 22 | with anyone on behalf of John Zink? | |
| 23 | A    I don't know. | |
| 24 | Q    How about Hughes-Anderson? | |
| 25 | A    Yeah.  Hughes-Anderson, he has. | 10:20AM |

JEFF LEGRAND, 9-13-07                    Page  1

1    IN THE UNITED STATES DISTRICT COURT FOR THE

2         NORTHERN DISTRICT OF OKLAHOMA

3

4  SOUTHWEST STAINLESS, LP, a         )        © O P Y
   Delaware limited partnership,      )

5              Plaintiff,             )

6  vs.                                )    NO. 07-CV-334-CVE-PJC

7  JOHN R. SAPPINGTON, WILLIAM B.     )
8  EMMER, RONALD L. SIEGENTHALER      )
   and ROLLED ALLOYS, INC.,           )
9  a Michigan corporation,            )

10             Defendants.            )

11

12  - - - - - - - - - - - - - - - - - - - - - - - -

13

14        *THE 30(b)(6) DEPOSITION OF JEFF LEGRAND*,

15  produced as a witness on behalf of the Defendants, in

16  the above styled and numbered cause, taken on the 13th

17  day of September, 2007, in the City of Tulsa, County of

18  Tulsa, State of Oklahoma, before me, Marlene Percefull,

19  Certified Shorthand Reporter, duly certified under and

20  by virtue of the laws of the State of Oklahoma.

21

22

23

24

25

JEFF LEGRAND, 9-13-07                     Page   93

1   pricing with John Zink in the Metals division.                2:01PM

2   Q    Is there anything else to your answer?

3   A    No.

4   Q    Who are these 12 to 15 customers we're talking

5   about?                                                        2:01PM

6         MR. GROB:  Please answer based on my

7   instruction.

8   A    Dow Chemical, BP, Bear, Valero, Total Petro

9   Chemical.  I'm trying to think who else.  Those are the

10  top ones off the top of my head.                              2:02PM

11  Q    Now, you said in the Metals division -- strike

12  that.  You said those were all outside of the Metals

13  division?

14  A    Correct.

15  Q    Are there any within the Metals division with     2:02PM

16  which Southwest has pricing agreements?

17  A    Like I said, we had posted pricing with John Zink.

18  Q    What do you mean by that?

19  A    We no longer have posted pricing with John Zink.

20  Q    What do you mean by posted pricing?                      2:02PM

21  A    Mr. Sappington would negotiate, I'm not sure

22  exactly how the transaction took place, but we would

23  post prices with John Zink for a period of time, 30

24  days, 60 day, 90 days, whatever that period of time

25  was, and they would place orders at those posted          2:02PM

JEFF LEGRAND, 9-13-07                    Page  94

| | | |
|---|---|---|
| 1 | prices. | 2:02PM |
| 2 | Q    Why is it that Southwest no longer has posted | |
| 3 | prices? | |
| 4 | A    Because shortly after Mr. Sappington and Mr. Emmer | |
| 5 | left, we were informed by John Zink that they would be | 2:02PM |
| 6 | no longer placing orders off the posted pricing. | |
| 7 | Q    Who at John Zink informed you of that? | |
| 8 | A    I personally wasn't informed of that.  I was | |
| 9 | informed of that by Mr. Sisney.  I do not remember the | |
| 10 | name of who else told everyone. | 2:03PM |
| 11 | Q    There was some testimony earlier in the week when | |
| 12 | you were in the room regarding evergreen agreements, do | |
| 13 | you recall that? | |
| 14 | A    Mm-hmm. | |
| 15 | Q    What does the term "evergreen agreement" mean? | 2:03PM |
| 16 | MR. GROB:  Mr. Legrand, please make sure | |
| 17 | that you answer with a verbal response. | |
| 18 | A    It's an agreement that you have with a customer | |
| 19 | that you're going to continue business in good faith | |
| 20 | over a period of time with nothing really, you know, | 2:03PM |
| 21 | documented, hard posted. | |
| 22 | Q    So it's an unwritten agreement, is that correct? | |
| 23 | A    Yes. | |
| 24 | Q    With whom does Southwest have evergreen agreements | |
| 25 | with? | 2:03PM |

