## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SOUTHWEST STAINLESS, L.P., | ) | |
| and HD SUPPLY, INC., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-0334-CVE-PJC |
| | ) | |
| JOHN R. SAPPINGTON, WILLIAM B. | ) | |
| EMMER, ROLLED ALLOYS, INC., | ) | |
| and RONALD L. SIEGENTHALER, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Now before the Court are Defendants' Motion for Summary Judgment and Brief in Support

(Dkt. # 80), and Plaintiffs' Motion for Partial Summary Judgment and Memorandum of Law in

Support Thereof (Dkt. # 82).  Defendants move for summary judgment as to all six counts in the

second amended complaint.  Plaintiffs move for summary judgment only as to Count IV.  For the

reasons set forth below, the Court finds that summary judgment for defendants should be granted

as to Count II, granted as to breach of the Employment Agreements in Count I, and denied as to the

remaining claims.

### I.  Relevant Background

The instant civil action arises from defendants' alleged breaches of virtually identical

noncompete provisions contained in several agreements.  Only a brief review of the relevant

background is necessary.

On January 24, 1997, defendants John R. Sappington ("Sappington"), William B. Emmer

("Emmer"), and Ronald L. Siegenthaler ("Siegenthaler") (collectively "former owners") sold their

interests in Southwest Stainless L.P. ("Southwest") to HD Supply, Inc. ("HD Supply").[1]  As part of

the conditions precedent to closing the sale, Emmer, Sappington, and Siegenthaler agreed to execute

and deliver certain agreements to HD Supply.  See Dkt. # 69-3, Acquisition Agreement, at 1-2.

These agreements included: (i) Employment Agreements between Sappington and Emmer, and their

new employer, Southwest, and (ii) Noncompetition Agreements between Sappington, Emmer, and

Siegenthaler, and Southwest's new parent entity, HD Supply.  See id.  The parties agreed that "their

respective representations, warranties, covenants and agreements" contained in the Acquisition

Agreement "survive[d] the Closing for a period of one (1) year from the Closing Date (the

'Indemnification Period.')."  Id. at 4.  All exhibits attached to the Acquisition Agreement, which

included the Employment and Noncompetition Agreements, became a part of the Acquisition

Agreement "as fully as though completely set forth herein."  Id.

The Employment and Noncompetition Agreements each contain nearly identical

Noncompete Provisions.  The Provisions state:

> During the time when the [former owner] is employed . . . and for the
> Noncompetition Period . . . the [former owner] specifically agrees that [he] shall not
> . . . either directly or indirectly . . . engage in any business within the States of
> Missouri, Texas, Oklahoma, Tennessee, Louisiana, Alabama and Florida (the
> "Geographic Area"), which competes in any manner with any business conducted
> by [Southwest] or [HD Supply] immediately prior to the Closing or during the term
> of [the former owner]'s employment with [Southwest] (or other affiliate of [HD
> Supply]).  For purposes of this Agreement, the term "Noncompetition Period" shall
> mean the later of three (3) years after the Closing Date, or one (1) year after the

---

[1]     To simplify for the purpose of this opinion, the Court refers to plaintiffs' predecessors
according to the entities' current names.  Three entities, Metals Incorporated, Stainless
Tubular Products, Inc., and Metals, Inc. – Gulf Coast Division, collectively known as the
Metals Group, were acquired by Hughes Supply, Inc. and merged to created Southwest.  See
Dkt. # 69-2, Acquisition Agreement, at 11; Dkt. # 69-4, Certificate of Merger, at 1.  Hughes
Supply, Inc. is the predecessor in interest to HD Supply.  Dkt. # 69, at 2.

[former owner] no longer receives any compensation from [Southwest], or any affiliate of [Southwest].

Dkt. # 69-3, Employment Agreement, at 32, 39; Dkt. # 69-3, Noncompetition Agreement, at 44-45, 48-49, 52-53.  The Noncompete Provisions continue:

> The [former owner] agrees that so long as [former owner] is working for [Southwest] . . . , the [former owner] shall not undertake the planning or organizing of any business activity competitive with the business of [] [Southwest] or [HD Supply]. The [former owner] agrees not to directly or indirectly solicit any of [] [Southwest]'s or [HD Supply]'s employees to work for [former owner] or for any business which is competitive with any business conducted by [Southwest or HD Supply] . . . prior to the date on which [former owner]'s employment with [Southwest] . . . is terminated within the Geographic Area and during the Noncompetition Period.

