UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SOUTHWEST STAINLESS, L.P., | ) | |
| and HD SUPPLY, INC., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-0334-CVE-FHM |
| | ) | |
| JOHN R. SAPPINGTON, WILLIAM B. | ) | |
| EMMER, ROLLED ALLOYS, INC., | ) | |
| and RONALD L. SIEGENTHALER, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This is an action by a former employer against former employees and their new employer for breaches of contracts and violations of other legal duties. A non-jury trial was held on April 28, 29, and 30, 2008. Having considered the evidence and the submissions of the parties, the Court hereby enters its findings of fact and conclusions of law:

I.    **FINDINGS OF FACT**[1]

A.    **The Parties**

1.    Plaintiff Southwest Stainless, L.P. ("Southwest") is the entity that resulted from the merger of three entities: Metals Incorporated ("Metals"), Stainless Tubular Products, Inc. ("STP"), and Metals, Inc. – Gulf Coast Division (collectively "the Metals Group"). Pl. Ex. 9; Tr. 13:5-7.

---

[1]    Any conclusion of law more appropriately characterized as a finding of fact is incorporated herein.

Plaintiff HD Supply, Inc. ("HD Supply") is the purchaser of the Metals Group.[2]   Pretrial Order, Stip. Fact B; Tr. 188:10-12.

2.      Southwest employees and others in the metals industry still refer to the entities comprising the Metals Group by their pre-merger names.  Tr. 189:21-24; 259:18-23; 335:14-17. Therefore, for ease of reference, the Court refers to Southwest as "Metals" or "STP" when discussing the separate operating units.

3.      Metals sells stainless steel products such as plate, sheet, and bar.  Tr. 12:14-15. Metals' products are typically 3/16 to 4 inches thick and can be as large as 8x20 feet and weigh as much as 13,000 pounds.  Tr. 12:16-21.  Metals' staple products include stainless steel plate products in various sizes and alloys, such as 304 and 316.  Tr. 16:16-20.  Metals and STP are housed in the same building.  Tr. 12:22-25.

4.      Defendant Rolled Alloys, Inc. ("Rolled Alloys") has been in business for fifty-three years, selling steel products and specialty alloys in the Tulsa market and nationwide.  Dep. of Tom Nichol, 91:13-16; Tr. 33:12-15; 208:21-209:1; 242:20-243:21.   Rolled Alloys has been both a vendor to and a competitor of Metals, which effectively served as a middleman for Rolled Alloys' products for at least fifteen years.  Tr. 36:15-24; 139:3-12; 204:15-25; 205:9-25; 409:2-14.  Once Rolled Alloys opened its Tulsa office, however, any remaining cooperative arrangement between Rolled Alloys and Metals ended.  Pretrial Order, Stip. Fact M; Tr. 204:10-205:25; 409:2-14.

5.      Rolled Alloys is one competitor of Metals among eleven or twelve currently in the Tulsa market.  Tr. 32:22-25; 207:15-21.

---

[2]      HD Supply is the successor in interest to Hughes Supply, Inc.  Pl. Ex. 10-11.  For ease of reference, HD Supply hereinafter refers to both Hughes Supply, Inc. and HD Supply.

6.      Defendant Ronald L. Siegenthaler ("Siegenthaler") is the president, sole shareholder, and sole employee of Myriad Technologies, a consulting company.   Tr. 185:23-186:10. Siegenthaler, through Myriad Technologies, serves as a consultant for Rolled Alloys. Tr. 185:10-17. Siegenthaler has been in the metals business in Tulsa, Oklahoma since 1966.  Tr. 188:4-6; 195:22-24.

7.      Defendant John R. Sappington ("Sappington") is employed by Rolled Alloys and serves as an outside salesperson.  Tr. 318:23-319:4; 397:2-6.  Sappington has been a salesperson in the metals business in Tulsa, Oklahoma for thirty-five years.  Tr. 334:1-15; 342:7-11.

8.      Defendant William B. Emmer ("Emmer") is employed by Rolled Alloys as an inside salesperson.  Tr. 303:8-10.  Emmer has been in the metals business in Tulsa, Oklahoma for thirty-seven years.  Tr. 250:20-22.

9.      Siegenthaler, Sappington, and Emmer have been business partners for decades.  Tr. 198:15-17.  Siegenthaler and Emmer have partnered in numerous business ventures over the years. Tr. 198:18-199:22; 271:11-273:19.

10.     Emmer considers Siegenthaler to be his best friend.  Tr. 270:24-271:1.

11.     Sappington considers Siegenthaler to be a good friend and his mentor.  Tr. 345:16-346:12.

12.     Prior to January 24, 1997, Siegenthaler, Sappington, and Emmer (among others) owned the three entities comprising the Metals Group.  Pretrial Order, Stip. Fact A; Pl. Ex. 1, at 1; Tr. 187:16-19; 250:23-25; 334:18-335:1.

**B.      The 1997 Sale and Relevant Concomitant Agreements**

13.      On January 24, 1997, HD Supply acquired all of the issued and outstanding shares of the Metals Group through a stock purchase transaction.  Pretrial Order, Stip. Fact B.  The primary agreement to the transaction was the Acquisition Agreement.  Pl. Ex. 1.

14.      As a condition precedent to the closing of the sale, Siegenthaler, Sappington, and Emmer entered into certain agreements with HD Supply.  Pretrial Order, Stip. Facts C-D; Pl. Ex. 1, at 22-23. These agreements included: (i) Employment Agreements between each of Sappington and Emmer, and their employer, Metals, and (ii) Noncompetition Agreements between each of Sappington, Emmer, and Siegenthaler, and Metals' new parent entity, HD Supply.  Pretrial Order, Stip. Fact D; Pl. Exs. 1, 4, 6-8; Tr. 192:23-193:3.

15.      The parties agreed that "their respective representations, warranties, covenants and agreements" contained in the Acquisition Agreement "survive[d] the Closing for a period of one (1) year from the Closing Date (the 'Indemnification Period.')."  Pl. Ex. 1, § 8.

16.      The Employment Agreements and Noncompetition Agreements each contain nearly identical Noncompete Provisions, by which Siegenthaler, Sappington, and Emmer agreed, inter alia:

(a)  During the time when the [former owner] is employed by [] any constituent corporation of the Metals Group and for the Noncompetition Period (as hereinafter defined) …, the [former owner] specifically agrees that [he] shall not …, either directly or indirectly, as a stockholder of any corporation or partner of any partnership or as an owner, investor, principal or agent, or in any other manner, engage in any business within the States of Missouri, Texas, Oklahoma, Tennessee, Louisiana, Alabama, and Florida (the "Geographic Area"), which competes in any manner with any business conducted by any constituent corporation of the Metals Group or [HD Supply] ….   For purposes of this Agreement, the term "Noncompetition Period" shall mean . . . one (1) year after the [former owner] no longer receives any compensation from Employer, or any affiliate of Employer.

(b)  The [former owner] agrees that so long as [former owner]  is working for any constituent corporation of the Metals Group (or any other affiliate of [HD Supply]),

4

> the [former owner] shall not undertake the planning or organizing of any business activity competitive with the business of the Metals Group or [HD Supply].  The [former owner] agrees not to directly or indirectly solicit any of the Metals Group's or [HD Supply's] employees to work for [former owner] or for any business which is competitive with any business conducted by the Metals Group or [HD Supply] prior to the date on which [former owner]'s employment with any constituent corporation of the Metals Group is terminated within the Geographic Area and during the Noncompetition Period.

Pl. Exs. 4-5, § 8 and 6-8, § 3 (emphasis added).  Thus, the Noncompetition Period in these Agreements was one year from the last day of employment with Metals.

17.     The Noncompete Provisions do not prohibit competition relating to aerospace industry end-users because Metals does not compete in this line of business.  Dep. of Southwest, 15:1-4; Dep. of Mike Stanwood, 124:16-25; Dep. of Pete Kaup, 111:19-25; Tr. 244:7-9.

18.     The Employment Agreements and Noncompetition Agreements also contain nearly identical Confidentiality Provisions, by which Siegenthaler, Sappington, and Emmer agreed, inter alia:

> [Former owner] shall not divulge, communicate, use to the detriment of [Metals of HD Supply], or for the benefit of any other business, firm, person, partnership or corporation, or otherwise misuse, any "Confidential Information," data or trade secrets, including secret processes, formulas or other technical data, production methods, customer lists, or personnel or proprietary information, pertaining to [Metals or HD Supply] . . . or their respective businesses.  [Former owner] acknowledges that any such information or data he may have acquired was received in confidence . . . .  Confidential Information, data or trade secrets shall not include any information which: (a) at the time of disclosure is within the public domain . . . . The parties stipulate that Confidential Information and all elements of it are important, material, confidential and gravely affect [profitability].

Pl. Exs. 4-5, § 7 and 6-8, § 5 (emphasis added).

19.     All of the Agreements provide for the application of Florida law.  Pl. Exs. 1, § 10 and 4-5, § 18 and 6-8, § 11; Tr. 193:25-194:2.  The Court held in a previous Opinion and Order (Dkt.

5

# 136), however, that OKLA. STAT. tit. 15, § 218 governs the interpretation of these Agreements.

20.     Subject to certain provisions not relevant here, the fixed term of the Employment Agreements was three years, commencing on January 24, 1997 and ending on January 23, 2000. Pl. Exs. 4-5, § 2.  The parties did not include a provision extending enforceability beyond January 23, 2000.

21.     The Noncompetition Agreements, on the other hand, contain no fixed term of enforcement other than the Noncompetition Period, see FOF ¶ 16, and expressly extend the Noncompetition Period "by any length of time during which [former owner] is in breach of any such covenants."  Pl. Exs. 6-8, § 8.

22.     The Noncompetition Agreements name Metals (now Southwest) as a third party beneficiary.  Pl. Exs. 6-8, § 14.

23.     The Noncompetition Agreements further provide that HD Supply is entitled to its reasonable costs and attorneys' fees if it is required to institute litigation seeking to enforce its rights under the Noncompetition Agreements.  Pl. Exs. 6-8, § 12.

C.     **Defendants' Post-Acquisition Employment With Metals**

24.     Immediately following the acquisition of the Metals Group by HD Supply, Sappington and Emmer served as and/or represented themselves to be executive employees of Metals.  Pretrial Order, Stip. Facts H-I.

25.     After the 1997 sale through the date of Sappington's resignation, he represented himself on his business cards as president of Metals.  Pretrial Order, Stip. Fact H.

26.     During that same period, Sappington's role changed from president to Metals Group's district manager, for which he had the highest managerial and operational responsibility for the Tulsa, Dallas, Mobile, and Houston offices.  Tr. 41:19-21; 50:3-6; 343:2-18.  Metals' upper management testified that Sappington was the district manager of Metals before he left.  Tr. 19:1-4; 41:16-21; 50:3-6.

27.     Sappington also worked as an outside salesperson, which meant that his job efficacy relied heavily on the relationships he built with customers.  Tr. 409:15-23.

28.     During his employment with Metals, Sappington received an annual base salary of $125,000 and an average annual bonus of approximately $220,000.  Tr. 342:12-22.  Sappington received several bonuses in the months leading up to his resignation from Metals, including:

- a retention bonus of $50,000 on January 26, 2007,
- a retention bonus of $27,000 on February 20, 2007, and
- a $377,000 bonus on March 30, 2007.

Pl. Ex. 31; Tr. 384:2-385:8.

29.     After the 1997 sale and at least until January 1, 2000, Emmer represented himself on his business cards as vice president and/or Tulsa branch manager of Metals.  Pretrial Order, Stip. Fact I; Tr. 260:17-18.  In January 2000, Emmer decided to "retire," but he returned to Metals only a few days later.  Tr. 262:1-23.