JEFF LEGRAND, 9-13-07                    Page  95

```
 1   A    Again, it's many.  Many customers in all the        2:03PM
 2   divisions that we have businesses.

 3   Q    Well, let's talk about what you've referred to as

 4   the Metals division regarding the evergreen agreement

 5   customers for the Metals division.                       2:03PM

 6   A    The only ones I was aware of was Koch and John

 7   Zink.

 8   Q    And those are still in place today as far as

 9   Southwest is concerned?

10   A    I'm not that familiar with Koch, but I know that    2:04PM

11   John Zink is not.

12   Q    And when did the evergreen agreement between

13   Southwest and John Zink cease to exist?

14   A    The posted pricing, whether you call that an

15   evergreen agreement or not, which I consider it an       2:04PM

16   evergreen agreement, ended with Mr. Sappington and

17   Mr. Emmer leaving Metals.

18   Q    And that was at the request of the customer,

19   correct?

20   A    Whether it was at the request of the customer or    2:04PM

21   not, we know our business patterns changed with the

22   customer when they said they would no longer be buying

23   off the posted pricing.

24   Q    So the customer communicated to Southwest that it

25   was no longer purchasing under this evergreen            2:04PM
```

JEFF LEGRAND, 9-13-07                    Page   96

1   agreement, correct?                                    2:04PM

2   A    Correct.

3   Q    What about Koch?  Is that evergreen agreement

4   still in place?

5   A    I'm not aware if it is or not.                    2:05PM

6   Q    Southwest is not aware?

7   A    Not aware.

8   Q    What about the marketing trade secrets of

9   Southwest, what are those?

10  A    How we go to market, sometimes we go to market as  2:05PM

11  a division on it's own, sometimes we go to market as a

12  complete entity under the IPVF banner.

13  Q    Anything else?

14  A    (Shakes head from side to side.)

15  Q    Who at Southwest is privy to that marketing       2:05PM

16  information you consider trade secret?

17  A    It would be myself, and depending on the customer

18  that we approach, that salesperson, that manager.  Each

19  market is different, each business is different how

20  they want to approach a particular customer.          2:05PM

21  Q    So that would be some of the 100-plus salespeople

22  with no noncompetes?

23  A    Correct.

24  Q    Anyone else have access to that marketing

25  information?                                           2:06PM

JEFF LEGRAND, 9-13-07                    Page 103

| | | |
|---|---|---|
| 1 | A     I'm not aware if they have or not.  I'm sure there | 2:14PM |
| 2 | has been some discussions. | |
| 3 | Q     Who at Southwest has talked to anyone at John Zink | |
| 4 | about the posted pricing issue? | |
| 5 | A     Dan Sisney may have, Les Lane may have.  Les Lane | 2:14PM |
| 6 | is an outside salesman. | |
| 7 | Q     And what did John Zink tell Southwest about the | |
| 8 | posted pricing issue? | |
| 9 | A     They felt because of -- my understanding is they | |
| 10 | felt because of the current market they needed to go | 2:14PM |
| 11 | out for more bids. | |
| 12 | Q     So your understanding -- strike that.  Southwest's | |
| 13 | understanding is that Zink stated it wanted to get more | |
| 14 | bids? | |
| 15 | A     Correct. | 2:15PM |
| 16 | Q     And that's why it stopped using the posted | |
| 17 | pricing? | |
| 18 | A     Correct.  That's what we were told by Zink. | |
| 19 | Q     Who at Zink told you that? | |
| 20 | A     Like I said, I'm not familiar with the people | 2:15PM |
| 21 | there.  I'm more -- when they told us, I did not ask | |
| 22 | them for names.  I do not have direct contact with the | |
| 23 | customers at Metals. | |
| 24 | Q     But someone at Southwest did. | |
| 25 | A     Dan Sisney or Les Lane, yes. | 2:15PM |

1  telling Mr. Murphy what should be going on in the shop.   3:26PM

2  Q    Any other actions that Southwest claims

3  Mr. Sappington took before leaving Southwest that were

4  not in Southwest's best interest?

5  A    No.                                                   3:26PM

6  Q    What does Southwest claim Mr. Emmer did before

7  leaving Southwest that were not in Southwest's best

8  interests?

9  A    Mr. Emmer's role at the time was consultant, and

10  I'm not sure how much time was spent in the office, so   3:26PM

11  I couldn't -- I couldn't answer that.

12  Q    So Southwest doesn't know anything that Mr. Emmer

13  did that was not in the best interest?

14  A    Prior to leaving?

15  Q    Prior to leaving.                                    3:26PM

16  A    No.

17  Q    Does Southwest believe that any of

18  Mr. Sappington's activities as alleged in this case

19  have been criminal?