Id. at 32, 39, 45, 49, 53.  The parties agreed that the Employment Agreement, Noncompetition Agreements, and Acquisition Agreement would be governed by Florida law.  See id. at 8, 35, 41, 46, 50, 53.

Subject to certain provisions not relevant here, the fixed term of the Employment Agreements was three years, commencing on January 24, 1997 and ending on January 23, 2000. Id. at 29.  The Employment Agreements specifically named HD Supply as a third party beneficiary. Id. at 34.  The only survival language in the Employment Agreements was that the "[p]rovisions . . . including [the Noncompete Provisions] . . . shall survive termination of this Agreement by [Sappington or Emmer] or [Southwest]."  Id.  The Employment Agreements were not terminated as that term is defined in the Agreements.  The parties did not include any other provision extending the enforceability of any term beyond January 23, 2000.

The Noncompetition Agreements, on the other hand, contain no fixed term other than the Noncompetition Period and expressly state that "[t]he covenants of [former owner] under this Agreement shall be independent of any other contractual relationship between [HD Supply] and

3

[former owner]." Id. at 50.  They name Southwest as a third party beneficiary.  Id. at 46.  The Noncompetition Agreements provide that the Noncompetition Period "shall be extended by any length of time during which [former owner] is in breach of any of such covenants."  Id.

In the second amended complaint, plaintiffs allege that Emmer resigned from Southwest on March 8, 2007. Dkt. # 69, at 9.  Sappington resigned on April 9, 2007.  Id.  After leaving Southwest, Sappington and Emmer began working for Rolled Alloys, Inc. ("Rolled Alloys").  Id.  Plaintiffs allege that, during their employment at Southwest, both Sappington and Emmer engaged in negotiations with Rolled Alloys.  Id.  Plaintiffs further allege that, in the weeks following Sappington and Emmer's resignations, defendants used or disclosed Southwest's confidential, proprietary, and trade secret business information, solicited Southwest's employees to work for Rolled Alloys, and solicited, serviced, or accepted business from Southwest's current and former customers.  Id. at 9-10.  Plaintiffs claim that Siegenthaler and Rolled Alloys also initiated and facilitated the recruitment of Sappington, Emmer, and other Southwest employees to join Rolled Alloys' Tulsa office.  Id. at 9.  According to plaintiffs, Sappington's, Emmer's, and Siegenthaler's conduct violates the Noncompete Provisions in the Agreements, which Southwest and HD Supply have rights to enforce.

Plaintiffs assert six claims for relief.  In Count I, plaintiffs allege that Sappington and Emmer breached the Employment Agreements and Noncompetition Agreements. Dkt. # 69, at 10.  In Count II, plaintiffs allege that Siegenthaler, Sappington, and Emmer breached the Acquisition Agreement. Id. at 11.  In Count III, plaintiffs allege that Sappington and Emmer tortiously interfered with Southwest's business relations.  Id. at 11-13.  In Count IV, plaintiffs allege that Sappington and Emmer breached their fiduciary duties of loyalty to Southwest.  Id. at 13-14.  In Count V, plaintiffs

allege that Siegenthaler and Rolled Alloys tortiously interfered with Southwest's contractual relations. Id. at 14-15. Finally, in Count VI, plaintiffs allege that Siegenthaler, Sappington, Emmer, and Rolled Alloys misappropriated Southwest's trade secrets. Id. at 15-17. Defendants seek summary judgment on all of plaintiffs' claims. Plaintiffs seek summary judgment only as to Count VI.

## II. Standard of Review

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could

reasonably find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252.  In essence, the inquiry for the Court

is "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." <u>Id.</u> at 250.  In its review,

the Court construes the record in the light most favorable to the party opposing summary judgment.

<u>Garratt v. Walker</u>, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.  Choice of Law

The Court begins with the parties' choice of law.  The parties dispute whether Oklahoma or

Florida law governs interpretation of the Noncompete Provisions.  The Tenth Circuit has held that,

in diversity cases, "federal courts must look to the forum state's choice-of-law rules to determine

the effect of a contractual choice-of-law clause." <u>MidAmerica Constr. Mgmt., Inc. v. Mastec N.