30.     When Emmer returned to work, Sappington instructed Metals' office manager as to how to complete Emmer's paperwork.  Tr. 181:24-182:3.  The records show no break in Emmer's employment with Metals.  Pl. Ex. 37; Tr. 182:4-184:13; 266:8-18.  Thus, the Court finds that the one-year Noncompetition Period did not begin to run in 2000.

31.     Emmer returned as a part-time consultant, handling freight claims and transportation issues.  Pl. Ex. 37; Tr. 262:21-263:15.  Metals paid Emmer a salary of $30,000, reimbursed him for gas expenses, and provided him with health insurance and a 401(k) plan.  Tr. 263:19-265:3.

32.     Siegenthaler, on the other hand, worked for Metals as a consultant for approximately three years and then took a hiatus from the metals industry.  Tr. 196:1-8.  Thus, his one-year Noncompetition Period began to run well before, and had expired by, 2006.

33.     During Siegenthaler's metals industry hiatus, he operated his consulting company, Myriad Technologies, from an office in Metals' building. Tr. 77:15-78:25; 196:9-20; 196:24-197:1.  Siegenthaler typically was present in his office three days a week and saw and spoke to Sappington and Emmer on a regular basis.  Tr. 78:6-13; 197:5-7.

**D.     Metals' Operations**

34.     Metals employs two types of salespeople, inside and outside.  Tr. 12:10-13.  Inside salespeople work in Metals' office filling orders and pricing quotes, and outside salespeople work directly with and call on customers.  Tr. 12:10-13; 476:10-15.

35.     Metals does not have "exclusive" customers who do business only with it, so Metals enters into transactions with customers in several different ways.  Dep. of Southwest, 143:9-17; Tr. 13:8-14:20.

36.     Some customers place "open orders," where the customer submits an order without a price.  Tr. 13:17-19.  Metals then fills in the price, sends the order back to the customer, and fills the order.  Tr. 13:20-14:4.

37.     Other customers submit "quotes" in response to which Metals determines the sizes, shapes, and alloys needed to fill the orders and then returns the quotes to the customers with prices

based on – among other things – inventory, cost, dimensions, turnaround time, and competitive information.  Tr. 14:5-15; 478:8-18; 539:18-540:25.

38.     Some customers which regularly place large orders may order using monthly-updated "posted pricing," which allows the customers to know prices on certain items in advance.  Tr. 477:15-23.

39.     Customer feedback reveals how competitors are pricing their products. Tr. 400:8-15. Metals' prices change monthly, weekly, or even daily, depending upon the circumstances and the customer account.  Dep. of Southwest, 116:10-14; Tr. 400:8-15.  Metals does not prevent its customers and vendors from disclosing pricing information to others.  Dep. of Southwest, 90:23-91:7; Tr. 50:17-51:14.

40.     Metals' profit margins also fluctuate – even "drastically at times." Tr. 400:16-401:5.

41.     Metals' "staple" products are stainless-steel plate products of various sizes, alloys (such as 304 and 316), and thicknesses (such as 1/4 and 3/16 inches thick).  Tr. 16:16-20; 242:25-243:2.  Metals also sells "specialty alloys," which typically are alloys above 316.  Tr. 242:20-243:16.  Metals is able to fill approximately 80% of the orders it receives without using a third party. Tr. 15:15-16. If Metals does not carry a certain product, it will obtain the material from a third-party producer or distributor.  Tr. 15:17-22.

42.     Because Metals must shape larger sheets of metal into smaller pieces according to customer specifications, there is often scrap or melted unusable material left over.  Tr. 502:8-18; 601:1-11. Metals' pricing is based on weight, and Metals charges its clients based on the full weight of material, which includes the unusable scrap.  Tr. 502:8-18.

43.     Metals' "full weight" pricing practices were developed and taught to Metals' employees by Emmer. Tr. 594:7-12; 601:12-14.  Metals' pricing methods did not change after the sale of the Metals Group to HD Supply or after Emmer's and Sappington's resignations. Tr. 17:16-25; 620:14-18; 625:9-12.

44.     While both Metals and Rolled Alloys use discretionary pricing systems, Rolled Alloys uses a different pricing approach in that it does not charge for any unusable material.  Tr. 166:5-17; 479:3-4; 501:24-502:7; 601:15-25; 616:11-18; 637:20-23.

**E.     Metals' Confidential Information**

45.     Metals maintains the confidentiality of its trade secrets by requiring all employees, including upper management, to sign confidentiality agreements.  Dep. of Jeff Legrand, 109:13-110:5; Dep. of Pete Kaup, 82:2-9; Tr. 43:6-19; 128:9-129:15; 400:2-4; 594:18-23.  Former owners, such as Siegenthaler, Sappington, and Emmer, were required to sign noncompetition agreements containing confidentiality provisions.  See supra FOF ¶ 18.

46.     Employees are reminded of the confidential nature of company information on a regular basis through emails from upper management.  Tr. 43:19-44:5; 594:24-595:3.

47.     Access to computerized information is restricted through the use of passwords.  Tr. 44:6-18; 480:2-4.  Upper management has access to all of Metals' confidential information.  Tr. 44:16-23; 398:22-399:14.

48.     Siegenthaler, Sappington, and Emmer testified that, during their employ at Metals, they believed the following information constituted trade secrets:

> list[s] of customers, the prices of our products and services, our manner of operation, including the marketing and sales strategies or tactics, utilized by Metals, Inc., our raw material sources, our cost of raw materials . . .  the source of such technology and any prospective technology the company is considering, the identity of product

10

components, the financial affairs of the company including operating costs and profit margins, prices charged to customers and any other information concerning Metals, Inc.'s business or other trade secrets as defined by law.

Pl Exs. 39-41; Tr. 227:16-228:8; 254:23-255:7; 405:5-17.

49.     Metals' current and former inside sales employees, including Ashley Lewis ("Lewis"), Bobbi Kenney ("Kenney"), and Todd Lesikar ("Lesikar"), understand that they have or had access to confidential information that should not be shared with competitors.  Tr. 130:9-131:1; 479:12-480:1; 594:7-23.

50.     If a competitor knows Metals' pricing structure and profit margins, it has an upper hand on competitive bids.  Tr. 45:9-46:6.

51.     Metals spent hundreds of thousands of dollars accumulating and maintaining its confidential information over its thirty year history.  Tr. 47:1-8; 401:6-24.

### F.     Siegenthaler Returns to the Metals Industry

52.     In August 2006, Siegenthaler told Sappington and Emmer separately on the golf course about his idea of opening a Rolled Alloys office in Tulsa.  Tr. 202:8-16; 269:11-16; 347:7-13.

53.     The following month, Siegenthaler contacted Tom Nichol ("Nichol"), president of Rolled Alloys, to discuss the possibility of working with Rolled Alloys.   Tr. 201:6-12. Siegenthaler's plan was to open a fully-functional Rolled Alloys office, including a support facility and warehouse, in Tulsa.   Tr. 200:9-16.   Siegenthaler kept his plans secret from prospective competitors.  Tr. 206:25-207:3.

54.     In October 2006, Rolled Alloys hired Siegenthaler (through his company) as a consultant to open a Rolled Alloys Tulsa location. Pretrial Order, Stip. Fact J; Tr. 201:20-23. Siegenthaler prepared the business plan.  Tr. 221:2-8.

55.     Around the same time, Siegenthaler informed Nichol that Emmer and Sappington were subject to noncompetition agreements.  Tr. 210:23-211:3.  Nichol told Siegenthaler to send copies of the Noncompetition Agreements to Rolled Alloys' attorney.  Dep. of Tom Nichol, 27:17-24; 28:7-10.  The Court finds that Siegenthaler had no reason to discuss the Noncompetition Agreements with Nichol if Siegenthaler were not considering hiring Sappington and Emmer.

56.     Rolled Alloys leased space for its Tulsa office in late October 2006.  Tr. 203:14-16.  Siegenthaler vacated his rent-free office in the Metals' building around the same time, deciding that he could no longer be housed in Metals' building if he planned to compete with Metals.  Tr. 200:4-22.

57.     Sappington and Emmer did not talk with anyone at Metals about Siegenthaler's plans or why he might be vacating his office.  Tr. 275:23-276:1; 355:18-356:13.  It is a reasonable inference that Sappington and Emmer did not discuss the subject because they knew about Siegenthaler's plans.

58.     Sappington and Emmer testified that they assumed that Metals knew that Rolled Alloys was coming to Tulsa.  Tr. 275:2-15; 276:3-5; 385:23-25.

59.     Siegenthaler started making sales calls for Rolled Alloys in late February 2007.  Tr. 231:23-232:1.  With four decades of experience in the industry, Siegenthaler had preexisting relationships with most of Rolled Alloys' current customers; indeed, he passed many of these customers on to Sappington when he and Sappington worked for Metals.  Tr. 195:22-24; 223:5-20.

60.     Siegenthaler continues to handle most of the outside sales for Rolled Alloys' Tulsa office.  Tr. 94:16-18.

### G.      Rolled Alloys' Startup

61.      The first employee hired for the new Rolled Alloys office was Shari Roberts ("Roberts"), who has been Siegenthaler's personal assistant for twenty-nine years. Tr. 77:2-5; 85:9-11.  Roberts began in October 2006 and serves as the sales and office administrator.  Tr. 75:10-15; 80:11-15.

62.      Roberts had virtually no sales experience prior to joining Rolled Alloys. Tr. 82:11-83:3; 310:21-311:11.

63.      In need of an inside salesperson, Siegenthaler and Roberts placed two advertisements in the newspaper.  Tr. 89:13-15; 213:19-23.  The advertisements did not mention Rolled Alloys' name.  Tr. 102:24-25.  No one responded to the ads.  Tr. 89:20-21; 213:22-25.

64.      In February 2007, Roberts, at Siegenthaler's direction, contacted Lesikar and invited him to lunch. Tr. 86:3-9; 87:19-88:2; 135:24-136:3; 214:2-5.  Lesikar, who was directly supervised by Sappington, was one of the top inside salespersons at Metals and occasionally went on outside sales calls.  Tr. 20:1-4; 124:5-8; 134:9-24; 147:7-148:9; 368:13-16.

65.      Siegenthaler had heard "from somewhere" that Lesikar was unhappy at Metals.  Tr. 214:1-14. Lesikar had told Sappington and others roughly six months before that he was dissatisfied in his position at Metals and that he was going to start looking for another job.  Tr. 131:11-132:4.

66.      At the beginning of the lunch meeting, Lesikar was asked to sign a confidentiality agreement.  Tr. 138:3-5.  The confidentiality agreement required Lesikar to keep confidential any business information that Siegenthaler and Roberts shared with Lesikar during the meeting.  Tr. 89:6-9.

13

67.     Once Lesikar signed the confidentiality agreement, Siegenthaler discussed his Tulsa plans in detail.  Tr. 138:12-139:2; 217:10-13.  Siegenthaler also offered Lesikar a position at Rolled Alloys; Lesikar accepted.  Tr. 138:5-11; 142:16-21; 218:17-21.

68.     Lesikar submitted his letter of resignation to Sappington on February 16, 2007, and informed Sappington that he was giving a couple of weeks' notice so that he could get his desk cleared off.  Pl. Ex. 26; Tr. 145:9-11; 146:3-8; 152:18-21.  Sappington read the letter and asked Lesikar where he was going.  Tr. 148:20-22.  Lesikar told Sappington that he had signed a confidentiality agreement, and that he could not disclose that information.  Tr. 148:21-23.  Sappington asked Lesikar to reconsider his decision because, if Lesikar were going to work for a competitor, he would have to be immediately terminated.  Tr. 148:24-149:1; 155:16-156:8.  Lesikar said that he would give it some thought.  Tr. 148:24-25.  Accordingly, Sappington instructed Lesikar to keep his proffered resignation a secret from his coworkers.  Tr. 149:6-13; 367:19-368:4.