20  A    Well, that's a pretty broad term.  I believe        3:27PM

21  Mr. Sappington was not doing his fiduciary duty to

22  protect this company.  Whether that constitutes

23  criminal or not, I'm not sure.  I'm not a lawyer.

24  Q    Has anyone at Southwest ever said to anyone else

25  that Mr. Sappington did anything that rose to the level  3:27PM

JEFF LEGRAND, 9-13-07          Page 156

| | | |
|---|---|---|
| 1 | Q   Do you know if Southwest sent any demand letters | 3:30PM |
| 2 | to Mr. Sappington about his employment? | |
| 3 | A   No. | |
| 4 | Q   Do you know if Southwest sent Mr. Sappington any | |
| 5 | letters at all regarding his employment with Rolled | 3:30PM |
| 6 | Alloys? | |
| 7 | A   Other than the legal documents in this case, no. | |
| 8 | Q   Did Southwest know how Mr. Emmer was contacted | |
| 9 | about his employment with Rolled Alloys? | |
| 10 | A   Not that I'm aware of, no. | 3:30PM |
| 11 | Q   Did Southwest ever know? | |
| 12 | A   No. | |
| 13 | Q   Take a look, please, at what has been marked | |
| 14 | Exhibit 6, and tell me when you've had a chance to | |
| 15 | review that. | 3:31PM |
| 16 | A   Okay. | |
| 17 | Q   What is it? | |
| 18 | A   It's a declaration of Mr. Sappington. | |
| 19 | Q   Is that one of the documents that you reviewed in | |
| 20 | preparation to testify today? | 3:31PM |
| 21 | A   Yes. | |
| 22 | Q   I'd like you to go through that document line by | |
| 23 | line and tell me anything that Southwest believes is | |
| 24 | not entirely accurate. | |
| 25 | MR. GROB:  Object to form. | 3:31PM |

JEFF LEGRAND, 9-13-07                    Page 157

| | | |
|---|---|---|
| 1 | A    Well, you know, I can't attest to what | 3:33PM |
| 2 | Mr. Sappington is doing for Rolled Alloys. | |
| 3 | Q    In other words, Southwest can't say anything about | |
| 4 | what he is doing for Rolled Alloys, right? | |
| 5 | A    Correct.  I mean, you know, aerospace alloys is a | 3:33PM |
| 6 | pretty broad term. | |
| 7 | Q    Okay.  We can come back to that.  What else in | |
| 8 | here do you think on behalf of Southwest might not be | |
| 9 | entirely accurate? | |
| 10 | A    I believe Mr. Sappington's position is more than | 3:33PM |
| 11 | outside sales. | |
| 12 | Q    Okay.  What else? | |
| 13 | A    Number 6, I don't believe that.  I don't believe | |
| 14 | he had a problem with that. | |
| 15 | Q    Can you say that again? | 3:34PM |
| 16 | A    Number 6, I believe he solicited employees of | |
| 17 | Metals. | |
| 18 | Q    And that's just the one employee you mentioned, | |
| 19 | correct? | |
| 20 | A    Yes. | 3:34PM |
| 21 | Q    Ms. Lewis? | |
| 22 | A    Well, we also know Mr. Brown was contacted, but we | |
| 23 | think that was Mr. Lesikar but they all worked out of | |
| 24 | the same office. | |
| 25 | Q    You don't know that Mr. Brown was contacted by | 3:34PM |

JEFF LEGRAND, 9-13-07          Page 184

| | |
|---|---|
| 1 | working for Rolled Alloys so they have a comfort level | 4:16PM |
| 2 | that they would be taken care of in the way they've |
| 3 | been taken care of in the past. |
| 4 | Q    who at John Zink has Mr. Sappington contacted |
| 5 | since he left Southwest? | 4:16PM |
| 6 | A    I can't give you a specific name. |
| 7 | Q    Southwest doesn't know if he's had contact with |
| 8 | anyone at John Zink, correct? |
| 9 | A    He does not need to contact anyone directly.  He |
| 10 | is there. | 4:16PM |
| 11 | Q    Southwest doesn't know anyone at John Zink that |
| 12 | John Sappington has contacted since he left Southwest, |
| 13 | correct? |
| 14 |         MR. GROB:  Object to form. |
| 15 | A    I don't know if Mr. Sappington has talked to | 4:16PM |
| 16 | anyone directly or not but, once again, he doesn't have |
| 17 | to. |
| 18 | Q    Southwest doesn't know of anyone at John Zink that |
| 19 | Mr. Sappington has contacted since he left Southwest, |
| 20 | yes or no? | 4:16PM |
| 21 |         MR. GROB:  Object to the form. |
| 22 | A    No.  I don't know if he's contacted anyone. |
| 23 | Q    what about Mr. Emmer at John Zink? |
| 24 | A    Once again, relationships that he's built up over |
| 25 | the years are intact. | 4:17PM |