Am., Inc.</u>, 436 F.3d 1257, 1260 (10th Cir. 2006).  Here, the forum state is Oklahoma.   The

Agreements provide that Florida law governs their interpretation.  <u>See</u> Dkt. # 69-3, Acquisition

Agreement, at 8; Dkt # 69-3, Employment Agreement, at 35, 41; Dkt. # 69-3, Noncompetition

Agreement, at 46, 50, 53.  Oklahoma law determines, therefore, whether the parties' choice of

Florida law is effective.  <u>MidAmerica Constr. Mgmt.</u>, 436 F.3d at 1260.  This is a question of law

for the Court.  <u>See</u> <u>Oliver v. Omnicare, Inc.</u>, 103 P.3d 626, 628 (Okla. Civ. App. 2004) ("[T]he

question of whether a covenant not to compete or non-competition provision is contrary to public

policy is a question of law for the Court.").

 Under Oklahoma law, "a contract will be governed by the laws of the state where the

contract was entered into <u>unless otherwise agreed and unless contrary to the law or public policy of

the state where enforcement of the contract is sought</u>." <u>MidAmerica Constr. Mgmt.</u>, 436 F.3d at

1260 (quoting <u>Williams v. Shearson Lehman Bros., Inc.</u>, 917 P.2d 998, 1002 (Okla. Civ. App.

6

1995)) (internal quotation marks omitted) (emphasis in original); see generally 70 A.L.R.2d. 1292

(1960) ("The general rule is that the public policy of the forum, established either by express

legislative enactment or by decisions of its courts, will not, as a rule, be relaxed, even on the ground

of comity, to enforce contracts which, though valid where made, contravene such policy.").

Oklahoma courts have defined "[p]ublic policy [a]s synonymous with the policy of the law,

expressed by the manifest will of the state which may be found in the Constitution, the statutory

provisions, and judicial records." Oliver, 103 P.3d at 628; see Cameron & Henderson, Inc. v.

Franks, 184 P.2d 965, 972 (Okla. 1947) ("But the public policy of the state has been found in

judicial records as well as in the statutes and Constitution.").  Because the parties agreed to be

governed by the law of Florida, this  Court must first determine whether the application of Florida

law to the interpretation of these agreements would violate the public policy of Oklahoma.

MidAmerica Constr. Mgmt., 436 F.3d at 1260.  To do so, the Court must identify if there is a

conflict between Florida and Oklahoma law.

### A.  Florida law

The enforceability of a covenant not to compete under the Florida Statutes is governed by

FLA. STAT. § 542.335.  Covenants not to compete must be "reasonable in time, area, and line of

business." Id. § 542.335(1).  The person seeking enforcement must prove "the existence of one or

more legitimate business interests justifying the restrictive covenant."[2] Id. § 542.335(1)(b).  The

---

[2]    "Legitimate business interests" include: trade secrets, valuable confidential business
information, substantial relationships with specific prospective or existing customers,
customer goodwill associated with a specific geographic location or trade area and
extraordinary or specialized training. Id. § 542.335(1)(b)1–5. Little question exists under
section 542.335 that "an employer has a legitimate business interest in prohibiting
solicitation of its customers with whom the employee has a substantial relationship. Where
an employee . . . gains substantial knowledge of his former employer's customers, their

person seeking enforcement also must show "that the contractually specified restraint is reasonably necessary to protect the legitimate business interests." Id. § 542.335(1)(c).  Once the person seeking enforcement establishes this prima facie case, the burden shifts to the person opposing enforcement to show that the restriction is "overbroad, overlong, or otherwise not reasonably necessary to protect" the legitimate business interests.  Id.  The covenant may be modified by a court if it is unreasonable as drafted.  See id.  The statute presumes that a three-year (or less) restrictive covenant executed by the seller of corporate stock is reasonable.  See id. § 542.335(d)(3) and (e).

The Court finds that the Noncompete Provisions could be enforced under Florida law. The duration of enforcement does not exceed three years, the interests sought to be enforced are specifically enumerated in section 542.335(1)(b), and the seven-state geographic restriction could be reasonably necessary to protect the legitimate business interests of Southwest.  In sum, Florida law presumes the noncompete provisions are reasonable.[3]  The Court concludes, therefore, that the Noncompete Provisions do not appear to conflict with Florida law.  Thus, the question becomes whether application of Florida law to the Noncompete Provisions violates Oklahoma law or public policy.