69.     The Court finds, given the fact that Lesikar told Sappington he would reconsider his resignation decision, that Sappington's instruction to keep his proffered resignation a secret was not improper or contrary to Metals' interests.

70.     According to Lesikar, the next time that he and Sappington discussed his resignation was on Lesikar's last day of employment at Metals, March 2, 2007.  Tr. 154:1-7.  Lesikar told Sappington that he was quitting.  Tr. 154:10-13.  Sappington then gathered the Metals employees in a conference room and announced Lesikar's resignation.  Tr. 154:19-21; 155:4-9.

71.     Lesikar began working at Rolled Alloys on Monday, March 5, 2007, as an inside sales person.  Tr. 116:21-24; 366:17-18.  Lesikar did not actually begin performing any sales work

until the end of March.  Tr. 158:14-159:8.  Rolled Alloys' Michigan headquarters initially sent sales leads for Lesikar and Siegenthaler to pursue in Tulsa.  Tr. 163:14-164:1.

72.     Upon Lesikar's departure from Metals, Lewis took over the account for Watson Metal Masters, located in Springfield, Missouri.  Tr. 463:5-9; 531:22.  Lewis noticed that Lesikar had not been marking up certain products very much, and that the profit margin on these items was below Metals' standard.  Tr. 531:22-25.  Lewis took her concerns to Sappington, who told her to increase the prices on these items by 15%.  Tr. 532:1-2.  Lewis was slightly surprised by this relatively large increase but did as her supervisor instructed.  Tr. 532:3-8.  Lewis testified that the increased prices on these items eventually caused Metals to lose the opportunity to quote on Watson Metal Masters orders.  Tr. 532:9-15.

73.     The Court finds that, although it appears that Sappington's instruction to increase Watson Metal Masters' prices by 15% was a poor management decision, the instruction was not, in and of itself, wrongful or contrary to Metals' interests.

74.     Although Sappington tried to fill Lesikar's position between March 2 and April 9, 2007, he ultimately was unsuccessful in his efforts to find a replacement.  Tr. 368:17-18; 370:18-23.  Sappington also was unsuccessful in finding a replacement for the Mobile branch manager who was terminated in early February 2007.  Tr. 377:13-24; 379:1-7.  The Court finds that, given Sappington's efforts to find replacements and the relatively short time span in which he had to accomplish this task, there is no reasonable inference of improper conduct by Sappington.

**H.      Emmer Resigns from Metals and Joins Rolled Alloys**

75.      Emmer claims that, after the conversation with Siegenthaler on the golf course in August 2006, Siegenthaler did not discuss the possibility of a Rolled Alloys Tulsa office again until December 2006.  Tr. 270:12-15; 277:11-278:9.

76.      According to Emmer, he called Siegenthaler in December 2006 to inquire about the possibility of working part-time at Rolled Alloys because his work at Metals was diminishing.  Tr. 267:23-24; 278:7-16.  Siegenthaler told Emmer that he would talk to Rolled Alloys and see if there was any need for a part-time employee.  Tr. 279:16-20.

77.      In light of the numerous business ventures Emmer entered into with his best friend over the years and Emmer's testimony that he did not ask Siegenthaler about his plans or his move from the Metals building between August and December 2006, Tr. 274:21-275:22, the Court infers that Emmer knew about Siegenthaler's plans, see FOF ¶ 57.

78.      Emmer testified that he did not alert anyone at Metals or HD Supply of his December 2006 telephone discussion with Siegenthaler.  Tr. 281:3-6.

79.      In February 2007, Emmer contacted Siegenthaler to see if he had asked Rolled Alloys about Emmer's possible part-time employment.  Tr. 281:15-282:19.  Siegenthaler said that he would have to look into it and get back to Emmer.  Tr. 282:18-21.

80.      In early March 2007, Siegenthaler offered Emmer a position at Rolled Alloys.  Tr. 284:13-17.

81.      On Friday, March 9, 2007, Emmer went into Sappington's office and told him that he was resigning from Metals.  Tr. 286:23-287:12; 294:21-25.  Emmer handed Sappington a letter

of resignation, which said that he was leaving Metals to spend time with his grandchildren and because he felt that his job was changing and diminishing at Metals.  Pl. Ex. 25; Tr. 287:4-288:12.

82.     Notwithstanding Emmer's testimony, Tr. 288:19-289:24; 292:25-293:18, it is likely that Emmer did discuss his true employment plans with Sappington before his resignation.  See FOF ¶ 88, infra.

83.     However, the Court finds that even if Emmer did discuss the possibility of leaving Metals for Rolled Alloys, this discussion in and of itself would not have been wrongful or contrary to Metals' interests.

84.     Emmer began working at Rolled Alloys on Monday, March 12, 2007.  Tr. 295:3-5. Emmer currently handles inside sales for the New Mexico, Arkansas, Colorado, and Kansas markets. Tr. 303:8-14.

**I.        Sappington Resigns from Metals and Joins Rolled Alloys**

85.     Sappington testified that he did not ask Siegenthaler why he was moving out of the Metals building in October 2006.  Tr. 350:10-351:1.

86.     After the conversation on the golf course in August 2006, Sappington and Siegenthaler claim that their next discussion about a Rolled Alloys Tulsa office occurred in December 2006 when Siegenthaler telephoned Sappington, said he was opening a Rolled Alloys office and later a warehouse, and asked Sappington if he wanted to be a part of it.  Tr. 202:17-22; 349:8-23; 352:24-354:16.  Sappington told Siegenthaler he would "think about" it because he wasn't sure he wanted to leave his position at Metals.  Tr. 354:17-19; 359:14-21.

87.     As found supra, see FOF ¶ 57, it is a reasonable inference from the totality of the circumstances that Sappington knew that Siegenthaler intended to open a Rolled Alloys Tulsa office

before this time, even if Sappington was not advised and asked if he was interested until December 2006.  See Tr. 350:10-18.

88.     The Court finds that Sappington discussed Siegenthaler's Rolled Alloys plans with Emmer in December.  Tr. 361:17-362:1.  Sappington's desk calendar, which he updated daily, indicates that Sappington "talked to Emmer about move" on December 14, 2006.  Tr. 362:22-363:9. Additionally, Sappington noted in his calendar on January 9, 2007, that Emmer was to contact an individual with Siegenthaler's new address and telephone number.  Tr. 364:25-365:22.

89.     The Court finds that Sappington's discussion with Emmer about a possible move was not, in and of itself, contrary to Metals' interests or company policy.

90.     In February 2007, Siegenthaler and Sappington met to discuss Sappington's  possible employment at the Rolled Alloys Tulsa office over an hour-long lunch at Flavors Restaurant.  Tr. 202:23-203:7; 358:21-360:5.

91.     At no time did Sappington tell anyone at Metals, including Mike Stanwood ("Stanwood"), Southwest's president, about Siegenthaler's plans or his solicitation of employment. Tr. 356:5-22; 357:11-25.  The fact that Sappington did not tell Stanwood about Siegenthaler's plans was not improper, because Sappington did not communicate with Stanwood on a regular basis given Stanwood's hands-off management style.  Tr. 357:16-25.  Moreover, by December 2006, "the word was on the street" that Rolled Alloys was opening a Tulsa office.  Tr. 356:20-21.  Sappington testified that he did not need to tell Stanwood facts he already knew or tell Stanwood about his Rolled Alloys' negotiations.  Tr. 385:19-22.

92.     Pete Kaup ("Kaup"), Metals' sales and purchasing manager, testified that he heard numerous rumors in the marketplace that Rolled Alloys was coming to Tulsa.  Tr. 12:1-2; 20:15-20;

18

22:7-9; 24:5; 356:20-24.  When Kaup asked Sappington whether he was leaving Metals for Rolled Alloys, Sappington repeatedly said no.  Tr. 24:6-8.

93.     Prior to February 2007, Sappington worked closely with his employees and kept close tabs on Metals' sales, reviewing all orders placed and quotes requested by customers.  Tr. 480:10-21.  Whenever Sappington was going to be out of the office, he would notify Metals' employees or update his desk calendar.  Tr. 346:17-347:6; 480:22-25; 598:6-7.  Lewis testified that Sappington's conduct began to change in February 2007, however.  Tr. 481:9-17.  It became more difficult to reach Sappington, even when he was in the office.  Tr. 481:9-14.

94.     On March 12, 2007, Kaup saw Siegenthaler, Emmer, and Lesikar having breakfast together at the Tulsa airport. Tr. 21:8-11.  Kaup found this meeting suspicious because Siegenthaler was working for Rolled Alloys, Lesikar had left for "a competitor," and Emmer had just "retired." Tr. 22:4-11.

95.     Kaup called Sappington and told him about this suspicious encounter.  Tr. 22:21-23; 373:23-374:3.  Sappington tried to convince Kaup that it was just a chance meeting in the airport and told him that he would contact Siegenthaler and Emmer to find out what was happening.  Tr. 23:4-9.  Sappington later told Kaup that he had called Emmer's home, but that Emmer was out of town.  Tr. 23:10-14.

96.     Sappington did not inform Jeff Legrand ("Legrand"), a Southwest district manager, or Stanwood about the airport encounter; Sappington believed that other Metals employees had alerted these individuals.  Tr. 374:4-375:3; 596:10-16.

97.     Sappington admits that he made his resignation decision before March 30, 2007 – the date on which he received a $377,000 bonus check.  Tr. 375:16-376:3.  Sappington intentionally

waited until the check had cleared before announcing his resignation.  Tr. 376:4-7.  The Court finds that the mere fact that Sappington planned his departure from Metals and waited for his bonus check to clear prior to announcing his resignation does not constitute wrongful conduct.

98.     On April 5, 2007, Kaup and Dan Sisney ("Sisney"), STP's manager, met with Sappington and asked Sappington to speak to the Metals' employees and assure them that the current management team, including Sappington, was remaining at Metals.  Tr. 20:12-13; 24:11-18; 24:24-25:5.  Sappington agreed to hold an employee meeting, but claimed he could not do so until Tuesday, April 10, 2007.  Tr. 24:19-23.

99.     To the extent Sappington's agreement to hold a meeting on Tuesday was a delay tactic, the Court finds that Sappington's behavior was not improper.

100.     Sappington claims that he accepted Siegenthaler's offer to work at Rolled Alloys on Friday, April 6, 2007.  Tr. 375:7-15.  It is a reasonable inference, based on a preponderance of the evidence, that Sappington had accepted Siegenthaler's offer before March 30, 2007.

101.     Sappington cleaned out his Metals' office on (Easter) Sunday, April 8, 2007, when no one was in the building.  Tr. 387:11-388:10.  Sappington claims that he placed everything of a confidential nature in a folder, which he gave to Jon Murphy, Metals' operations manager.  Tr. 26:12-14; 388:12-18.

102.     The next day, April 9, 2007, Sappington submitted his letter of resignation to the office manager.  Tr. 390:9-391:5.

103.     Sappington then went to Kaup's office, shook Kaup's hand, and told him he was leaving for Rolled Alloys because Kaup "wouldn't stop."  Tr. 26:17-24.

104.    After Sappington left the building, Kaup and Sisney went to check Sappington's empty office.  Tr. 27:4-21.  Sappington had removed his artwork, photographs, and knick-knacks; virtually all of the paperwork on his desk was gone.  Id.  All that remained was a manila envelope with unknown contents, a customer list, and a computer.  Tr. 27:18-21.

105.    Sappington began working at Rolled Alloys as an outside salesperson later that same day, April 9, 2007.  Tr. 319:2-4.