JEFF LEGRAND, 9-13-07          Page 185

| | | |
|---|---|---|
| 1 | Q    And I understand your point about the | 4:17PM |
| 2 | relationships.  What I'm asking you is not about | |
| 3 | relationships, what I'm asking you about is contacts | |
| 4 | and I want to know who at John Zink Mr. Emmer has | |
| 5 | contacted since he left Southwest? | 4:17PM |
| 6 | A    The answer is the same for Mr. Sappington at this | |
| 7 | time.  I'm not sure if -- we are not sure if he's | |
| 8 | contacted anyone. | |
| 9 | Q    So Southwest doesn't have any knowledge of having | |
| 10 | any contacts by Mr. Emmer? | 4:17PM |
| 11 | A    At this time. | |
| 12 | Q    Who at Hughes-Anderson has John Sappington | |
| 13 | contacted since he left Southwest? | |
| 14 | A    He plays golf with a gentleman every Wednesday | |
| 15 | night. | 4:17PM |
| 16 | Q    Who is that? | |
| 17 | A    Once again, you asked this question a few minutes | |
| 18 | ago.  I'm not sure of the gentleman's name. | |
| 19 | Q    And what business has been discussed between the | |
| 20 | two of them? | 4:17PM |
| 21 | A    I wasn't in the golf cart. | |
| 22 | Q    What business does Southwest know that has been | |
| 23 | discussed between Mr. Sappington and the gentleman from | |
| 24 | Hughes-Anderson? | |
| 25 | A    Mr. Sappington could have, you know, not played in | 4:17PM |

JEFF LEGRAND, 9-13-07                    Page 225

| | | |
|---|---|---|
| 1 | Q     How do you know that? | 5:01PM |
| 2 | A     It's our belief. | |
| 3 | Q     What facts does Southwest have to support those | |
| 4 | beliefs? | |
| 5 | A     Our beliefs are, the facts are, Rolled Alloys came | 5:02PM |
| 6 | in to this marketplace and hired the people that had | |
| 7 | the most experience in the marketplace.  These | |
| 8 | gentlemen have noncompete agreements and employment | |
| 9 | agreements that forbid them from doing that with the | |
| 10 | sale of the company, the goodwill they provided the | 5:02PM |
| 11 | company in the acquisition. | |
| 12 | Q     Has Southwest obtained any orders from John Zink | |
| 13 | since Mr. Sappington left? | |
| 14 | A     Yes. | |
| 15 | Q     How many? | 5:02PM |
| 16 | A     I couldn't tell you how many. | |
| 17 | Q     More than one? | |
| 18 | A     Yes. | |
| 19 | Q     More than five? | |
| 20 | A     Possibly. | 5:02PM |
| 21 | Q     How much money do those orders reflect in terms of | |
| 22 | revenue? | |
| 23 | A     I believe I just answered that question a while | |
| 24 | ago that I didn't know how much business we have done | |
| 25 | with John this year. | 5:02PM |

JOHN R. SAPPINGTON, 9-10-07          Page    1

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2              NORTHERN DISTRICT OF OKLAHOMA

 3

 4   SOUTHWEST STAINLESS, LP, a        )     COPY
     Delaware limited partnership,     )
 5                                      )
               Plaintiff,              )
 6                                      )
     vs.                                )     No. 07-CV-334-CVE-PJC
 7                                      )
     JOHN R. SAPPINGTON, WILLIAM B.    )
 8   EMMER, RONALD L. SIEGENTHALER     )
     and ROLLED ALLOYS, INC.,          )
 9   a Michigan corporation,           )
                                        )
10             Defendants.             )

11

12   - - - - - - - - - - - - - - - - - - - - - - - - - - -

13

14         THE DEPOSITION OF JOHN RUSSELL SAPPINGTON,

15   produced as a witness on behalf of the Plaintiff, in

16   the above styled and numbered cause, taken on the 10th

17   day of September, 2007, in the City of Tulsa, County of

18   Tulsa, State of Oklahoma, before me, Marlene Percefull,

19   Certified Shorthand Reporter, duly certified under and

20   by virtue of the laws of the State of Oklahoma.