---

purchasing history, and their needs and specifications it follows that the employer has a legitimate business interest under the statute." N. Am. Prod. Corp. v. Moore, 196 F. Supp.2d 1217, 1223 (M.D. Fla. 2002).

[3]     Moreover, to the extent the temporal and geographic restrictions might be found "overbroad, overlong, or otherwise unreasonable," section 542.335(1)(c) permits modification of the restrictive covenant.

8

### B.  Oklahoma law

Oklahoma law voids all restraints of trade, except those made pursuant to the sale of goodwill or dissolution of a partnership.[4] See OKLA. STAT. tit. 15, § 217 ("Every contract by which any one is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by Sections 218 and 219 of this title, is to that extent void."). Here, the parties do not dispute that they executed the Agreements as part of the sale of Southwest stock, which included goodwill.  See Dkt. # 80, at 17-18; Dkt. # 82, at 20; Dkt. # 69-2, at section 4.1.2.  Thus, section 218 governs the Noncompete Provisions (absent application of Florida law).  Section 218 provides:

> One who sells the goodwill of a business may agree with the buyer to refrain from carrying on a similar business within a specified county and any county or counties contiguous thereto, or a specified city or town or any part thereof, so long as the buyer, or any person deriving title to the goodwill from him carries on a like business therein.  Provided, that any such agreement which is otherwise lawful but which exceeds the territorial limitations specified by this section may be deemed valid, but only within the county comprising the primary place of the conduct of the subject business and within any counties contiguous thereto.

OKLA. STAT. tit. 15, § 218.

In Eakle v. Grinnel Corp., 272 F. Supp. 2d 1304,1312 (E.D. Okla. 2003), the court applied Delaware law pursuant to the parties' choice of law.  The seller of a security company agreed not to compete with the buyer in a similar line of business in Arkansas and Oklahoma for a period of five years from the date of sale.  Id. at 1306.  The seller later claimed that this noncompete agreement was unenforceable because, as drafted, it violated Oklahoma law.  Id. at 1307.  The seller claimed that the agreement's two-state territorial restriction contravened section 218.  Id. at 1311.

---

[4]     In 2001, the Oklahoma Legislature enacted OKLA. STAT. tit. 15, § 219A, which permits certain noncompetition agreements in the employment context.  Section 219A is not applicable here, however, as the parties executed the Agreements prior to 2001.

The court agreed: "section 218 would preclude enforcement of the [noncompete agreement] in the Arkansas/Oklahoma region and that a modification consistent with section 218 would limit enforcement to a particular county . . . and those contiguous thereto." Id. at 1311-12.  Nevertheless, the court found that "[a] mere difference in the law is not sufficient to warrant the application of the public policy exception. . . . To hold otherwise would be to allow the exception to swallow the rule." Id. at 1312.  That court held that if it were to apply Oklahoma law simply because the agreement's territorial restrictions exceeded section 218's geographic limitations, "the forum's law would always apply when a difference in respective states' laws could be shown." Id. The court determined that a "broader concept of public policy" must be violated before the forum state's laws would apply. Id.  In conclusion, that court found that enforcement of the noncompete agreement did not violate Oklahoma public policy or law because "Oklahoma nonetheless approves of the concept of non-compete agreements when the sale of goodwill is involved, albeit with certain geographic restrictions." Id.

        This Court declines to follow Eakle's rationale.  First, Eakle was decided prior to the Tenth Circuit's clear mandate that a choice-of-law clause is unenforceable if its application violates the law or public policy of Oklahoma as expressed in the state's constitution, statutes, or case law. MidAmerica Constr. Mgmt., 436 F.3d at 1260.  Second, Eakle was decided prior to Oliver, 103 P.3d at 628, in which the Oklahoma Court of Civil Appeals held that the manifest will of the state may be found in the text of Oklahoma statutes.  Third, to the extent Eakle relied on the Tenth Circuit's unpublished decision in Mirville v. Mirville, 10 Fed. Appx. 640 (10th Cir. 2001) (interpreting Kansas law), the Court notes that Mirville is merely persuasive authority and is superseded by MidAmerica Construction Management's subsequent (published) interpretation of Oklahoma law.