106.    Sappington acknowledged that, through his actions, he put his personal interests over the interests of Metals by failing to inform his employer that a competitor was coming to town – all the while contemplating that he would go to work for that same competitor.  Tr. 393:1-6.  As discussed supra, see FOF ¶ 91, the Court finds that Sappington's failure, in the months leading up to his planned resignation, to alert Metals' about Rolled Alloys' well-publicized Tulsa plans was not acting against his employer's interest.

107.    Legrand testified that he had no information to suggest that Sappington had made "substantial preparations" to leave Metals, or that Sappington induced any employees of Metals to leave the company to work for Rolled Alloys.  Tr. 59:1-12; 60:4-17.

108.    Legrand further testified that he had no information that, before Sappington's and Emmer's resignations, they had done anything to steer business to Rolled Alloys, had talked to vendors of Metals about doing business with Rolled Alloys, or had copied and taken any of Metals' confidential information.  Tr. 65:25-66:10; 66:21-67:2.

**J.    Rolled Alloys' 2007 Operations**

109.    After Sappington and Emmer joined Rolled Alloys, Lesikar told more than a dozen Metals customers, including GA Rainey, Linde, Wagner Plate Works, Braden, and Flowell, that

Sappington and Emmer had joined Rolled Alloys' team.  Tr. 173:1-8; 174:15-175:24.  Lesikar testified that he told the customers that he was their contact because Sappington and Emmer were subject to noncompetition agreements.  Tr. 177:8-19.

110.    Siegenthaler likewise had discussions with customers, including Hughes Anderson, about Sappington joining Rolled Alloys.  Tr. 232:9-233:1.  When customers asked if Sappington could call on them, Siegenthaler told the customers that he could not.  Tr. 232:17-22.

111.    Rolled Alloys' Michigan office also informed at least one client that Sappington had joined Rolled Alloys.  Tr. 327:4-8.

112.    Rolled Alloys' Tulsa office currently employs six individuals: Roberts, Emmer, Sappington, Siegenthaler, Lesikar, and one other inside sales person.  Tr. 103:8-11; 366:17-18.

113.    Rolled Alloys did approximately $13 million in business in 2007.  Tr. 240:16-24.  Of that $13 million, $5-$6 million came from sales by Sappington and Emmer to customers in the states of New Mexico, Arkansas, Colorado, and Kansas, and to aerospace industry end-users.  Tr. 319:5-23.

**K.    Count I: Breach of Contract — Employment And Noncompetition Agreements**

114.    In the second amended complaint, plaintiffs allege that Sappington and Emmer breached the Noncompete Provisions and Confidentiality Provisions in the Employment Agreements and Noncompetition Agreements.  Dkt. # 69, at 10.  According to plaintiffs, such breaches have caused, and continue to cause, irreparable injury and damages to Metals.  Id.

115.    The Court granted summary judgment in defendants' favor as to the alleged breaches of the Employment Agreements.  See Dkt. # 136, at 13-14.  The Court found that the relevant provisions in the Employment Agreements were not enforceable because the Employment

Agreements clearly expired by their own terms on January 23, 2000. Id. at 13. The Court denied summary judgment as to the alleged breaches of the Noncompetition Agreements. Id. at 15.

116. The Court finds that neither Sappington's nor Emmer's pre-resignation conduct violated the Noncompetition Agreements. Plaintiffs presented no evidence that either former owner, prior to resigning, planned or organized business activity competitive to Metals. In fact, Legrand admitted knowing of no pre-resignation actions by Emmer that were not in the best interests of Metals. Dep. of Southwest, 153:6-16. Similarly, Legrand testified that he had no information to suggest that Sappington made substantial preparations to leave Metals, induced any employees to leave Metals, steered business from Metals to Rolled Alloys, talked to vendors about doing business with Rolled Alloys, or copied and took any of Metals' confidential information. See FOF ¶¶ 107-08.

117. The Court finds that Sappington and Emmer did violate the Noncompetition Agreements, however, by their employment with Rolled Alloys' Tulsa office during the one-year Noncompetition Period following their departures from Metals. The Noncompete Provisions prohibit direct and indirect engagement in any business within the Geographic Area which competes in any manner with any business conducted by Metals. FOF ¶ 16. The Noncompetition Agreements are clear that Sappington and Emmer could not be "agents," i.e., employees, of a local competitor during the one-year post-resignation period because to do so would constitute indirect engagement in competition.[3]

---

[3]     The operative verb, "engage," is defined as "involv[ing] oneself" or "tak[ing] part in." BLACK'S LAW DICTIONARY (8th ed. 2004).

118.    Although Sappington and Emmer testified that they did not specifically call on Tulsa area customers, the Court finds that, as discussed _infra_, they did work on two discrete projects for Tulsa area customers.  _See_ FOF ¶¶ 136, 145.

119.    The Court finds that Sappington violated the Confidentiality Provision of his Noncompetition Agreement by using his knowledge of Metals' confidential Hughes Anderson quote, submitted immediately before his resignation, to help Rolled Alloys underbid Metals on that project. _See_ FOF ¶¶ 141-45, _infra_.

120.    The Court finds that Emmer did not breach the Confidentiality Provision of his Noncompetition Agreement.  Plaintiffs presented no evidence that Emmer used or disclosed Metals' confidential information after his resignation.

121.    The Court finds that, during the Noncompetition Period, Sappington did golf and socialize with particular Rolled Alloys' customers, some of whom were in the Tulsa area.  Tr. 104:13-105:21; 231:18-22; 413:21-414:13; 419:25-420:2.  Rolled Alloys has done business with some of these customers since Sappington's and Emmer's arrivals. Tr. 236:2-4; 237:2-7; 419:20-24. Although the record is clear that golf historically has been, and continues to be, utilized as a means of obtaining business, Tr. 410:2-11, plaintiffs presented no direct evidence that Sappington ever discussed business at any of the at-issue golf outings, or that these social activities created this business for Rolled Alloys.  Further, plaintiffs did not present a basis for approximating the extent to which the relationships between Metals and these Tulsa area customers have been damaged by this conduct.

122.    The Court finds that Sappington and Emmer did not violate the Noncompete Provisions by directly or indirectly soliciting Metals' employees to work for Rolled Alloys.

24

Plaintiffs presented no testimony, documentation, or other evidence that Sappington and Emmer were involved in Siegenthaler's recruitment of Lesikar.

### i.      Metals' General Lost Profits

123.    Two Metals' inside salespersons, Kenney and Lewis, reviewed Metals' sales reports for years 2002-2006 and testified about Metals' losses allegedly caused by defendants' wrongful conduct.  <u>See</u> Tr. 481:24-483:24; 493:21-533:9; 598:14-640:2.  In essence, Kenney and Lewis testified that, because Metals had done a large volume or specific percentage of business with certain customers prior to Sappington's and Emmer's departures, and because: (i) Sappington – as the outside salesperson – had good relationships with these customers, (ii) Rolled Alloys strategically decided <u>not</u> to use "full weight" pricing, (iii) Metals' business with these customers substantially decreased or completely ended after Sappington's and Emmer's departures, (iv) some of these customers now do business with Rolled Alloys when they did not do so before, and/or (v) some of these customers purchased Metals' "staple" products from Rolled Alloys in 2007, <u>ipso</u> <u>facto</u>, defendants caused Metals' business losses.  <u>See id.</u>  Kenney and Lewis admitted that they did not know how many other competitors besides Rolled Alloys bid on these customers' orders.  Tr. 551:20-23; 552:6-13; 637:8-10.

124.    Kenney and Lewis calculated Metals' losses by multiplying Rolled Alloys' 2007 sales to specific customers by Metals' average profits for the same customers.  The following table summarizes their computations:

| Customer | Location | Metals' Average Annual Revenue 2002-2006 | Rolled Alloys' 2007 Sales (based on documents produced) | Metals' Average Profit Margin 2002-2006 | Metals' Lost Profits | Trial Testimony Citation (Tr.) |
|---|---|---|---|---|---|---|
| Braden | Tulsa Co. | $ 750,000 - $1,000,000 | $ 131,000 | 25% | $33,000 | 482:7 - 483:24; 494:2 - 496:8 |
| Callidus | Tulsa Co. | $ 500,000 | $ 48,000 | 40% | $20,000 | 598:16 - 602:3; 609:7-14 |
| Cust-O-Fab | Tulsa Co. | $1,000,000 | $ 186,000 | 40% | $76,000 | 602:10 - 608:7 |
| Elliot Precision | Tulsa Co. | $ 60,000 - $ 100,000 | $ 68,400 | 27% | $18,500 | 497:3 - 500:22 |
| Energy Exchanger | Tulsa Co. | $ 250,000 | $ 200,000 | 25% | $50,000 | 609:15 - 614:1 |
| Fabsco Shell & Tube | Creek Co. | $ 210,000 - $ 280,000 | $ 117,000 | 32% | $37,500 | 500:25 - 503:13 |
| First Process Steel | Tulsa Co. | $ 200,000 - $ 300,000 | $ 45,000 | 28% | $12,600 | 503:19 - 506:13 |
| Allegheny Invoices | | | $ 73,000 | 10% | $7,300 | |
| Flowell | Tulsa Co. | $ 140,000 - $ 225,000 | $ 64,000 | 37% | $24,000 | 175:25 - 176:10; 506:18 - 507:23; 510:9 - 511:11 |
| GC Broach | Tulsa Co. | $ 160,000 | $ 27,400 | 38% | $10,400 | 511:16 - 513:12 |
| Heat Transfer | Tulsa Co. | $ 500,000 | $ 50,000 | 30% | $15,000 | 614:5 - 616:25 |
| Holloway Machine Co. | Tulsa Co. | $ 243,000 (1/07 - 4/07) | $ 45,500 | 40% | $18,000 | 513:16 - 515:8 |
| Hughes Anderson | Tulsa Co. | $ 325,000 - $ 350,000 | $ 100,000 | 20% -25% | $22,000 | 412:8-13; 515:11 - 517:2 |
| Wagner Plate Works | Tulsa Co. | $1,000,000 | $ 280,000 | 17% | $48,000 | 528:24 - 530:11 |
| Watson Metal Masters | Springfield, MO | $ 125,000 | $ 137,000 | 38% | $52,000 | 463:5-9; 530:12 - 533:9 |
| Zeeco | Tulsa Co. | $ 250,000 | $ 80,000 | 40% | $24,000 | 617:11 - 622:3 |
| **Total:** | | | | | **$468,300** | |

125.     Kenney and Lewis admitted that Metals did not submit bids for most of the projects comprising Rolled Alloys' 2007 sales to these customers.  Tr. 527:22-23; 529:24-530:4; 572:8-573:4; 576:20-577:2; 578:24-579:11; 580:1-6; 580:21-581:22; 615:21-616:7; 616:8-10; 618:24-619:2; 627:24-628:1; 629:20-630:4; 633:17-22; 634:25-635:2; 636:22-25.  Flowell, for example, would not immediately invite Metals to submit new bids if its last bid had been high.  Tr. 507:16-23.  For other customers, such as Braden and Elliott, Lewis did not know how many bids Metals had made on jobs that ultimately were awarded to Rolled Alloys.  Tr. 554:15-23; 571:20-572:7.

126.     When Metals did submit bids against Rolled Alloys, Metals often quoted higher prices than Rolled Alloys.  Tr. 575:1-10; 578:17-21; 580:1-9; 580:21-581:14; 628:2-4; 630:5-7; 634:6-12; 637:1-4.  Kenney attributed the higher prices to the different pricing structure used by Rolled Alloys. Tr. 634:6-12; 630:5-7.

127.     Even when Metals submitted a lower bid, however, that did not guarantee business, as Metals lost approximately five bids to Rolled Alloys despite having offered a lower price.  Tr. 577:8-16.