21

22

23

24

25
```

JOHN R. SAPPINGTON, 9-10-07          Page 147

| | | |
|---|---|---|
| 1 | years and no one ever told you that they were going | 12:16PM |
| 2 | over there before someone told you, "Hey, I saw them at | |
| 3 | the airport"? | |
| 4 | MR. FLAMM:  Objection. | |
| 5 | A    Nobody told me. | 12:17PM |
| 6 | Q    Mr. Sappington, did you not have a number of | |
| 7 | closed-door meetings with Mr. Emmer in the weeks | |
| 8 | leading up to his leaving? | |
| 9 | A    No. | |
| 10 | Q    You never went into in Mr. Emmer's office behind | 12:17PM |
| 11 | closed doors and had a conversation with him for a half | |
| 12 | hour or 45 minutes? | |
| 13 | A    No, absolutely not. | |
| 14 | Q    When Lesikar left, what was his position? | |
| 15 | A    Sales, inside sales. | 12:17PM |
| 16 | Q    And you said he left in January 2007, correct? | |
| 17 | A    I think that was the time frame, yes. | |
| 18 | Q    Who did you replace him with? | |
| 19 | A    Well, to be honest with you, I don't know if we | |
| 20 | replaced him with a gentleman from our shop, Owen | 12:17PM |
| 21 | Thornton. | |
| 22 | Q    What do you mean when you say a gentleman from | |
| 23 | your shop? | |
| 24 | A    There was a gentleman that had worked in our shop | |
| 25 | for a period -- for a long period of time that we felt | 12:17PM |

JOHN R. SAPPINGTON, 9-10-07          Page 179

1   Q    Well, I don't think we asked that question.  But        2:00PM

2   is that your answer, you didn't feel an obligation to

3   talk to Mr. Stanwood about it?

4          MR. FLAMM:  Same objection.

5   A    It was not necessarily that I didn't have -- I          2:00PM

6   feel I had an obligation.  I felt like we acted pretty

7   much independently.  He liked it and I liked it.  He

8   let me did my thing so I felt like I can handle it on a

9   local basis without having to report anything to him.

10  He was not a micromanager.                                    2:01PM

11  Q    Mr. Sappington, you just testified that you knew

12  that Mr. Stanwood was taking a more active role in the

13  management of your branches, which was one of reason

14  you were more unhappy toward the latter part of that

15  year 2006.  So that doesn't just jive with what he said   2:01PM

16  about, well, I can do what I want because I was running

17  my own branch?

18          MR. FLAMM:  Objection.  Your

19  characterization of his testimony.

20  Q    If you speak louder, it's not going to make any       2:01PM

21  difference.

22          MR. FLAMM:  I'm making my objection.

23  Q    You can answer.

24  A    Mr. Stanwood was dictating what we would do in our

25  branch.  There was no discussion about it.  This is the   2:01PM

JOHN R. SAPPINGTON, 9-10-07          Page 195