Oklahoma law governs the interpretation of the Noncompete Provisions because the parties' choice of law "violate[s] the provisions of Oklahoma law with respect to contracts in restraint of trade." Oliver, 103 P.3d at 629. Section 218 plainly states that noncompete agreements may not restrict competition beyond "a specified county and any county or counties contiguous thereto, or a specified city or town or any part thereof." OKLA. STAT. tit. 15, § 218. Yet the Noncompete Provisions at issue here seek to restrict competition in seven states – a geographic region far broader than the narrow area permitted by the Oklahoma Legislature under section 218. The fact that section 218 permits courts to "blue-pencil" agreements that exceed this narrow geographic scope, moreover, does not negate the unequivocal fact that Florida law enforces restrictive covenants that Oklahoma law does not. The application of Florida law hinges not on whether the Noncompete Provisions would be enforceable if modified pursuant to Oklahoma law, but on whether the application of Florida law contravenes Oklahoma public policy as expressly manifested in section 218. Because the Court finds that it does, the Court concludes that Oklahoma law governs the interpretation of the Noncompete Provisions.

The Noncompete Provisions are valid and enforceable insofar as they are consistent with section 218. As to the Noncompete Provisions' three-year (or less) period of enforcement, Oklahoma law enforces restrictive covenants with durations of up to five years. See Hartman v. Everett, 12 P.2d 543, 543-44 (enforcing five-year noncompete agreement); Herrington v. Hackler, 74 P.2d 388, 391 (Okla. 1937) (enforcing portion of five-year noncompete agreement, notwithstanding the overbroad territorial restriction). Thus, the duration of the Noncompete Provisions is valid. As to the Noncompete Provisions' seven-state geographic restriction, the Court

11

must limit enforcement to Tulsa County and those counties surrounding Tulsa County.[5]  See Herrington, 74 P.2d at 391 ("The fact that the parties took in too much territory does not render the agreement wholly void, but is only void to the extent that it prevents the seller from engaging in a like business beyond the confines of the county.").  The Court concludes, therefore, that the Noncompete Provisions as geographically modified are enforceable under Oklahoma law.

## IV.  Analysis of Plaintiffs' Claims

Defendants argue that no genuine issues of material fact exist with respect to plaintiffs' claims.  Defendants submit that Count I fails because Sappington and Emmer have not violated the Noncompete Provisions, and Southwest and HD Supply have not suffered any damages.[6]  Dkt. # 80, at 15.  Defendants submit that Count II fails because the Acquisition Agreement contains no ongoing obligations, the record does not contain a claim that Sappington, Emmer, and Siegenthaler failed to satisfy the conditions precedent prior to closing, and all post-closing obligations expired in 1998.  Id. at 17-18.  Defendants submit that Count III fails because Southwest cannot satisfy the three elements of interference with business relations.  Id. at 20.  Defendants submit that Count IV fails because Southwest offers no evidence that Sappington and Emmer breached a fiduciary duty of loyalty.  Id.  Defendants submit that Count V fails because plaintiffs cannot show that Siegenthaler and Rolled Alloys maliciously and wrongfully interfered with the Agreements between Southwest

---

[5]     Defendants do not claim that the substantive breadth of the Noncompete Provisions is outside the meaning of "carrying on a similar business" as set forth in section 218.  See Eakle, 272 F. Supp. 2d at 1312.

[6]     Defendants also argue, albeit in prior briefing, that the Noncompete Provisions in the Employment Agreements are not enforceable because the Agreements expired by their own terms on January 23, 2000.  Dkt. # 53, at 3.

12

and Sappington and Emmer.  Id. at 22.  Finally, defendants submit that Count VI fails because plaintiffs cannot show misappropriation of information which constitutes trade secrets.  Id. at 23.

In response, plaintiffs argue that genuine issues of material fact exist with respect to all claims except Count IV.  According to plaintiffs, Sappington's and Emmer's employment by Rolled Alloys directly violates the Noncompete Provisions because these defendants are serving as agents for a local competitor of Southwest.  Dkt. # 82, at 20.  Plaintiffs also claim that Sappington and Emmer, while employed by Southwest, failed to disclose Siegenthaler's and Rolled Alloys' plans to open a branch in Southwest's "back yard."  Id. at 21.  Both plaintiffs and defendants support their motions with excerpts of contradictory deposition testimony.