128.     Lewis testified that Metals has done practically no business with Enterprise Manufacturing, whose owner also owns Elliot Precision, since Sappington left Metals.  Tr. 452:18-20; 497:5-7; 500:10-11.  Metals averaged $160,000 to $200,000 in sales to Enterprise Manufacturing between 2002 and 2006, with a profit margin of 27%.  Tr. 498:6-20.  According to Lewis, because Metals' business with Enterprise Manufacturing is practically nonexistent now, Metals has incurred lost profits in the amount of $48,600, calculated by multiplying an average revenue of $180,000 by 27%.  Tr. 498:6-8; 498:18-20; 500:10-11.

27

129.    In sum, Metals considered many of its customers to be "captured accounts" in that Metals would usually obtain a high percentage of their business through quotes or posted pricing. Tr. 544:10-16.  To obtain better pricing, however, all that these so-called "captured" customers had to do was solicit bids from Metals' competitors.  Tr. 545:8-18.

130.    Customers also could save money by cutting out the middleman.  Metals acted as a middleman for Rolled Alloys for many years, creating Tulsa customers for Rolled Alloys prior to the opening of Rolled Alloys' Tulsa office.  Braden, for example, was buying a Rolled Alloys product from Metals. Tr. 552:11-13.  Because Metals sold that product for a higher price than Rolled Alloys, customers could achieve better deals by buying directly from Rolled Alloys. Tr. 552:20-553:11.

131.    In fact, after Rolled Alloys opened its Tulsa office, some customers even called Rolled Alloys' Michigan office about orders, which were forwarded to the new Tulsa office.  Tr. 163:10-23; 316:16-19.

132.    Lewis testified that she had no personal knowledge that Sappington and Emmer "were instrumental" in any of Rolled Alloys' above listed sales.  Tr. 509:12-14.  She also admitted using subjective factors in calculating Metals' revenue averages by including 2007 sales figures for some customers but not others.  Tr. 559:2-8; 560:15-17.

133.    Absent testimony from customers that Sappington and Emmer caused the transfer of their business, the Court has no basis other than pure speculation that Sappington or Emmer caused Metals' general lost profits.

134.    The Court finds that plaintiffs are not entitled to general lost profit damages from Sappington and Emmer.  Plaintiffs failed to prove by a preponderance of the evidence that Sappington's and Emmer's employment with Rolled Alloys and/or conduct caused any of the general

lost profits.  The claimed lost profits are based on sales that Rolled Alloys made, but the record contains no evidence that Metals would have made these profits had the Noncompetition Agreements not been breached.

### ii.    Metals' Individual Lost Sales

### Cust-O-Fab

135.    While employed during his first year at Rolled Alloys, Emmer helped price a $449 order for Cust-O-Fab, a Tulsa customer  Tr. 308:9-309:2; 603:19-607:17.  Emmer admitted that the writing on this order looks like his handwriting.  Tr. 308:9-309:2.  Cust-O-Fab does not deal in any kind of aerospace business.  Tr. 315:5-7.

136.    Emmer's work on the Cust-O-Fab order is a direct violation of his Noncompetition Agreement.

137.    The Court finds, by a preponderance of the evidence, that Metals' average profit margin for this customer was 40%.  See FOF ¶ 124.

138.    Applying the 40% profit margin to this order, Metals sustained $180 in damages as a direct result of Emmer's wrongful conduct.

### Hughes Anderson

139.    Prior to his departure from Metals, Sappington was the outside salesperson for Hughes Anderson, a Tulsa customer.  Tr. 35:20-22; 422:24-423:2.  Rich Gustafson ("Gustafson") was Sappington's primary purchasing contact at Hughes Anderson.  Tr. 412:11-13.  Sappington has known Gustafson for eight to ten years, and the two often played golf together while Sappington was employed with Metals.  Tr. 412:8-10; 515:16-21.

140.    Lesikar was the inside salesperson on the Hughes Anderson account during his employment with Metals.  Tr. 469:5-10.  Before Lesikar left, Sappington brought in Owen Thornton ("Thornton"), a Metals shop employee with no prior sales experience, to quote bids on the Hughes Anderson account.  Tr. 369:21-370:15; 469:5-16.

141.    In late March 2007, after Sappington had already decided he was going to Rolled Alloys, Hughes Anderson asked Metals to quote a large order for stainless plate.  Tr. 469:17-470:1. Thornton sought Sappington's assistance in pricing the quote.  Tr. 426:14-19; 470:2-14.  Pursuant to Sappington's instructions, Thornton quoted the project with a 20% profit margin and submitted the first quote to Hughes Anderson on April 2, 2007.  Tr. 470:17-25; 474:22-25.

142.    The same day that Thornton submitted the first quote to Hughes Anderson, Sappington's desk calendar reveals that he had lunch with Gustafson.  Tr. 424:4-19.  Sappington testified that he did not recall having lunch with Gustafson that week.  Tr. 424:7-21.

143.    A few days after Thornton submitted the first quote to Hughes Anderson, Sappington told Thornton that Hughes Anderson said the quote was a little high.  Tr. 471:2-9.  Sappington directed Thornton to re-quote the project to lower the prices on the 1/2, 5/8, and 3/4 inch plates.  Tr. 471:2-14.  Thornton re-priced the project and submitted a second quote to Hughes Anderson for $208,900.  Tr. 471:19-23.  The profit margin on the second quote was 15%, meaning that Metals would have made a profit of $31,200 on the order.  Tr. 475:4-6.

144.    Sappington resigned his employment with Metals shortly after the second quote was submitted.  Tr. 472:12-15.  On April 12, 2007, just three days after Sappington left Metals, Hughes Anderson placed a $208,044 order with Rolled Alloys for the exact same project with which Sappington had assisted Thornton.  Pl. Ex. 27; Tr. 426:6-427:19; 472:24-473:13.  Metals had lower

prices on many of the products, except that Rolled Alloys had lower prices on the 1/2, 5/8, and 3/4 inch plate material – the exact material Sappington directed Thornton to re-price. Tr. 473:17-474:4.

145.    The Court finds that, based on the totality of the evidence, Sappington must have disclosed, or directly or indirectly worked on, the Hughes Anderson order at Rolled Alloys, a direct violation of Sappington's Noncompetition Agreement. As a result, plaintiffs are entitled to an award of $31,200 in damages against Sappington.

146.    Subsequent to the loss of this sale, Sappington partnered with Gustafson in a summer golf league to fulfill a prior commitment. Tr. 397:15-398:13. Sappington testified that he told Gustafson up-front that he could not discuss business. Tr. 397:11-398:3. Sappington paid for his own participation in this golf league. Tr. 422:15-17.

**John Zink**

147.    During his employment with Metals, Sappington was the outside salesperson for John Zink, located in Tulsa, Oklahoma. Tr. 34:7-9; 106:14-16; 430:10-12.

148.    In February 2007, John Zink was trying to decide which materials to use for a large project, based on pricing and availability. Tr. 518:16-24. Steve Ingram ("Ingram") of John Zink asked Lewis for prices on 304 and 316 materials of varying thicknesses. Tr. 518:16-19. Lewis spoke with Sappington about how to handle this request, and Sappington instructed Lewis to price the material 20% over replacement cost. Tr. 519:2-23.

149.    Within two days of John Zink's request, Lewis provided John Zink with quotes on the different materials. Tr. 520:4-9. Based on Lewis' quotes, the project would have resulted in revenues between $780,000 and $1.2 million, meaning that Metals would have made a profit of $160,000 to $240,000. Tr. 522:5-18.

150.   Shortly after Lewis submitted the quotes to John Zink, Steve Ingram and Gail McKinney ("McKinney"), also of John Zink, requested a meeting with Sappington and Lewis to discuss John Zink's options.  Tr. 520:10-14.  Sappington and Lewis went to the meeting; at its conclusion, Ingram and McKinney still had not made a decision.  Tr. 520:15-23.

151.   Sappington and Lewis suggested that they take McKinney on a mill tour so that she could learn about the differences in materials.  Tr. 521:2-8.  That tour with Metals never took place. Tr. 521:9-10.  Instead, Roberts, who had no prior sales experience with John Zink, took McKinney on the mill tour on behalf of Rolled Alloys.  Tr. 82:11-83:3; 311:2-11; 521:9-14.

152.   Shortly thereafter, John Zink requested an update on pricing from Metals; yet before Lewis could respond to John Zink, it already had placed the order with Rolled Alloys.  Tr. 521:15-19.

153.   Roberts believes that Rolled Alloys had the opportunity to bid on this John Zink project because Siegenthaler had lunch with Robert Dawkins, another John Zink representative.  Tr. 112:15-20.

154.   Some time after Metals lost this bid but before Sappington resigned, John Zink requested a meeting with Sappington to address Metals' late deliveries and other problems.  Tr. 459:14-25.  Sappington claims that he assured John Zink that Metals would correct the problems. Tr. 459:20.

155.   After Sappington left, Lewis and Sisney could not locate the folder in which the paperwork for the large John Zink quote had been kept.  Tr. 522:19-523:8.  The last time Lewis had seen the folder was in Sappington's office some time in March.  Tr. 523:4-5; 523:18-22.  Lewis and Sisney thoroughly searched Lewis' and Sappington's offices and files.  Tr. 523:9-15.  The folder was never found.  Tr. 523:16-17.

156.    There is no evidence that Sappington removed the John Zink file from his office. Kaup and Legrand even testified that they had no knowledge of such an occurrence.  Tr. 27:11-28:4; 73:22-24.  The Court finds, therefore, that it cannot reasonably infer that Sappington took the John Zink file, particularly because Rolled Alloys had already received the order by the time Sappington resigned.  See FOF ¶¶ 152, 155.  The Court finds Sappington's testimony regarding placement of confidential documents in a manila envelope to be credible.  See FOF ¶ 101, 104.

157.    Lewis testified that, since Sappington's departure, Metals has had to reduce its profit margin on John Zink orders from 40% to 19% to keep John Zink's business.  Tr. 523:23-524:5. According to Lewis, because Metals' profit margin has been cut in half, Metals has lost approximately $270,000 per year, based on its previous average annual revenue of $1.5 million.  Tr. 517:13-15; 524:6-9.  However, Kaup testified that John Zink is expected to do several million dollars in business with Metals "this year."  Tr. 31:12-19.

158.    The Court finds that plaintiffs have failed to prove by a preponderance of the evidence that Sappington caused the loss of any John Zink business, particularly since Metals lost the one large order before Sappington left, and Metals had delivery and other problems.

**Linde**

159.    Sappington was the outside salesperson for Linde, located in Tulsa, Oklahoma.  Tr. 436:21-437:8; 524:12-14.

160.    In late February 2007, Lesikar was working on a large project for Linde, called the MX19 project, expected to result in a total of approximately $1 million in revenue.  Tr. 149:14-150:1; 526:1-4.  Metals had filled orders for the MX19 project before, and each time Metals submitted a bid, it received the entire MX19 order.  Tr. 584:16-585:3.

33

161.     Lesikar submitted his resignation letter to Sappington on February 16, 2007.  Tr. 148:16-149:13.  There is disputed testimony as to whether Lesikar worked at home on Metals' projects, including the MX19 project, after his proposed resignation.  Tr. 149:14-18; 151:12-19; 526:3-527:1.  Whether he did or not, plaintiffs have proved no improper conduct by Sappington regarding the MX19 order.

162.     Sappington's desk calendar reveals that he had lunch with his Linde contact on March 2, 2007, Lesikar's last day of employment with Metals.  Tr. 439:16-20.

163.     Sappington testified that he had lunch with Hughes Anderson – not Linde – on that day.  Tr. 439:21-440:2.

164.     After Lesikar joined Rolled Alloys, he received $74,000 in orders from Linde, matching what was left of the MX19 project.  Tr. 150:2-151:8; 527:6-528:4.  Had Metals been able to complete these MX19 orders, its profit on the remainder of the project would have been $25,000.  Tr. 528:5-8.  The Court finds that the identity of with whom Sappington had lunch on March 2 is irrelevant, for even if Sappington had lunch with Linde on Lesikar's last day, this fact alone still would not show that Sappington proximately caused the MX19 project to follow Lesikar from Metals to Rolled Alloys.