```
 1   A    I'm not aware of any.                          2:19PM
 2   Q    Do you know whether Rolled Alloys had the same
 3   pricing structure?  And I don't mean by saying prices
 4   but the same deal with John Zink where they publish
 5   prices for a period of time and they could buy off that  2:19PM
 6   published list.
 7   A    I don't believe any other distributor including
 8   Rolled Alloys would have had any published pricing
 9   because Metals was in there, had basically an
10   Evergreen, no contract but an Evergreen agreement with   2:20PM
11   link to supply them material.
12               And as Mr. Dawkins often said, serve
13   was a big part of that.  We were local, they were
14   local, so it was very difficult for another industry
15   to come in.  So if you're on the outside looking in    2:20PM
16   as Rolled was, you got in there simply by going in
17   and trying to beat the competitions pricing.
18   Q    And you were the competition at Metals, correct?
19   A    Metals has always been the competition.
20   Q    And when it comes to John Zink, you were         2:20PM
21   definitely the guys to beat, is that right?
22   A    Absolutely.
23   Q    And you said an Evergreen agreement, can you tell
24   me what you mean by that?
25   A    Well, there was nothing stating that there was a  2:20PM
```

JOHN R. SAPPINGTON, 9-10-07          Page 196

1   hard and fast contact.  There was an agreement by John       2:20PM
2   Zink and by their current company, Koch, to buy from --
3   Koch had an agreement with STP solely.  John Zink had
4   an agreement with Metals and STP to buy products from
5   them.  Didn't guarantee anything, it just -- we will        2:21PM
6   all continue to buy product from you as long as you
7   continue to service, as long as you continue to keep us
8   competitive, all those good things.  If you ever cease
9   to do that, then you're out.
10  Q    How long did you have that Evergreen agreement?        2:21PM
11  Whether you say Koch, is that K-O-C-H?
12  A    K-O-C-H.
13  Q    Okay.  How long did you have that, what you have       2:21PM
14  referred to as Evergreen agreement with Koch?
15  A    I'm going to say that an agreement was started in      2:21PM
16  the early '90s, 1991, '92, I'm not sure.
17  Q    So you had that -- that agreement in place during
18  the acquisition, correct?
19  A    Yes.
20  Q    And was Koch one of those entities that was            2:21PM
21  anticipated to transfer their business subsequent to
22  the acquisition?  Let me put it in a different way.  To
23  continue doing business with whatever the Metals Group
24  was after the acquisition, was it anticipated --
25  A    Yes.                                                   2:22PM

JOHN R. SAPPINGTON, 9-10-07          Page 198

| | | |
|---|---|---|
| 1 | general discussion in the office. | 2:23PM |
| 2 | Q   What did you hear? | |
| 3 | A   That we have taken some orders from John Zink. | |
| 4 | Q   Do you know if Rolled Alloys has any published | |
| 5 | pricing for John Zink while you were working for them | 2:23PM |
| 6 | now? | |
| 7 | A   I can't say because, again, I don't get involved | |
| 8 | in the pricing or the handling of John Zink, so I don't | |
| 9 | know if we have published pricing or not. | |
| 10 | Q   But you were pretty sure -- | 2:23PM |
| 11 | A   I don't think so. | |
| 12 | Q   Okay. You were pretty sure that Metals was the | |
| 13 | only one that published pricing with them at least for | |
| 14 | the Tulsa business but before you went over there, | |
| 15 | correct? | 2:23PM |
| 16 | A   Correct. | |
| 17 | Q   But you don't know now whether Rolled Alloys has | |
| 18 | any published pricing with them, do you? | |
| 19 | A   I don't believe there is, but, again, I can't say | |
| 20 | 100 percent that there is not. | 2:24PM |
| 21 | Q   And after you arrived at Rolled Alloys, did you | |
| 22 | have -- did you come to find out whether Rolled Alloys | |
| 23 | had done any business with John Zink while you were | |
| 24 | working for Metals? | |
| 25 | A   Yes. | 2:24PM |

1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2
    SOUTHWEST STAINLESS, LP,     )
 3       PLAINTIFF,              )
                                 )
 4   VS.                         ) CASE NO: 07-CV-334-CVE-FHM
                                 )
 5   JOHN R. SAPPINGTON,         )
     WILLIAM B. EMMER, AND       )
 6   ROLLED ALLOYS, INC.,        )
        DEFENDANTS.              )
 7

 8

 9
    ********************************************************
10

11              DEPOSITION OF MIKE STANWOOD

12                   November 15, 2007

13
    ********************************************************
14

15

16

17      DEPOSITION OF MIKE STANWOOD, produced at the
    instance of Defendants and duly sworn, was taken in the
18  above-styled and numbered cause on the 15th day of
    November, 2007, from 8:25 a.m. until 12:14 p.m., before
19  Judy S. Hodges, CSR, RPR, in and for the State of
    Texas, reported by stenograph machine, at the offices
20  of Southwest Stainless, L.P., 8505 Monroe Road,
    Houston, Harris County, Texas.
21

22

23

24            COPY

25                              JOB NUMBER: _____
```

32

```
 1      Q    Do you know if it was more than two years ago?

 2      A    I would assume it was more than two years

 3   ago.  Again, I don't know.

 4      Q    How often were you in contact with

 5   Mr. Sappington when he was reporting to you?

 6      A    It would vary, always at the end of the month

 7   because we were getting numbers in.  We would have

 8   meetings where I would call John and, you know, help

 9   set up a meeting.  Or if John needed something, needed

10   something like new equipment, we'd talk about getting

11   into different products.  Basically that's it.  We

12   would discuss how to expand our markets.

13      Q    What kind of contact did you have, in person,

14   telephone, e-mail?

15      A    Both, both.

16      Q    How often did you talk to him on the

17   telephone?

18      A    Probably once or twice a month, you know, some

19   months more than others.

20      Q    Did you communicate with him by e-mail?

21      A    Very seldom, if any.

22      Q    Did he come down to Houston?

23      A    Uh-huh.

24      Q    How often?

25      A    Probably once a quarter.
```

Electronically signed by judy hodges (101-114-351-9776)          5bd545c6-f7a7-4191-9f1c-ee73843e2b7b

33

1    Q    Did you go up to Tulsa?

2    A    Very seldom.

3    Q    How often?

4    A    Tulsa, probably four times in the years.  I

5  didn't need to because John ran the location there.