### A.  Count I: The Employment Agreements and Noncompetition Agreements

The interpretation of an unambiguous contract is a question of law for the courts.  Ferrell Const. Co., Inc. v. Russell Creek Coal Co., 645 P.2d 1005, 1007 (Okla. 1982).  "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."  OKLA. STAT. tit. 15, § 154.  Courts are to read the whole contract together, "so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others."  Id. § 157.  Courts must deduce the parties' intent from "the four corners of the instrument.  Where no ambiguity exists, intent must be determined from the words used, absent fraud, accident, or pure absurdity."  Oral Roberts Univ. v. Anderson, 11 F. Supp. 2d 1332, 1335 (N.D. Okla. 1997) (citation omitted).

The Court finds that summary judgment should be partially granted as to Count I.  The Noncompete Provisions in the Employment Agreements are not enforceable because the Employment Agreements clearly expired by their own terms on January 23, 2000.  The only survival

language in the Employment Agreements was that the "[p]rovisions . . . including [the Noncompete Provisions] . . . shall survive termination of this Agreement by [Sappington or Emmer] or [Southwest]." Dkt. # 69-3, at 34. Yet here, Sappington, Emmer, and Southwest did not "terminate" the Employment Agreements, as that term is defined in the Agreements. The Employment Agreements expired by their own terms, at which time Sappington and Emmer became employees-at-will. See generally Wallace v. Mental Health Servs. of S. Okla., Inc., 33 P.3d 966, 967 (Okla. Civ. App. 2001) ("[A]bsent an employment contract, Oklahoma is an 'at-will' employment state."). The Agreements contain no survival language in the case of expiration. Thus, the Noncompete Provisions did not survive their natural expiration.[7] The Court concludes that summary judgment should be granted as to the alleged breach of the Employment Agreements.

As to the Noncompetition Agreements, the Court finds that the Noncompete Provisions within these Agreements are enforceable. The Noncompete Provisions clearly state that the "Noncompetition Period" is the later of three years after closing, or one year after Sappington and Emmer no longer receive any compensation from Southwest or any affiliate. Plaintiffs brought suit against Sappington and Emmer for activity occurring while still employed and within one year of receiving compensation from Southwest.

Further, both HD Supply and Southwest may enforce the Noncompete Provisions. "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." OKLA. STAT. tit. 15, § 29. The contract does not have to specifically

---

[7]     In a case such as this where the contractual terms are unambiguous, the Court need not examine the parties' subjective intent, whatever that may be. See OKLA. STAT. tit. 15, § 165 ("If the terms of a promise are in any respect ambiguous or uncertain, [they] must be interpreted in the sense in which the promisor believed, at the time of making [them], that the promisee understood [them]." (emphasis added)).

name the third-party as a beneficiary; the contract only need "be made 'expressly for the benefit of a third person' and 'expressly' simply means 'in an express manner; in direct or unmistakable terms; explicitly; definitely; directly.'"   Keel v. Titan Constr. Corp., 639 P.2d 1228, 1231 (Okla. 1981) (citation omitted).  Here, the Noncompetition Agreements clearly state that Southwest is a third party beneficiary.  Dkt. # 69-3, at 46.  Thus, Southwest, in addition to HD Supply, may enforce the Noncompetition Agreements.

As to whether Sappington and Emmer breached these enforceable Noncompetition Agreements, the Court finds that, when viewing the evidence in the light most favorable to the nonmoving party, genuine issues of material fact exist.  Plaintiffs claim that merely working at the Rolled Alloys' Tulsa office constitutes breach of the Noncompetition Agreements.  Dkt. # 82, at 18. They also offer circumstantial evidence in support of their claim that Sappington and Emmer are involved, at least indirectly, in Rolled Alloys' business with certain customers.

Each side characterizes snippets of contradictory deposition testimony in an effort to circumvent the underlying genuine issue of material fact: whether defendants' conduct breaches the Noncompetition Agreements.  Such characterizations are unavailing, however, because the Court may not make credibility determinations or weigh the evidence at the summary judgment stage.  See Burlington N. & Sante Fe Ry. Co. v. Grant, 505 F.3d 1013, 1022 (10th Cir. 2007) (noting that credibility determinations, the weighing of evidence, and the drawing of legitimate inferences must be done by the factfinder); Nat'l Am. Ins. Co. v. Am. Re-Ins., 358 F.3d 736, 743 (10th Cir. 2004) ("The district court . . . should not determine whether it believes the movant's evidence; rather it must determine whether the nonmovant offered any specific facts that demonstrate the existence of

a material fact to be tried.").  The Court concludes, therefore, that summary judgment should be denied as to the Noncompetition Agreements in Count I.