165.     After Sappington left, Metals seldom received the opportunity to quote further jobs for Linde.  Tr. 527:20-23.

166.     Linde has expressed concerns to Metals about quality control and has indicated that Rolled Alloys has better quality control.  Tr. 29:11-15; 31:4-8.

167.     The Court finds that plaintiffs have not proved by a preponderance of the evidence that Sappington's conduct caused Metals to lose the remaining MX19 orders.  The evidence does not

34

show that Lesikar, on behalf of Rolled Alloys, obtained these orders as the natural and proximate result of Sappington's breach.  Plaintiffs do not claim that Lesikar is restricted from competing directly against Metals.

168.    In sum, the Court finds that plaintiffs proved by a preponderance of the evidence that (i) Emmer directly caused Metals to lose the Cust-O-Fab order, and (ii) Sappington directly caused Metals to lose the Hughes Anderson order.  Plaintiffs are entitled to an award of $180 against Emmer and $31,200 against Sappington.

### L.     Count II: Breach of Contract — Acquisition Agreement

169.    In the second amended complaint, plaintiffs claim that Siegenthaler, Sappington, and Emmer breached the Acquisition Agreement, and that such breach caused damage to plaintiffs.  Dkt. # 69, at 11.

170.    The Court granted summary judgment in defendants' favor as to the alleged breach of the Acquisition Agreement.  See Dkt. # 136, at 16.  The Court found that the plain language of the Acquisition Agreement precluded plaintiffs' claim.  Id. at 17.  Plaintiffs could not seek to hold defendants liable for breach of the Acquisition Agreement when the conditions precedent to closing indisputably had been satisfied and the agreement had been fully performed.  Id.

### M.     Count III: Interference with Business Relations

171.    In the second amended complaint, plaintiffs claim that Metals "possesses advantageous business relationships with its former, current and prospective customers, and has an expectation of continued advantageous business relationships with them."  Dkt. # 69, at 11-12. According to plaintiffs, Sappington and Emmer intentionally and maliciously interfered with Metals' "advantageous" business relationships by: (a) soliciting Metals' vendors and customers to do business

35

with Rolled Alloys, to the detriment of Metals, (b) taking advantage of Metals' confidential information, while still employed by Metals, to convert business from Metals to Rolled Alloys, (c) soliciting and encouraging Metals' employees to leave their employment and begin employment with Rolled Alloys, (d) converting Metals' existing confidential project and bid information to the benefit of Rolled Alloys, and (e) using and disclosing Metals' confidential, trade secret, and proprietary business information to the detriment of Metals.

172.     Other than Sappington's use of existing confidential project and bid information relating to Hughes Anderson, the Court finds that Sappington and Emmer did not interfere with Metals' business relations.   Based on the evidence presented at trial, Metals does not have any contractual or business right to continued orders from any of the customers at issue.  Metals had no contracts with these customers, and the record is clear that, under all of the circumstances, Metals had no reasonable assurance of the customers' future business.  See FOF ¶¶ 35, 127, 129-30.

173.     Further, plaintiffs have no produced specific evidence that the at-issue customers ceased doing business with Metals as a direct result of defendants' conduct.  In fact, nearly all of the at-issue customers continue to patronize Metals, notwithstanding reports by some that Metals had some operations problems.  See FOF ¶¶ 154, 166.

174.     The Court finds, therefore, that plaintiffs are entitled to recover from Sappington the $31,200 profits they had a reasonable assurance of realizing on the Hughes Anderson quote, but plaintiffs may recover these profits only once, i.e., no double recovery.

**N.     Count IV: Breach of Fiduciary Duty of Loyalty**

175.     In the second amended complaint, plaintiffs claim that Sappington and Emmer breached their fiduciary duties of loyalty to Metals by, inter alia: (a) using or disclosing Metals'

confidential business information to the benefit of Rolled Alloys, (b) using or disclosing Metals'
confidential information to convert projects on which Metals was working and/or bidding to gain a
competitive advantage over Metals, and (c) colluding with Rolled Alloys to solicit Metals' employees
to staff Rolled Alloys' new Tulsa office.  Dkt. # 69, at 13-14.

176.    The Court finds that Sappington and Emmer owed certain duties to Metals as
employees.  <u>See</u> COL ¶¶ 24-26.

177.    The Court finds that Emmer did not breach the fiduciary duties he owed to Metals.
Plaintiffs presented no evidence that Emmer acted against Metals' interest in matters relating to the
employment relationship, that he used or disclosed Metals' confidential information to his benefit or
the benefit of a third party, or that he failed to perform his job duties as instructed.  <u>See</u> FOF ¶¶ 108,
116.  Further, Emmer's inquiry about and acceptance of future employment was not, in and of itself,
wrongful conduct.  <u>See</u> FOF ¶¶ 76, 79.

178.    By contrast, the Court finds that Sappington did breach his fiduciary duties to Metals.
While Sappington did not, in the months leading up to his resignation, fail to act in Metals' interest
and under Metals' control, <u>see</u> FOF ¶¶ 69, 73-74, 89, 91, 97, 99, 106-08, 164, he did disclose Metals'
confidential quote information to help Rolled Alloys underbid Metals, <u>see</u> FOF ¶ 145.

179.    The Court finds that plaintiffs presented no evidence that Sappington and Emmer
solicited Metals' employees to work for Rolled Alloys.

180.    The Court finds, therefore, that plaintiffs are entitled to recover from Sappington the
$31,200 profits they would have realized on the Hughes Anderson quote, but plaintiffs may recover
these profits only once, <u>i.e.</u>, no double recovery.

O.      **Count V: Interference with Contractual Relations**

181.    In the second amended complaint, plaintiffs claim that Metals had contractual relationships with Sappington and Emmer about which Siegenthaler and Rolled Alloys knew.  Dkt. # 69, at 14.  According to plaintiffs, Siegenthaler and Rolled Alloys intentionally and maliciously interfered with plaintiffs' contracts with Sappington and Emmer by: (a) employing Sappington and Emmer, (b) relying on Sappington's and Emmer's employment with Metals to entice Metals' customers and vendors away from Metals, and (c) permitting and encouraging Sappington and Emmer to solicit other Metals' employees away from Metals, all in violation of Sappington's and Emmer's Noncompetition Agreements with Metals.  Id. at 15.

182.    The Court finds that Siegenthaler and Rolled Alloys intentionally and unlawfully interfered with Metals' contractual relationships with Sappington and Emmer.  At the time Siegenthaler and Rolled Alloys hired Sappington and Emmer, they knew that Sappington and Emmer were subject to Noncompetition Agreements with Metals.  Although Siegenthaler and Rolled Alloys could not predict this Court's subsequent rulings as to choice of law, they did know that the Agreements forbid Sappington and Emmer from directly or indirectly engaging in any business within Oklahoma (at least) that competed in any manner with any business conducted by plaintiffs. FOF ¶ 16.  Rolled Alloys' employment of Sappington and Emmer, moreover, led to their direct involvement in at least two orders for Tulsa area customers.  FOF ¶¶ 136, 145.

183.    The fact that Siegenthaler sought advice from Rolled Alloys' legal counsel, FOF ¶ 55, does not negate the fact that Rolled Alloys' mere employment of Sappington and Emmer in Tulsa violated the express terms of the Noncompetition Agreements.  Siegenthaler and Rolled Alloys intentionally committed a harmful act without justification or excuse.

184.   The Court finds that plaintiffs presented no direct evidence that Siegenthaler or Rolled Alloys permitted or encouraged Sappington or Emmer to breach the Noncompetition Agreements as otherwise alleged.

185.   The Court finds that Siegenthaler and Rolled Alloys are jointly and severally liable with each other and with Sappington for the $31,200, and with Emmer for the $180, in damages that directly resulted from Sappington's and Emmer's breaches of the Noncompetition Agreements.

**P.      Count VI: Misappropriation of Trade Secrets**

186.   In the second amended complaint, plaintiffs allege that Sappington and Emmer had access to Metals' highly valuable and confidential trade secrets, including but not limited to, customer lists, bid/pricing information, and margin structures. Dkt. # 69, at 15.  Plaintiffs allege that Metals took reasonable and considerable efforts to maintain the secrecy of its trade secrets.  Id. at 16. According to plaintiffs, Siegenthaler, Sappington, Emmer, and Rolled Alloys have misappropriated Metals' trade secrets for the benefit of Rolled Alloys in violation of OKLA. STAT. tit. 78, § 86.  Id. Plaintiffs contend that Metals has been, and continues to be, irreparably damaged by defendants' tortious conduct.  Id.

187.   Metals' confidential information regarding specific customer lists, bid/pricing information, and margin structures constitute trade secrets.  Metals takes reasonable measures to protect the confidentiality of this information.

188.   Employees and management must sign confidentiality agreements. FOF ¶ 45. Metals' employees understand that they should not share Metals' confidential information with anyone, including competitors and customers, and employees are reminded of the confidential nature of company information through emails from upper management.  FOF ¶ 46-49.  Metals restricts access

39

to computerized confidential information through the use of passwords.  FOF ¶ 47.  Moreover, Siegenthaler, Sappington, and Emmer admitted that, during their employ at Metals, they believed this information qualified as "trade secrets."  FOF ¶ 48.

189.   With regard to the economic value of this information, Metals spent hundreds of thousands of dollars accumulating and maintaining the secrecy of its pricing practices and profit margins over its thirty year history.  FOF ¶ 51.  A competitor that knows Metals' pricing structure and profit margins has an upper hand on competitive bids.  FOF ¶ 50.

190.   The Court finds that Sappington and Rolled Alloys misappropriated Metals' trade secrets, but Siegenthaler and Emmer did not.

191.   Sappington misappropriated trade secrets by using his knowledge of the Hughes Anderson quote, on which he assisted immediately before his resignation, to assist Rolled Alloys in underbidding Metals.  FOF ¶ 141-45.  The Hughes Anderson order was priced just under Metals' quote, and the price difference was reflected in the prices on the core materials Sappington had instructed Thornton to change.  FOF ¶ 144.

192.   Rolled Alloys is liable for Sappington's misappropriation of the information in the Hughes Anderson quote because it knew or had reason to know that it acquired this confidential information by improper means.  Rolled Alloys knew Sappington was subject to the Noncompetition Agreement containing the Noncompete Provision and the Confidentiality Provision.  FOF ¶¶ 16, 18, 55.

193.   Other than the Hughes Anderson quote, plaintiffs failed to prove by a preponderance of the evidence that any other trade secrets were used or disclosed to the detriment of Metals. Legrand testified that he had no information that Sappington or Emmer copied or took any of Metals'

40

confidential information.  FOF ¶ 108.  Kaup testified that Sappington left his customer list and a manila envelope, presumably with confidential contents, in his office on his last day.  FOF ¶ 104. Further, to the extent plaintiffs allege that Sappington and Emmer disclosed to Rolled Alloys the "full weight" pricing system they developed and implemented at Metals, Rolled Alloys does not use Metals' pricing system.  FOF ¶ 44, 126.  The Court finds that a competitor must be able to compete, and the fact that Rolled Alloys applies a more competitive pricing system than Metals does not, ipso facto, mean that defendants used or disclosed Metals' trade secrets.

194.    The Court finds that plaintiffs are entitled to recover against Sappington and Rolled Alloys the $31,200 profits plaintiffs would have realized on the Hughes Anderson quote, but that plaintiffs may recover these profits only once, i.e., no double recovery.