6    Q    Four times total or four times each year?

7    A    No, four times total.

8    Q    What was Mr. Sappington's authority to run the

9  Tulsa operations?

10   A    Complete authority, hiring, firing, buying,

11  the markets, strategic moves.  It was his to run.

12   Q    Did you have any expectations for him to come

13  to you to get approval to do particular things?

14   A    Certain things we would -- as all the managers

15  of our division, we would discuss when we were getting

16  into different materials, different alloys, hiring

17  someone to, you know, represent us, just normal things

18  you'd do to run a business and as I do when I have to

19  report to my supervisor.

20   Q    Who is your supervisor?

21   A    Mr. Joe DeAngelo.

22   Q    Is he an employee of HD Supply?

23   A    Yes.

24   Q    What's his position?

25   A    President, CEO.

1    that may be where he was going.  I heard about it.  I

2    think that's what I said earlier.

3       Q    Was there anything with regard to

4    Mr. Sappington not meeting your expectations that came

5    to your attention after you decided to award him a

6    300,000-dollar-plus bonus in 2007?

7       A    After the bonus was awarded you said?

8       Q    After you had decided that he would get --

9       A    After he got it or after I decided?  Because I

10   would have to stick amounts in before.  After he got

11   the bonus, there was obviously the Todd situation.  If

12   he did know where he was going or not, I don't know.

13      Q    So you believe that Mr. Lesikar left after

14   you'd already decided what amount Mr. Sappington would

15   get?

16      A    You know, I don't know the date Mr. Lesikar

17   left.  My point with John, I decided on an amount that

18   John was to get; and quite honestly, John knew all

19   along.  It was no secret where the bonuses were

20   heading.  John had copies of his P&L every month and

21   had known the history of the bonus pool.

22      Q    What I really want to get to is, what came to

23   your attention about Mr. Sappington not meeting your

24   expectations after you decided that he would get a

25   300,000-dollar-plus bonus in 2007?

78

```
 1      A    Well, Mr. Sappington left shortly after the
 2   check was cashed.  So where he has ended up as an
 3   employee and where Todd has ended up, obviously I'm a
 4   little disappointed that -- you know, that possibly
 5   this was known all along.
 6      Q    What was known all along?
 7      A    That Rolled Alloys was coming to town and that
 8   during this period of time while cashing retention
 9   checks that possibly this was known.
10      Q    Why do you say possibly?
11      A    I -- you know, you asked me what I felt; and
12   this is how I felt.
13      Q    All the other stuff, though, Canada, Mobile,
14   Siegenthaler in the office, purchasing from overseas,
15   if John hadn't met your expectations on those, you
16   already knew it at the time you decided to give him a
17   big bonus in 2007, correct?
18      A    Yes, sir.
19      Q    Did you work with Mr. Emmer?
20      A    Mr. Emmer was part of the company that Hughes
21   Supply bought and had a few times got to, you know,
22   talk and do a little bit of work with Mr. Emmer, very
23   little over the years.
24      Q    How many times a year would you be in contact
25   with Mr. Emmer?
```

Electronically signed by judy hodges (101-114-351-9776)          5bd545c6-f7a7-4191-9f1c-ee73843e2b7b

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SOUTHWEST STAINLESS, LP, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) Case No: 07-CV-334-CVE-FHM |
| JOHN R. SAPPINGTON, et al., | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF RON SIEGENTHALER

Ron Siegenthaler truthfully states he is competent to testify if called, and he further truthfully states of his own personal knowledge as follows:

1.     I started working in the metals industry in the mid-1960s. As a result of my work in the industry and my efforts to stay in touch with my network of professional contacts, I have developed and maintained relationships with many people and businesses who have a need for the types of materials provided by metals suppliers such as Metals, Inc. and Rolled Alloys. Some history of my relationships with a few particular customers is set forth below.