## B.  Count II: The Acquisition Agreement

As to Count II, the Court finds that summary judgment for defendants should be granted. The parties do not dispute that the plain language of the Acquisition Agreement provides that Emmer, Sappington, and Siegenthaler were to execute and deliver the Noncompetition Agreements to HD Supply as a condition precedent to closing the sale.  See Dkt. # 69-3, Acquisition Agreement, at 1-2; see also Dkt. # 82, at 20.  Defendants fulfilled this pre-closing condition, and plaintiffs do not claim otherwise.  Plaintiffs claim instead that the "interrelatedness" of the Agreements renders a breach of the Noncompetition Agreements a breach of the Acquisition Agreement.  Plaintiffs support their contention with citations to two authorities.

Section 158 of Title 15 of the Oklahoma Statutes provides that "[s]everal contracts relating to the same matters, between the same parties, and made as part of substantially one transaction, are to be taken together."  In Pauly v. Pauly, 176 P.2d 491, 493-95 (Okla. 1946), the Oklahoma Supreme Court construed a quitclaim deed and memorandum of contract, which memorialized a contemporaneous verbal agreement between the same parties, as one contract.  For three reasons, this Court finds that neither section 158 nor Pauly supports plaintiffs' contention.  First, simply because the Court must construe the Acquisition Agreement and the Noncompetition Agreements together does not mean that an alleged breach of the Noncompetition Agreements constitutes a breach of the Acquisition Agreement.  As stated above, Sappington, Emmer, and Siegenthaler fulfilled their pre-closing duty of executing and delivering the Noncompetition Agreements. Second, Pauly is distinguishable.  Unlike in Pauly, the Noncompetition Agreements expressly state

16

that "[t]he covenants of [former owner] under this Agreement shall be <u>independent</u> of any other contractual relationship between [HD Supply] and [former owner]."  Dkt. # 69-3, at 50 (emphasis added).   Third, were Southwest successful in conflating the separate Agreements into the Acquisition Agreement, the one-year survival period would preclude plaintiffs' claim.  All post-closing obligations terminated in 1998.  <u>See</u> Dkt. # 69-3, at section 8.1 ("[T]he parties hereto agree that their respective representations, warranties, <u>covenants</u> <u>and</u> <u>agreements</u> contained in this Agreement shall survive the Closing for a period of one (1) year from the Closing Date (the 'Indemnification Period') (emphasis added)).[8]

The Court concludes, therefore, that the plain language of the Acquisition Agreement precludes plaintiffs' claim.  Plaintiffs cannot seek to hold defendants liable for breach of the Acquisition Agreement when the conditions precedent to closing indisputably have been satisfied.  Thus, defendants are entitled to summary judgment as to Count II.

## C.  The Remaining Counts

As to Counts III through VI, the Court finds that genuine issues of material fact exist that preclude summary judgment.  Both sides proffer characterizations of contradictory deposition testimony in support of their motions.  As stated above, however, the Court may not make credibility determinations or weigh the evidence at the summary judgment stage.  <u>See</u> <u>Grant</u>, 505 F.3d at 1022 (noting that credibility determinations, the weighing of evidence, and the drawing of legitimate inferences must be done by the factfinder); <u>Nat'l Am. Ins.</u>, 358 F.3d at 743 ("The district court . . . . should not determine whether it believes the movant's evidence; rather it must determine whether

---

[8]      Plaintiffs' arguments pertaining to section 8.2 of the Acquisition Agreement are misplaced.  <u>See</u> Dkt. # 82, at 21.  Neither defendants nor this Court have referenced section 8.2 of the Agreement in discussing the unambiguous one-year survival term (section 8.1).

the nonmovant offered any specific facts that demonstrate the existence of a material fact to be tried.").  The Court concludes, therefore, that summary judgment should be denied as to these claims.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment and Brief in Support (Dkt. # 80) is **granted** in part and **denied** in part: it is granted as to Count II; it is granted as to breach of the Employment Agreements in Count I; it is denied as to breach of the Noncompetition Agreements in Count I; and it is denied as to Counts III through VI.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment and Memorandum of Law in Support Thereof (Dkt. # 82) is **denied**.

**DATED** this 1st day of April, 2008.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

18