195.    The Court finds that plaintiffs, as the prevailing party, did not bring their misappropriation claim in bad faith.

196.    The Court further finds, by clear and convincing evidence, that Sappington and Rolled Alloys willfully and maliciously misappropriated the Hughes Anderson quote information.  See COL ¶ 45-46.  There is no other explanation for how Rolled Alloys was able to approximate Metals quote within $856, asking a higher price on all materials except the 1/2, 5/8, and 3/4 inch plates.  See FOF ¶ 143.  Accordingly, the Court hereby exercises its discretion, based on the lengths to which Metals went to protect admittedly confidential information, to award exemplary damages to plaintiffs in an amount equal to the amount of actual damages.  Therefore, plaintiffs are entitled to recover against Sappington and Rolled Alloys exemplary damages in the amount of $31,200.

41

197.    The Court deems abandoned plaintiffs' implicit request for injunctive relief under Count VI. Plaintiffs do not seek such relief in the pretrial order or in their proposed findings of fact and conclusions of law.

## II.    CONCLUSIONS OF LAW[4]

### A.    Jurisdiction, Venue, and Applicable Law

1.    This Court has jurisdiction over the subject matter and over all parties to this action under 28 U.S.C. § 1332(a).  Tr. 5:3-17.

2.    Venue in this district is proper under 28 U.S.C. §§ 1391(a) and (c).

3.    In a previous Opinion and Order (Dkt. # 136), the Court found that OKLA. STAT. tit. 15, § 218 governs the interpretation of the Noncompetition Agreements because the parties choice of law contravenes Oklahoma public policy.  Id. at 11.  The Court found that section 218 plainly precluded enforcement of the Noncompetition Agreements beyond "a specified county and any county or counties contiguous thereto, or a specified city or town or any part thereof."  Id. (quoting OKLA. STAT. tit. 15, § 218).

4.    Accordingly, the Court limited enforcement of the Noncompete Provisions from the original seven-state Geographic Area to an area consisting of only Tulsa County and those counties contiguous to Tulsa County.[5]  Id. at 11-12.  The Court noted that defendants did not challenge the

---

[4]    Any finding of fact more appropriately characterized as a conclusion of law is incorporated herein.

[5]    These counties include Rogers, Wagoner, Okmulgee, Creek, Pawnee, Osage and Washington.  See Oklahoma County Map – Oklahoma Map, http://county-map.digital-topo-maps.com/oklahoma.shtml (last visited July 31, 2008).

substantive breadth of the Noncompete Provisions as being outside the meaning of "carrying on a similar business" as set forth in section 218.  Id. at 12 n.5.

5.      Oklahoma law also applies to plaintiffs' tort-based claims.  See Dkt. # 130, at 13.

**B.      Count I: Plaintiffs Have Proved that Sappington and Emmer Breached the Noncompetition Agreements**

6.      To establish a breach of the Noncompetition Agreements, plaintiffs must show: (1) the formation of a contract; (2) breach of that contract; and (3) damages as a direct result of the breach.  Digital Design Group, Inc. v. Info. Builders, Inc., 24 P.3d 834, 843 (Okla. 2001).

7.      Because Sappington and Emmer executed the Noncompetition Agreements as a condition precedent to closing the 1997 sale, the Oklahoma provision applicable to these Agreements is OKLA. STAT. tit. 15, § 218.

8.      Section 218 provides:

> One who sells the goodwill of a business may agree with the buyer to refrain from carrying on a similar business within a specified county and any county or counties contiguous thereto, or a specified city or town or any part thereof, so long as the buyer, or any person deriving title to the goodwill from him carries on a like business therein.

OKLA. STAT. tit. 15, § 218.

9.      The Oklahoma legislature passed section 218 to provide protection in a case such as this.  "[T]he purpose of this statute is to allow the parties to the transfer of a going business to mutually agree . . . that the transferee will be protected from his transferor who might use his previously acquired experience, contacts and expertise to promote his own interests in the same field of business in competition with his transferee."  Farren v. Autoviable Servs., Inc., 508 P.2d 646, 648 (Okla. 1973).  Section 218 is not limited to the prohibition of competing for customers, such as the

anti-solicitation proscriptions under OKLA. STAT. tit. 15, § 219A,[6] but prohibits future employment in the same competitive industry.  See, e.g., Griffin v. Hunt, 268 P.2d 874, 875-76 (Okla. 1954) (enforcing noncompete agreement prohibiting seller of goodwill from engaging in the practice of veterinary medicine in Beckham County, Oklahoma); Clare v. Palmer, 203 P.2d 426, 427, 429 (Okla. 1949) (enforcing restrictive covenant preventing seller of goodwill from owning, operating, or being connected with any drugstore operated in Fort Gibson, Oklahoma); Herrington v. Hackler, 74 P.2d 388, 390-91 (Okla. 1937) (enforcing noncompete provision requiring defendant to refrain from the practice of medicine for five years); see also Eakle v. Grinnell Corp., 272 F. Supp. 2d 1304, 1312 (E.D. Okla. 2003) (concluding that the noncompetition agreement's restrictions – i.e., no direct or indirect ownership in a similar business, no direct or indirect employment by any competitive business, no direct or indirect interference with customers and employees, and no direct or indirect solicitation of business – were within the meaning of section 218's "carrying on a similar business"). While the Oklahoma Supreme Court has not explicitly discussed the meaning of "carrying on a similar business" for purposes of section 218, its decisions cited above make clear that noncompetition agreements may preclude future employment in the same competitive industry under the ambit of section 218.

10.     The plain language of the Noncompetition Agreements comports with section 218 because it prohibits Sappington and Emmer from "either directly or indirectly, as a[n] … owner, investor, principal or agent, or in any other manner, engag[ing] in any business within [Tulsa County

_____

[6]     Section 219A was passed in June 2001 and, thus, is inapplicable to these Agreements entered into in 1997.

or counties contiguous to Tulsa County], which competes in any manner with any business conducted by the Metals Group or [HD Supply]."  FOF ¶ 16.

11.    The Noncompetition Agreements promote the purpose of section 218 by allowing plaintiffs to retain the goodwill purchased from the Metals Group and to further cultivate those customer relationships for one year, free from the former owners' competition.

12.    The Court concludes that the Noncompetition Agreements' restriction against future employment in the same industry within the modified restricted area and one-year time period is within the ambit of section 218's coverage of "carrying on a similar business."

13.    The Court concludes that plaintiffs have proved the elements of their breach of contract claim and are entitled to judgment in their favor that Sappington and Emmer breached the Noncompetition Agreements.  Plaintiffs also are entitled to a one-year injunction as discussed in section F infra.

14.    In determining losses caused by the breach of a noncompete agreement, the Court relies on the general rules governing damages in breach of contract cases.

15.    Under Oklahoma law, the measure of damages for breach of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."  OKLA. STAT. tit. 23, § 21.

16.    The general rule for damages for breach of contract is that damages "cannot be recovered unless they are clearly ascertainable, both in their nature and origin, and unless it is established [that] they are the natural and proximate consequences of the breach and are not contingent or speculative."  Gen. Fin. Corp. v. Dillon, 172 F.2d 924, 930 (10th Cir. 1949); see also

Weyerhaeuser Co. v. Brantley, 510 F.3d 1256, 1267 (10th Cir. 2007) ("Oklahoma law prohibits recovery of damages that are uncertain and speculative."); Rainbow Travel Serv., Inc. v. Hilton Hotels Corp., 896 F.2d 1233, 1239 (10th Cir. 1990) ("The rule in Oklahoma . . . is that the prohibition against recovery of damages because the loss is uncertain or too speculative in nature applies to the fact of damages, not to the amount.").

17.     As to lost profits, "profits which would have been realized if a contract had been performed may be recovered as damages for its breach, provided they are susceptible of being ascertained with reasonable certainty and their loss may reasonably be supposed to have been within the contemplation of the defaulting party at the time the contract was made as a probable result of its breach." Ferrell Constr. Co. v. Russell Creek Coal Co., 645 P.2d 1005, 1010 (Okla. 1982) (internal quotation marks and citation omitted);  see Florafax Int'l, Inc. v. GTE Market Res., Inc., 933 P.2d 282, 296 (Okla. 1997) (finding that a claimant must show that profits would have been made had the contract not been breached).  In the usual case, however, "anticipated profits 'are too remote, speculative, and dependent upon uncertainties and changing circumstances to warrant a judgment for their loss.'" Weyerhaeuser, 510 F.3d at 1267 (quoting Collinsville v. Brickey, 242 P. 249, 253 (Okla. 1925)).

18.     The Court concludes that plaintiffs have proved that certain lost sales were the natural and proximate consequence of Sappington's and Emmer's breaches.  See FOF ¶¶ 135-36, 141-45.

### C.     Count III: Plaintiffs Have Not Proved that Sappington and Emmer Interfered with Plaintiffs' Business Relations

19.      To establish a claim for tortious interference with business relations, plaintiffs must demonstrate: (1) that plaintiffs "had a business or contractual right with which there was interference"; (2) "[t]hat the interference was malicious and wrongful, and that such interference was

46

neither justified, privileged nor excusable"; and (3) "[t]hat damage was proximately sustained as a result of the complained-of interference."  Mac Adjustment, Inc. v. Prop. Loss Res. Bureau, 595 P.2d 427, 428 (Okla. 1979); Navistar Int'l Transp. Corp. v. Vernon Klein Truck & Equip., 919 P.2d 443, 446 (Okla. Ct. App. 1994); see Dill v. Edmond, 155 F.3d 1193, 1207-08 (10th Cir. 1998). Malice is defined as "the intentional performance of a wrongful act without justification or excuse." Morrow Dev. Corp. v. Am. Bank and Trust Co., 875 P.2d 411, 416 (Okla. 1994).

20.     "[I]t is not unlawful for one to 'interfere with the contractual relations of another if [this is done] by fair means, if [it is] accompanied by honest intent, and if [it is done] to better one's own business and not to principally harm another.'"  Id. at 416 n.21 (quoting Del State Bank v. Salmon, 548 P.2d 1024, 1027 (Okla. 1976)) (alterations in original).  "[L]egitimate and fair competition is essential to our free enterprise system." Overbeck v. Quaker Life Ins. Co., 757 P.2d 846, 849 (Okla. Civ. App. 1984).

21.     In the absence of a contractual relationship, plaintiffs "must show either that prospective economic advantage would have been achieved had it not been for such interference or that there was, in view of all the circumstances, a reasonable assurance thereof." Crystal Gas Co. v. Okla. Natural Gas Co., 529 P.2d 987, 990 (Okla. 1974) (internal quotation marks and citation omitted).

22.     Plaintiffs also must produce specific evidence showing that customers ceased doing business with them as a direct result of defendants' interference.  Id. (finding that a plaintiff must prove causation "by something more than his own guess as to what had gone on in his former customers' minds, where that mental operation was entirely uncommunicated to him or . . . to anyone else." (internal quotation marks and citation omitted)).

47

23.     Lacking proof to satisfy the first element, <u>see</u> FOF ¶¶ 172-73, plaintiffs' tortious interference with business claim necessarily fails.  Judgment in favor of Sappington and Emmer is appropriate on plaintiffs' tortious interference with business claim.