2.     **John Zink**: I have known Robert Dawkins, Director of Materials for John Zink, since the late 1970s. I visited Mr. Dawkins shortly after I started making sales calls for Rolled Alloys in 2007, and soon thereafter Rolled Alloys' Tulsa office obtained business from John Zink (which was already doing business with Rolled Alloys in 2006 before the Tulsa office even opened). Neither John Sappington nor Bill Emmer worked with me in this process or provided me with any information about John Zink.

3.     **Hughes-Anderson**: I have called on Hughes-Anderson since the late 1960s for various different suppliers. I have known Monte Stewart, Hughes-Anderson's President, since

the 1980s.  I have also known Rich Gustafson, who handles purchasing for Hughes-Anderson, for years.  I visited Mr. Gustafson shortly after I started making sales calls for Rolled Alloys in 2007, and soon thereafter Rolled Alloys' Tulsa office obtained business from Hughes-Anderson (which was already doing business with Rolled Alloys in 2006 before the Tulsa office even opened).  Neither John Sappington nor Bill Emmer worked with me in this process or provided me with any information about Hughes-Anderson.

4.      **Wagner Plate Works**:  I have known Phil Lacy at Wagner Plate Works since the two of us worked together at Patterson Steel in the mid-1960s.  I visited Mr. Lacy shortly after I started making sales calls for Rolled Alloys in 2007, and soon thereafter Rolled Alloys' Tulsa office obtained business from Wagner Plate Works (which was already doing business with Rolled Alloys in 2006 before the Tulsa office even opened).  Neither John Sappington nor Bill Emmer worked with me in this process or provided me with any information about Wagner Plate Works.

5.      **Braden Manufacturing**:  I have called on Braden Manufacturing since the mid-1970s.  I visited Jerry Suitor at Braden Manufacturing shortly after I started making sales calls for Rolled Alloys in 2007, and soon thereafter Rolled Alloys' Tulsa office obtained business from Braden.  Neither John Sappington nor Bill Emmer worked with me in this process or provided me with any information about Braden Manufacturing.

6.      **Linde**:  I have known Wayne Inhofe at Linde for several years.  I visited Mr. Inhofe shortly after I started making sales calls for Rolled Alloys in 2007, and soon thereafter Rolled Alloys' Tulsa office obtained business from Linde.  Neither John Sappington nor Bill Emmer worked with me in this process or provided me with any information about Linde.

{W1235711.1}                                         2

7.   **Cust-o-Fab**: I have known Barry Keeler, a co-owner of Cust-o-Fab, since the 1970s. I visited Barry's son Eric Keeler, who is a purchasing agent for Cust-o-Fab, shortly after I started making sales calls for Rolled Alloys in 2007, and soon thereafter Rolled Alloys' Tulsa office obtained business from Cust-o-Fab (which was already doing business with Rolled Alloys in 2006 before the Tulsa office even opened). Neither John Sappington nor Bill Emmer worked with me in this process or provided me with any information about Cust-o-Fab.

8.   **Energy Exchangers**: I have known Jim Elder at Energy Exchangers since the 1980s. I visited Mr. Elder shortly after I started making sales calls for Rolled Alloys in 2007, and soon thereafter Rolled Alloys' Tulsa office obtained business from Energy Exchangers. Neither John Sappington nor Bill Emmer worked with me in this process or provided me with any information about Energy Exchangers.

9.   **Hanlock**: I have known Mike Hanson at Hanlock since the two of us worked together at Patterson Steel in the mid-1960s. I visited Mr. Hanson shortly after I started making sales calls for Rolled Alloys in 2007, and soon thereafter Rolled Alloys' Tulsa office obtained business from Hanlock (which was already doing business with Rolled Alloys in 2006 before the Tulsa office even opened). Neither John Sappington nor Bill Emmer worked with me in this process or provided me with any information about Hanlock.

10.   **Inserv**: I have known Jerry Schivally at Inserv since he was a young man; I had a business relationship with his father for decades, and Jerry Schivally sometimes worked with his father. I visited Jerry Schivally at Inserv shortly after I started making sales calls for Rolled Alloys in 2007, and soon thereafter Rolled Alloys' Tulsa office obtained business from Inserv. Neither John Sappington nor Bill Emmer worked with me in this process or provided me with any information about Inserv.

11.    **Flowell**: I have known Stan Bridgeford at Flowell for approximately 15 years. I visited Mr. Bridgeford shortly after I started making sales calls for Rolled Alloys in 2007, and soon thereafter Rolled Alloys' Tulsa office obtained business from Flowell. Neither John Sappington nor Bill Emmer worked with me in this process or provided me with any information about Flowell.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 25, 2008.

Ron Siegenthaler