**C.     Count IV: Plaintiffs Have Proved that Sappington Breached His Fiduciary Duties Owed to Metals**

24.     This Court sitting in diversity will not establish new Oklahoma law.  <u>See</u> <u>Taylor v. Phelan</u>, 9 F.3d 882, 887 (10th Cir. 1993) ("As a federal court, we are generally reticent to expand state law without clear guidance from its highest court . . . .").  To date, Oklahoma courts have not expressly recognized a fiduciary duty of loyalty owed by an employee to his employer as set forth in the Restatement (Third) of Agency (2006).[7]

25.     The Oklahoma Supreme Court has noted, however, that "[t]he essence of an agency relation is the right of the principal to give directions that the agent is under a duty to obey as long as he remains the agent.  <u>The agent should act in the principal's interest and at his control</u>."  <u>Enter. Mgmt. Consultants, Inc. v. State ex rel. Okla. Tax Comm'n</u>, 768 P.2d 359, 362 n.13 (Okla. 1988) (emphasis added).  This rule of law derives from the Restatement (Second) of Agency (1958), which Oklahoma courts have repeatedly cited in their analysis of agency relationships.  <u>See</u> <u>Douglas v. Steele</u>, 816 P.2d 586, 589 (Okla. Civ. App. 1991) (finding that a travel agent had a duty to act with "the care, skill and diligence a fiduciary rendering that kind of service would reasonably be expected to use."); <u>Morrison v. State</u>, 792 P.2d 1189, 1191 (Okla. Crim. App. 1990) (explaining that agents are "'<u>fiduciaries; they owe to the principal the basic obligations of agency: loyalty and obedience</u> . . . .'" (quoting Restatement (Second), <u>supra</u>, § 14N cmt. a)) (alterations in original); <u>Smith v. St.</u>

---

[7]     Neither the parties nor this Court have been able to locate any Oklahoma case adopting any provision of the Restatement (Third) of Agency (2006).

Francis Hosp., Inc., 676 P.2d 279, 281 (Okla. Civ. App. 1983) ("A principal-agent relationship denotes a fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act for his benefit and subject to his control, and consent by the other so to act.").

26.     In addition to a duty to act for the principal's benefit in matters connected to the agency relationship, an agent also has a duty not to use or to disclose the principal's confidential information for his own purposes or those of a third party both during and following the agency relationship.  See Restatement (Second), supra, § 396.

27.     Nevertheless, an agent is not prohibited from taking actions, not otherwise wrongful, to prepare for competition following termination of the agency relationship.  See id. § 393 cmt.e; see also In re Prof'l Home Health Care, 159 Fed. Appx. 32, 34 (10th Cir. 2005) (unpublished decision) (applying Colorado law and citing the Restatement (Second)).[8]

28.     The Court concludes that Emmer did not breach any fiduciary duties he owed to Metals.  See FOF ¶ 177.

29.     The Court concludes that Sappington, on the other hand, did breach the fiduciary duties he owed to Metals.  See FOF ¶ 178.

30.     Plaintiffs are entitled to recover the damages proximately caused by Sappington's breach.  See Restatement (Second), supra, § 399(b) ("A principal whose agent has violated . . . his duties has an appropriate remedy for such violation" including recovery for losses).

---

[8]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1: 10th Cir. R. 32.1.

31.     Plaintiffs' losses are the same as their losses for Sappington's breach of his Noncompetition Agreement.  Because plaintiffs cannot obtain a double recovery for the same injury, see Green Bay Packaging, Inc. v. Preferred Packaging, Inc., 932 P.2d 1091, 1097 (Okla. 1996) (noting that a plaintiff is entitled only to one damage award on alternative theories of recovery), plaintiffs shall not recover additional monetary relief from Sappington on this tort-based claim.

**D.     Count V: Plaintiffs Have Proved that Siegenthaler and Rolled Alloys Interfered with Plaintiffs' Contractual Relations with Sappington and Emmer**

32.     To establish a claim for tortious interference with a contract, plaintiffs must establish: "(1) a business or contractual right with which there was interference; (2) the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable; and (3) damage was proximately sustained as a result of the complained-of interference." Anderson v. Suiters, 499 F.3d 1228, 1238 (10th Cir. 2007) (quoting Morrow Dev. Corp., 875 P.2d at 416); see Mac Adjustment, 595 P.2d at 428.  Malice is defined as "the intentional doing of a harmful act without justification or excuse." Morrow Dev. Corp., 875 P.2d at 416.

33.     While Oklahoma courts have not addressed the issue of whether plaintiffs can recover for tortious interference with covenants not to compete, section 768 of the Restatement (Second) of Torts (1979) provides that a defendant is not "justified in engaging an employee to quit his job and work for him in an activity that would mean violation of [a] contract not to compete." See also Magic Valley Truck Brokers, Inc. v. Meyer, 982 P.2d 945, 950 (Idaho Ct. App. 1999) (applying the Restatement (Second) and noting that "a number of jurisdictions have held that a former employer can recover from a new employer for tortiously interfering with an employee's covenant against competition.").

50

34.     The Court concludes that Siegenthaler and Rolled Alloys intentionally and unlawfully interfered with Metals' contractual relationships with Sappington and Emmer. See FOF ¶¶ 182-83.

**E.     Count VI: Plaintiffs Have Proved that Sappington and Rolled Alloys Misappropriated Metals' Trade Secrets**

35.     To bring a claim pursuant to the Oklahoma Uniform Trade Secrets Act ("OUTSA"), plaintiffs must demonstrate: (a) the existence of a trade secret; (b) misappropriation of this secret by defendants; and (c) use of the trade secret by defendants to the detriment of plaintiffs. Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc., 584 F.2d 946, 951 (10th Cir. 1978); Micro Consulting, Inc. v. Zubeldia, 813 F. Supp. 1514, 1534 (W.D. Okla. 1990); see OKLA. STAT. tit. 78, § 86 (defining trade secret and misappropriation).

36.     The term "trade secret" is defined as information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and [] is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." OKLA. STAT. tit. § 86(4).  "There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret." Pre-Paid Legal Servs. v. Harrell, No. CIV-06-019-JHP, 2008 WL 111319, at *11 (E.D. Okla. Jan. 8, 2008) (internal quotation marks and citation omitted).

37.     For information to qualify as a trade secret, it must not be generally known or readily ascertainable by proper means to others who can obtain economic value from it, and the information must be the subject of reasonable efforts to maintain its secrecy.  See id.; see also Cent. Plastics Co. v. Goodson, 537 P.2d 330, 333-34 (Okla. 1975) (holding that a trade secret must have "a substantial element of secrecy" and must give "an economic advantage over competitors who do not know or

51

use it."). Evidence of reasonable efforts to maintain secrecy includes implementation of secured or restricted access and use of confidentiality agreements. <u>See</u> <u>Micro Consulting</u>, 813 F. Supp. at 1535 ("Secrecy need not be absolute."); <u>Harrell</u>, 2008 WL 111319, at *11-12 (noting that as a general rule, "the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret." (internal quotation marks and citation omitted)).

38.     Confidential information regarding operating and pricing policies may qualify as trade secrets. <u>Black, Sivalls & Bryson</u>, 584 F. 2d at 952.

39.     OUTSA defines "misappropriation" as: "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of the disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . ." OKLA. STAT. tit. 78, § 86(2)(b)(2)(b). A corporation also may be liable for misappropriation under OUTSA if it "knows or has reason to know" that the information used was a trade secret of another "acquired by improper means." <u>Id.</u> § 86(2)(a).

40.     The statute defines "improper means" as, among other things, "breach or inducement of a breach of a duty to maintain secrecy." <u>Id.</u> § 86(1).

41.     The distinction between taking written lists and memorizing information is immaterial. <u>Goodson</u>, 537 P.2d at 334.

42.     The Court concludes that Sappington and Rolled Alloys misappropriated Metals' trade secrets as to the Hughes Anderson quote. <u>See</u> FOF ¶ 187-92.

43.     The Court concludes that there was no other misappropriation of Metals' trade secrets.  See FOF ¶ 193.

44.     Plaintiffs' injury under OUTSA is the same as their injuries under Sappington's Noncompetition Agreement and for Rolled Alloys' tortious interference.  Because plaintiffs cannot obtain a double recovery for the same injury, see Green Bay Packaging, 932 P.2d at 1097 (noting that a plaintiff is entitled only to one damage award on alternative theories of recovery), plaintiffs usually would be precluded from recovering additional damages.

45.     OUTSA provides, however, that "[i]f willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made [for misappropriation]."  OKLA. STAT. tit. 78 § 88.B.  The statute does not define "willful and malicious."

46.     Oklahoma courts have, in other contexts, defined malice as "the intentional performance of a wrongful act without justification or excuse."  Morrow Dev. Corp., 875 P.2d at 416.

47.     The Court deems abandoned any other requests for punitive damages, as plaintiffs do not seek such relief in the pretrial order or in their proposed findings of fact and conclusions of law.

## F.     Injunctive Relief

48.     To obtain a permanent injunction, plaintiffs must prove: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."  Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 822

(10th Cir. 2007).[9]  Irreparable harm determinations are based on such factors as "the difficulty in calculating damages, the loss of unique product, and existence of intangible harms such as loss of goodwill or competitive market position."  Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1264 (10th Cir. 2004); see Equifax Servs. v. Hitz, 905 F.2d 1355, 1361 (10th Cir. 1990) (finding that irreparable harm may be found where the evidence suggests that a precise calculation of damages is impossible).

49.     Plaintiffs have satisfied the four requirements for an injunction.  First, plaintiffs have achieved actual success on the merits of their breach of contract claim.  Second, the evidence clearly shows irreparable harm.  Sappington's and Emmer's wrongful conduct has harmed Metals' competitive market position and goodwill to an unprovable and incalculable degree.  Third, Metals' right to enforce the Noncompetition Agreements outweighs the harm that the injunction may cause Sappington and Emmer.  The former owners still may solicit customers, as well as work for competitors, located outside Tulsa County and contiguous counties.  The former owners also may solicit aerospace industry end-users so long as they are not employed by a competitor in Tulsa County or contiguous counties.  Fourth, the injunction will not adversely affect the public interest. Instead, it will fulfill the purpose of OKLA. STAT. tit. 15, § 218 by allowing the purchasers of goodwill to protect their intangible assets.

50.     Further, section 8 of the Noncompetition Agreements requires the tolling of the Noncompetition Period during the time in which Sappington and Emmer are in violation of the

---

[9]      The standard for a permanent injunction is the same as for a preliminary injunction, except that "a permanent injunction requires showing actual success on the merits, whereas a preliminary injunction requires showing a substantial likelihood of success on the merits." Id.

Agreements.   FOF ¶ 21.   The injunction provides plaintiffs with this express benefit of the contractual bargain.

51.      Plaintiffs are entitled to a one-year prospective injunction beginning on the date of the Court's judgment.   The injunction shall prohibit Sappington and Emmer from directly or indirectly engaging in any business, within Tulsa County and any contiguous counties, that competes in any manner with any business conducted by plaintiffs, as set forth in the Noncompetition Agreements.

52.      If Sappington and Emmer continue in Rolled Alloys' employment during the term of the injunction, they must work in an office that is not located in the prohibited geographic area and not deal with any customers in that area.   See Farren, 508 P.2d at 647, 649 (affirming trial court's granting of a prospective temporary injunction for the period of the restrictive covenant); see also Harrell, 2008 WL 111319, at *14 (ordering prospective injunction to bar defendant's solicitation based on the court's plenary power and inherent power to do equity).

### G.      Motion for Judgment as a Matter of Law

53.      At the close of plaintiffs' case in chief, defendants orally moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 52(c).   Tr. 649:18-20.   Defendants argued that plaintiffs failed to prove damages on their contract claim and tort claims.   Tr. 649:23-651:10.   The Court took defendants' motion under advisement.   Tr. 651:11-16.   Based on these findings of fact and conclusions of law, the Court finds that defendant's oral motion for judgment as a matter of law is moot.

**H.       Attorneys' Fees and Costs**

54.       As prevailing parties, plaintiffs may seek reasonable attorneys' fees and costs pursuant to Fed. R. Civ. P. 54(d).

A separate Judgment consistent with this Opinion and Order is entered herewith.

**IT IS SO ORDERED** this 1st day of August, 2008.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT